## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NORTHWESTERN CORPORATION, | Case No. 03-12872 (JLP) |
| Debtor. | |
| THE PLAN COMMITTEE<br>OF NORTHWESTERN CORPORATION, | |
| Appellant, | |
| v. | Civil Action No. 06-157 |
| NORTHWESTERN CORPORATION, | |
| Appellee. | |

## MOTION OF THE PLAN COMMITTEE
## FOR RELIEF FROM THE STANDING ORDER ON MEDIATION
## IN THIS APPEAL AND FOR EXPEDITED BRIEFING AND ORAL ARGUMENT

The Plan Committee (the "Plan Committee")[1] appointed in the above-captioned

chapter 11 case of NorthWestern Corporation ("NOR" or the "Reorganized Debtor") pursuant to

Section 7.9 of NOR's Second Amended and Restated Plan of Reorganization Under Chapter 11

of the Bankruptcy Code (the "Plan") [App.Des. No. 10][2], by and through its undersigned

counsel, hereby moves this Court, pursuant to Rules 8011 and 8019 of the Federal Rule of

Bankruptcy Procedure (the "Bankruptcy Rules") for relief from this Court's standing order on

---

[1]    Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Plan.

[2]    References to items identified in Appellant's Designation of Items to be Included in the Record on Appeal and
Statement of Issues to be Presented on appeal are referred to as "App. Des. No.___."

mediation and to expedite briefing and oral argument in this bankruptcy appeal (the "Motion"). In support of this Motion, the Plan Committee respectfully represents as follows:

## PRELIMINARY STATEMENT

The Plan Committee is charged with protecting the interests of NOR's unsecured creditors during the final stages of NOR's chapter 11 case. The primary purpose of the Plan Committee is to oversee the "[C]laims reconciliation and settlement process." Plan at § 7.9. One of its key interests is to ensure that all unsecured creditors receive their rightful recoveries in a timely manner.

The Plan Committee has appealed the Bankruptcy Court's (Honorable John L. Peterson presiding) order entered on February 7, 2006 (the "Order") [App. Des. No. 92] denying the Motion of the Plan Committee in Aid of Consummation and Implementation of the Plan for Order Authorizing and Directing NorthWestern Corporation to Distribute Surplus Distributions (the "Surplus Distribution Motion") [App. Des. No. 73].

The appeal primarily involves the Bankruptcy Court's misinterpretation of Section 7.7 of the Plan holding, in direct contradiction of Section 7.7's express terms, that a Surplus Distribution of New Common Stock held in the Disputed Claims Reserve cannot be made to holders of Allowed Class 7 and 9 Claims prior to the resolution of each and every Disputed Claim, including those held by Magten Asset Management Corporation ("Magten") and Law Debenture Trust Company of New York ("Law Debenture"), despite the fact that the Disputed Claims Reserve contains at least 2.2 million surplus shares currently valued in the market at approximately $70.4 million. The holders of Allowed Class 7 and 9 Claims already have been prejudiced by the Order and because of the nature of the property at stake, will be further harmed by delay in consideration of this appeal. Specifically, the holders of such

Allowed Claims are being deprived of a meaningful portion of their rightful recoveries of New Common Stock to which they are entitled under the Plan, exposed to the equity market risk without the ability to exercise their rights with respect to such stock and unable to exercise corporate rights to which they would be entitled if the New Common Stock were distributed to them as required by Section 7.7 of the Plan. Thus, cause exists for bypassing mediation and expediting consideration of this appeal.

## JURISDICTION

1.    This is a motion in an appeal of a final order of the Bankruptcy Court. This Court has jurisdiction herein pursuant to 28 U.S.C. §158(a) and Bankruptcy Rules 8001, 8011 and 8019.

## BACKGROUND

2.    On September 14, 2003, NOR filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

3.    On April 15, 2004, Magten and Law Debenture commenced an adversary proceeding against NOR on behalf of all holders of certain quarterly income preferred securities (the "QUIPS"), asserting, among other things, that NOR was the recipient of certain utility assets in a fraudulent conveyance (the "QUIPS Litigation"), which proceeding is currently pending in the District Court as Civil Action No. 04-1494.

4.    On or about August 31, 2004, NOR filed the Plan.

5.    After hearings held on August 25, 2004, and October 6, 2004, the Bankruptcy Court issued an oral decision confirming the Plan, as modified, on October 8, 2004

[App. Des. No. 30]. Subsequently, the Bankruptcy Court entered an order dated October 19, 2004, confirming the Plan (the "Confirmation Order") [App. Des. No. 22].

6.     The Plan became effective as of November 1, 2004 (the "Effective Date") and was substantially consummated on December 29, 2004, as evidenced by NOR's filing of the Notice of (A) Entry of Order Confirming the Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code and (B) the Occurrence of the Effective Date [App. Des. No. 31] and the Notice of Substantial Consummation of the Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code filed by the Debtor [App. Des. No. 35], respectively.

7.     The terms of the Plan provide that, after the Effective Date, NOR shall continue to settle Disputed Claims. To the extent that Disputed Claims are Allowed, they are to be satisfied from shares of New Common Stock held in the Disputed Claims Reserve established pursuant to Section 7.5 of the Plan. In connection therewith, on October 25, 2004, NOR filed its Notice of Establishment of Claim Reserve Pursuant to Section 7.5 of the Plan and Paragraph 27 of the Confirmation Order [App. Des. No. 28], establishing a reserve containing approximately 13.5% of the New Common Stock issued by NOR on the Effective Date.

8.     Section 7.7 of the Plan sets forth the mechanism by which the Reorganized Debtor is required to make periodic distributions to holders of Allowed Class 7 and 9 Claims from the Disputed Claims Reserve. Specifically, the Plan provides that to the extent a Disputed Claim is settled for less than the amount set aside for such Disputed Claim in the Disputed Claims Reserve, such surplus shall constitute Surplus Distributions, as defined in

Sections 1.183 and 7.7 of the Plan, to be distributed to the holders of Allowed Claims.[3]  Shares

designated as Surplus Distributions are not available to settle other outstanding Disputed Claims.

Rather, they are to be distributed for the benefit of holders of Allowed Class 7 and 9 Claims on

the next occurring Subsequent Distribution Date.  See Plan at § 7.7. "Subsequent Distribution

Dates" are defined by Section 1.182 of the Plan to be "each six (6) month anniversary of the

Effective Date."  See Plan at § 1.182.

> 9.    On October 6, 2004, NOR and PPL Montana, LLC ("PPL") entered into a

stipulation, which was approved by the Bankruptcy Court on October 6, 2004, establishing a

segregated reserve within the Disputed Claims Reserve for the Disputed Claims of PPL

equivalent to a $50 million Class 9 Claim (the "PPL Segregated Reserve") [App. Des. No. 18].

> 10.    On November 3, 2004, the Court entered a Stipulation and Order

establishing a segregated reserve for those QUIPS holders electing to participate in the QUIPS

Litigation (the "Stipulation") [App. Des. No. 33].  The Stipulation provides that the Reorganized

Debtor would set aside shares of New Common Stock equivalent to a $25 million Class 9 Claim

within the Disputed Claims Reserve solely for distribution on account of the QUIPS Litigation

claims holders (the "QUIPS Litigation Claims") if they are successful in the QUIPS Litigation

(the "QUIPS Litigation Claims Reserve").  Paragraph 3 of the Stipulation provides, in part, that:

> [T]o the extent that QUIPS Litigation Claims against the QUIPS
> Litigation Claims Reserve is more than $25 million, the QUIPS
> Litigation claimants shall be entitled to draw on any assets

---

[3]  Specifically, Section 7.7 of the Plan provides as follows: "The following assets shall constitute Surplus Distributions:  (i) Unclaimed Property; and (ii) to the extent that a Disputed Claim is not Allowed or becomes an Allowed Claim in an amount less than the Disputed Claim Amount, any excess of the amount of Cash or New Common Stock in the Disputed Claims Reserve attributable to such Disputed Claim over the amount of Cash or New Common Stock actually distributed on account of such Disputed Claim plus any interest, dividends or other Distributions earned thereon.  On each Subsequent Distribution Date, the holders of Allowed Claims shall receive a Pro Rata Share in the Surplus Distributions attributable to such holders' Class…" Plan at § 7.7.

<u>remaining</u> in the Disputed Claim Reserve.  <u>The Debtor has no</u>
<u>obligations to replenish the Disputed Claim Reserve</u>.

<u>See</u> Stipulation at ¶3. (emphasis added).

11.    On September 14, 2005, NOR filed its Motion for Order Pursuant to

Bankruptcy Rule 9019 Authorizing and Approving Settlement (the "<u>Proposed PPL Settlement</u>")

with PPL and PPL Global, LLC [App. Des. No. 71].  Under the Proposed PPL Settlement, in

exchange for the transfer of certain assets to PPL, among other things, PPL agreed to release any

claim or interest it had with respect to the PPL Segregated Reserve, thus allowing the shares

segregated within the PPL Segregated Reserve to be released into the Disputed Claims Reserve.

12.    By order dated September 29, 2005 (the "<u>PPL Order</u>") [App. Des. No. 72],

the Bankruptcy Court approved the Proposed PPL Settlement and, among other things ordered

the shares held in the PPL Segregated Reserve to be released into the Disputed Claims Reserve.

<u>See</u> PPL Order at third decretal paragraph.

13.    As a result of NOR's successful efforts to settle Disputed Claims, the only

remaining Disputed Claims are the QUIPS Litigations Claims asserted by Magten and Law

Debenture.  <u>See</u> Transcript of January 11, 2006 hearing held before Honorable John L. Peterson,

App. Des. 92 at p. 45.  Accordingly, the Disputed Claims Reserve contains shares of New

Common Stock, including the shares formerly segregated as part of the PPL Segregated Reserve,

deemed by the Plan to be Surplus Distributions.  Thus, Section 7.7 of the Plan is triggered and a

Surplus Distribution is required to be made.  As of the entry of the PPL Order, NOR has at least

2,204,550 shares of common stock in the Disputed Claims Reserve that should have been

distributed to holders of Allowed Claims as early as November 1, 2005.  Nonetheless, Surplus

Distributions have not been made since the Effective Date – November 1, 2004.

14.    On September 29, 2005, in anticipation of the PPL Order and the upcoming Subsequent Distribution Date, the Plan Committee filed the Surplus Distribution Motion, requesting an order (i) designating the shares of New Common Stock released from the PPL Segregated Reserve as Surplus Distributions, (ii) directing NOR to provide the Plan Committee with information regarding the total number of shares within the Disputed Claims Reserve constituting Surplus Distributions and (iii) authorizing and directing NOR to make a supplemental distribution of all Surplus Distributions to holders of Allowed Claims in accordance with Section 7.7 of the Plan on the next Subsequent Distribution Date.

15.    On October 12, 2005, Magten and Law Debenture (collectively, the "Joint Objectors") filed a joint objection (the "Objection") [App. Des. No. 77] to the Surplus Distribution Motion in which they effectively sought a stay of the Plan by objecting to any Surplus Distributions until such time it is determined, based on an evidentiary hearing, whether or not a surplus exists in the Disputed Claims Reserve.

16.    On January 3, 2006, NOR filed its response (the "NOR Response" and collectively with the Objection, the "Responses") [App. Des. No. 85] to the Surplus Distribution Motion.

17.    On January 11, 2006, a hearing (the "Hearing") on the Surplus Distribution Motion and the Responses was held. At the Hearing, NOR took the position that, even if the QUIPS Litigation Claims Reserve were increased to an amount of shares equivalent to the full Class 9 value of the amount asserted by the Joint Objectors for the QUIPS Litigation Claims in their related proofs of claim, approximately $48.8 million,[4] there remain approximately 1,561,313 shares of New Common Stock currently valued in the market at

approximately $50 million in the Disputed Claim Reserve that could be distributed as Surplus Distributions. [See App. Des. No. 91 at pp. 45-49]. Nonetheless, on February 7, 2006, the Bankruptcy Court entered the Order denying the Surplus Distribution Motion in total.

18.     As set forth in the Order, the Bankruptcy Court held that despite its finding that the Disputed Claims Reserve contained surplus shares, the Reorganized Debtor was not required to distribute Surplus Distributions because Section 7.7 of the Plan (i) requires full resolution of all Disputed Claims before any Surplus Distribution can be made and (ii) does not require the Reorganized Debtor to distribute any Surplus Distributions from the Disputed Claims Reserve every six months from the Effective Date of the Plan.

19.     The Bankruptcy Court's holding is a clear misreading of the Plan. The plain language of the Plan provides that, if available, Surplus Distributions are to be made *every* six months following the Effective Date of the Plan. The QUIPS Litigation Claims Reserve was established as a sub-reserve for distributions to the QUIPS Litigation Claims' holders if they are eventually successful in the QUIPS Litigation. To the extent the QUIPS Litigation Claims are ultimately allowed in a sum more than $25 million as a result of the QUIPS Litigation, the QUIPS Litigation claimants are only entitled to distributions from the general Disputed Claim Reserve to the extent stock remains therein at the conclusion of the QUIPS Litigation. Consistent with these provisions of the Plan, the Stipulation provides that the Reorganized Debtor does not have any obligation to replenish the Disputed Claim Reserve and the holders of allowed QUIPS Litigation Claims will only be entitled to draw on "remaining assets" in the Disputed Claims Reserve.

---

(continued...)

[4]   See NOR Response at p. 12, ¶ 26 and App. Des. No. 91 at p. 45.

20.     On February 7, 2006, the Plan Committee filed a Notice of Appeal of the Order.

## RELIEF REQUESTED

21.     By this Motion, the Plan Committee requests that the District Court enter an order (i) bypassing the standing order requiring mediation in this appeal and (ii) expediting briefing and oral argument.

## ARGUMENT

A.     RELIEF FROM STANDING ORDER

22.     By order dated July 23, 2004, the Court ordered that all appeals from the Bankruptcy Court would be subject initially to mediation (the "Standing Order"). The Standing Order states that mandatory mediation is necessary to "assist the parties to amicably resolve the disputes which are the subject of appeals before this Court."

23.     This appeal implicates a straight forward question of law – the interpretation of a Plan provision. Magten and Law Debenture implacably oppose any Surplus Distributions arguing that no Surplus Distributions should be made prior to the conclusion of the QUIPS Litigation – notwithstanding the language in both the Plan and Stipulation dictating otherwise. Both the Reorganized Debtor (the drafter of the Plan) and the Plan Committee agree that periodic Surplus Distributions are expressly contemplated by the Plan. Even the Bankruptcy Court agreed that there is surplus in the Disputed Claims Reserve. See Order at ¶ I. Given the purely legal question at issue in the appeal, the diametrically opposing views of the parties and the two failed mediations in previous appeals to this Court, the Plan Committee unfortunately believes that an amicable resolution of this appeal is highly unlikely.

24.     The Plan Committee understands the policy and intent of the Standing Order to facilitate the expeditious and amicable resolution of appeals from the Bankruptcy Court, but there are circumstances, such as those existing here, where mediation would do nothing but delay resolution of the appeal causing undue economic risk for creditors and imposing unnecessary expense to be borne in large part by the Reorganized Debtor.

25.     The delay in the resolution of this appeal, likely to be occasioned by mediation, will prevent creditors entitled to Surplus Distributions from timely receiving the economic recovery to which they are entitled under the Plan.  Moreover, it will continue to expose the New Common Stock at stake, to which creditors are entitled, to fluctuations of the market while simultaneously preventing holders of Allowed Class 7 and 9 Claims from exercising the panoply of rights, including their ownership and voting rights, with respect to such shares.  Mediation also would add cost to the appeal for the Reorganized Debtor which is responsible for the legal fees incurred by both the Plan Committee and itself.  Finally, in view of the polarized positions of the parties to the appeal on a straightforward issue of Plan interpretation, mediation is likely a waste of resources.

B.      EXPEDITING APPEAL AND ARGUMENT

26.     Rule 8019 of the Bankruptcy Rules provides that:

> In the interest of expediting decision or for other cause, the district court or the bankruptcy appellate panel may suspend the requirements or provisions of the rules in Part VIII, except Rules 8001, 8002 and 8013, and may order proceedings in accordance with its direction.

27.    Further, the Advisory Committee Note indicates that Rule 8019 is derived from Rule 2 of the Federal Rules of Appellate Procedure ("FRAP").  FRAP 2 provides, in pertinent part,

> On its own or a party's motion, a court of appeals may – to expedite its decision or for other good cause – suspend any provision of these rules in a particular case and order proceedings as it directs . . .

28.    The Advisory Committee Note to FRAP 2 clearly indicates that the intent is to authorize an appellate court to "expedite the determination of cases of pressing concern to the public or to the litigants by prescribing a time schedule other than that provided by the rules." (emphasis added).  Similarly, "[i]n the unusual case, Bankruptcy Rule 8019, applicable in appeals, permits the district court…to design the procedure to meet the necessity of the situation, either shortening the allowable time for designated steps in the procedure or eliminating some steps entirely." 10 COLLIER ON BANKRUPTCY § 8019.07 (15th ed. 1998).

29.    In the interest of expediting a decision, the Plan Committee seeks to accelerate the briefing schedule set forth in Bankruptcy Rule 8009 and, at the conclusion of the briefing, requests that oral argument be set at the Court's earliest convenience.  The Third Circuit has endorsed the District Court's application of Bankruptcy Rule 8019 "in the interest of expediting decision or other good cause."  See In re Rashid, 210 F. 3d 201, 209 n.4 (3d Cir. 2000).

30.    In In re Combustion Eng'g, Inc., 2003 Bankr. LEXIS 1044 (Bankr. D. Del. 2003), the District Court for the District of Delaware, pursuant to Bankruptcy Rule 8019, set an expedited briefing and motions schedule with respect to an anticipated appeal of a bankruptcy court decision which required briefing by both parties to be completed within twenty-one days of

entry of the final order to be appealed from. Id. at *8. The court after equating the "good cause" requirement of Bankruptcy Rule 9019 to the "irreparable harm" requirement of Bankruptcy Rule 8011, found that the appellant would suffer irreparable harm if not afforded an expedited determination of final judgment. Id. at *4; see also In re United Pan-Europe Communications N.V., 2003 WL 221819, at *3 (S.D.N.Y. 2003) (reading Bankruptcy Rule 8019's requirement of showing "good cause" to mean a showing of potential irreparable harm, as required by Bankruptcy Rule 8011).

31.     Here, the holders of Allowed Claims will suffer irreparable harm in the absence of an expedited decision regarding their right to a Surplus Distribution of New Common Stock through the preclusion of their ability to exercise fundamental shareholder rights associated with such stock. Under Delaware law, the deprivation of fundamental stockholder rights, for any duration of time, represents irreparable harm not reasonably compensable by damages. See Allen v. Prime Computer, Inc., 540 A.2d 417; 421 (Del. 1988). See also Frenz v. Gencor Indus., 2005 Del. Ch. LEXIS 141 (Del. Ch. 2005) ("Plaintiffs could allege . . . that interference with a shareholder's right to nominate an independent director constitutes an irreparable harm."); R.D. Hubbard v. Hollywood Park Realty Enters., 1991 Del. Ch. LEXIS 9, at*16-18 (Del. Ch. 1991) (finding that "thwarting shareholders' voting rights" would result in irreparable harm).

32.     This appeal is limited to the proper interpretation of a discrete provision of the Plan – Section 7.7. Section 7.7 clearly and expressly provides that to the extent a Disputed Claim is settled for less than the amount set aside for such disputed claim in the Disputed Claims Reserve, the difference shall constitute Surplus Distributions and be distributed to the holders of Allowed Claims on the Next Subsequent Distribution Date. "Subsequent Distribution Date" is

defined by Section 1.182 of the Plan to be "each six (6) month anniversary of the Effective Date." See Plan at §1.182. Even a surface review of the pertinent Plan provisions leads one to conclude that the Bankruptcy Court either misinterpreted Section 7.7, or chose to ignore it in entering the Order. Thus, the issue present here is susceptible to briefing, argument and consideration by the Court on an expedited basis.

33.    Moreover, time is critical. The Order has effectively delayed the distribution of over $70 million of publicly traded common stock in the Reorganized Debtor to holders of Allowed Claims. These holders of Allowed Claims are rightfully entitled to these shares and the accompanying shareholder rights. Absent swift consideration of the appeal, the holders of Allowed Claims, denied the shareholder rights which lawfully attach to the shares of New Common Stock to be distributed, will suffer irreparable harm. The avoidance of such irreparable harm constitutes good cause to expedite final determination.

34.    None of the parties to this appeal will be burdened by an expedited briefing schedule since this appeal advances questions of law (primarily regarding the interpretation and application of the Plan) which have already been extensively briefed and argued by the parties in connection with the Surplus Distribution Motion.

(Remainder of page intentionally left blank)

## CONCLUSION

For the foregoing reasons, the Plan Committee respectfully requests that the Court enter an order, substantially similar to that attached hereto, bypassing mediation and expediting briefing and oral argument in this appeal.

Dated: March 9, 2006

THE BAYARD FIRM

By: _____
Neil B. Glassman, Esq.  (No. 2087)
Charlene Davis, Esq.  (No. 2336)
Eric M. Sutty, Esq. (No. 4007)
222 Delaware Avenue, Suite 900
Wilmington, DE 19801
Tel: (302) 655-5000

-and-

Alan W. Kornberg, Esq.
Kelley A. Cornish, Esq.
Margaret A. Phillips, Esq.
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: 212-373-3000

Counsel for the Plan Committee

619812v1                                   14

# Unreported Decisions

LEXSEE 2003 BANKR LEXIS 1044

**IN RE Combustion Engineering**

**Bankruptcy No. 03-10495 JKF, Chapter 11**

**UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

*2003 Bankr. LEXIS 1044*

**July 2, 2003, Decided**

**SUBSEQUENT HISTORY:** Subsequent appeal at, Remanded by *In re Combustion Eng'g, Inc., 391 F.3d 190, 2004 U.S. App. LEXIS 24834 (3d Cir. Del., 2004)*

**DISPOSITION:** Court issued case management order in event of appeal.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** After a reorganization plan was approved, debtor filed a informal letter application seeking an expedited briefing schedule for anticipated appeals and motions practice. Creditors objected to the debtor's application.

**OVERVIEW:** Debtor was seeking a briefing schedule for anticipated appeals and motions practice associated with the confirmation of a plan of reorganization. It sought to shorten the time for opening briefs. Creditors objected to the debtor's application. The court determined that it had the authority under Fed. R. Bankr. P. 8019 to suspend the timing requirements associated with a motion or an appeal. Also, Fed. R. Bankr. P. 8011 provided for emergency motions in order to prevent irreparable harm. The court held that a "fragile" plan of reorganization requiring an expedited determination of final judgment constituted a threat of irreparable harm. The record supported debtor's assertion that time was of the essence. The court noted that creditors were not unfairly limited by its decision to shorten the applicable time period. Therefore, the court set forth the time period applicable to the bankruptcy case in question.

**OUTCOME:** The court set an expedited briefing and motions schedule for the bankruptcy case.

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Practice & Proceedings > Appeals Governments > Courts > Rule Application & Interpretation*
[HN1] Under Fed. R. Bankr. P. 8002(a), a party has 10 days from the entry of judgement to appeal an order of the bankruptcy court to the district court. Rule 8002(b) also provides that a motion for relief from a judgment or order pursuant to Fed. R. Bankr. P. 9024 must likewise be filed within 10 days. A motion for relief under Rule 9024 tolls the time to file an appeal. Fed. R. Bankr. P. 8002(b). Finally, Fed. R. Bankr. P. 8006 provides that an appellant has 10 days after the filing of an appeal within which to file a designation of items to be included in the record on appeal and a statement of the issues to be presented. The bankruptcy court may not reduce either of the 10-day periods of Fed. R. Bankr. P. 8002 for filing an appeal or motion for relief from a judgment or order. Fed. R. Bankr. P. 9006(c)(2). In the interest of expediting a decision, however, the court has authority under Fed. R. Bankr. P. 8019 to suspend other timing requirements associated with a motion or appeal. Fed. R. Bankr. P. 8019 Furthermore, Fed. R. Bankr. P. 8011 provides for emergency motions to prevent irreparable harm. Fed. R. Bankr. P. 8011(d).

*Bankruptcy Law > Chapter 11 (Reorganization)*
*Bankruptcy Law > Practice & Proceedings > Appeals Governments > Courts > Rule Application & Interpretation*
[HN2] A bankruptcy court may suspend the Federal Rules of Bankruptcy Procedure in the interest of expediting decision or for other good cause. Fed. R. Bankr. P. 8019. The courts have borrowed the irreparable injury standard from Fed. R. Bankr. P. 8011 governing emergency motion practice to determine whether a suspension is justified under Fed. R. Bankr. P. 8019. A fragile plan of reorganization requiring an expedited determination of final judgment will constitute a threat of irreparable harm

for the purposes of Fed. R. Bankr. P. 8011 and Fed. R. Bankr. P. 8019. Thus, that a party will suffer irreparable harm should there not be a swift confirmation may constitute grounds for a suspension of the Federal Rules of Bankruptcy Procedure under Fed. R. Bankr. P. 8019.

**COUNSEL:** [*1]  For Combustion Engineering, Inc., Debtor: Curtis A. Hehn, Laura Davis Jones, Michael Paul Migliore, Pachulski, Stang, Ziehl Young & Jones, Curtis A. Hehn, Michael Paul Migliore, Pachulski Stang Ziehl Young Jones, Wilmington, DE.

For Combustion Engineering, Inc., Plaintiff: Curtis A. Hehn, Pachulski Stang Ziehl Young Jones, Wilmington, DE.

For Official Committee of Unsecured Creditors, Creditor Committee, Freeborn & Peters.

For Official Committee of Unsecured Creditors, The Official Committee of Unsecured Creditors of Combustion Engineering, Inc., Creditors Committees: Michael R. Lastowski, William K. Harrington, Duane Morris LLP, Wilmington, DE.

For Official Committee of Unsecured Creditors, Creditor Committee: Richard W. Riley, Duane Morris LLP, Wilmington, DE.

**JUDGES:** ALFRED M. WOLIN.

**OPINIONBY:** Alfred M. Wolin

**OPINION:**

### MEMORANDUM OPINION

This matter has been opened before the Court upon the informal letter application of the Debtor seeking a briefing schedule for anticipated appeals and motion practice associated with the Opinion and Order of confirmation of the plan of reorganization in the above-referenced matter recently issued by the Honorable Judith K. Fitzgerald, [*2]  U.S.B.J. Judge Fitzgerald's Opinion is not yet final, but contemplates a supplementation of the record and final Order within a few days. The Court has considered letters from Certain Cancer Claimants ("CCC") and Certain Insurers opposing the debtor's letter application.

Counsel for the Debtor has urged a very abbreviated briefing schedule on this matter, calling for opening briefs within 14 days of a final Order of the Bankruptcy Court. Counsel represents that a quick resolution of this case is necessary if the Debtor is to survive to be reorganized. The opposing parties have objected, arguing that their time to appeal may not be shortened by this

Court. Additionally, the opposing parties point out that they have a right to move for reconsideration of the Bankruptcy Court's decision within ten days of its becoming final, and that such a motion would toll the time for an appeal.

[HN1] Under *Federal Rule of Bankruptcy Procedure 8002 (a)*, a party has 10 days from the entry of judgement to appeal an Order of the Bankruptcy Court to the District Court. *Rule 8002(b)* also provides that a motion for relief from a judgment or order pursuant to *Rule 9024* must likewise be filed within 10 days. The [*3]  CCC and the Certain Insurers are correct that a motion for relief under *Rule 9024* tolls the time to file an appeal. *Fed. R. Bankr. P. 8002(b)*. Finally, *Rule 8006* provides that an appellant has 10 days after the filing of an appeal within which to file a designation of items to be included in the record on appeal and a statement of the issues to be presented. *Fed. R. Bankr. P. 8006*.

The Court may not reduce cither of the ten-day periods of *Rule 8002* for filing an appeal or motion for relief from a judgment or order. *Fed. R. Bankr. P. 9006 (c) (2)*. In the interest of expediting a decision, however, the Court has authority under *Rule 8019* to suspend other timing requirements associated with a motion or appeal. *Fed. R. Bankr. P. 8019* (the district court may suspend requirements or provisions of the rules in Part VIII, except *Rules 8001, 8002 and 8013*). Furthermore, *Rule 8011* i.c. provides for emergency motions to prevent irreparable harm. *Fed. R. Bankr. P. 8011(d)*.

[HN2] The Court may suspend the rules "in the interest of expediting decision or for other good cause." *Fed. R. Bankr. P. 8019*; see *In re Rashid, 210 F. 3d 201, 209 n.4 (3d Cir. 2000)*. The Courts have borrowed the [*4]  irreparable injury standard from *Rule 8011* governing emergency motion practice to determine whether a suspension is justified under *Rule 8019*. See Europe Movieco Partners Ltd. v. United Pan-Europe Communs. N.V. (In re United Pan-Europe Communs. N.V.), 2003 U.S. Dist. LEXIS 1297, No. 02-16020 (BRL), -47 (RWS), 2003 WL 221819, at *3 (S.D.N.Y. Jan. 30, 2003) (the "good cause" required by *Rule 8019* will be equated to the requirement of "irreparable harm" required, of emergency motions by *Rule 8011*).

A "fragile" plan of reorganization requiring an expedited determination of final judgment will constitute a threat of irreparable harm for the purposes of the *Rules 8011 and 8019*. In re Finley, Kumble et alia, *135 B.R. 456, 458 (S.D.N.Y. 1992)*. Thus, that a party will suffer irreparable harm should there not be swift confirmation may constitute grounds for a suspension of the Rules under *Rule 8019*. The Court finds the representations that this plan is a fragile plan and that time is of the essence to be credible and supported by the record.

Turning to the procedural situation posited by the letters of the parties, the Court sees two possible outcomes. Once Judge Fitzgerald's Order becomes final, the parties opposing the plan may appeal. Their [*5] time to do so may not be shortened. Once a notice of appeal is filed, however, the Court will abbreviate the time to designate the record and file their merits brief to fourteen days from the date of the Order (or four days from the latest date a Notice of Appeal may be filed). Any reply will be due seven days following the appellants' submissions. The Order filed herewith shall put this schedule into effect prospectively, notwithstanding that the appeal has not been filed.

On the other hand, the opponents of the plan may file a motion to reconsider, more properly denominated a *Rule 9024* motion for relief, from the Order before Judge Fitzgerald. In that event, this Court will immediately withdraw the reference to the Bankruptcy Court of the entire case. There will be no delay of an appeal due to the tolling effect of the motion, because there will no appeal to this Court; any appeal will lie in the Court of Appeals. The Order filed herewith shall provide that the withdrawal of the reference will be automatic and without further Order of the Court. In this event, a further case management order shall issue from the Court.

The CCC objects that this matter will come before the Court [*6] only in part as an appeal. In substantial part, Judge Fitzgerald's rulings will be subject to review of Proposed Findings of Fact and Conclusions of Law on Non-Core Matters pursuant to *Rule 9033*. The Court perceives no obstacle in this fact. Indeed, an objection to proposed findings on non-core matters must be filed within ten days, which will bring the merits of the objection to the district court more quickly than an appeal. In this case, the Court will extend the time to object to the Proposed findings to fourteen days, to make it consistent with the briefing of the anticipated appeal. Responses will be due seven days later.

Plan opponents may be expected to argue that the Court's solution unfairly limits the time they have to prepare their appeal or motion. The Court rejects such a claim. The parties have litigated hard before Judge Fitzgerald. This Court has examined the briefs submitted to the Bankruptcy Court and it is plain that the arguments are already mature and well-drafted. The record will not be difficult to assemble. Any claim that the opponents of the plan have not yet decided whether to appeal (or to move) would be disingenuous. Lastly, this prospective Letter Opinion [*7] and Order will provide ample notice to the plan opponents,, in excess of the fourteen days from the entry of Judge Fitzgerald's final order, to prepare their submissions.

Finally, the plan opponents may contend that this Court may not enter an Order governing an appeal because it lacks jurisdiction until the appeal is filed. The parties are put on notice that, if necessary, the Court will file a supplementary Order adopting the attached Order and adopting the briefing schedule set forth therein nunc pro tunc if a Notice of Appeal is filed.

ALFRED M. WOLIN

## CASE MANAGEMENT ORDER

For the reasons set forth in the Court's Memorandum Opinion filed herewith; and the Honorable Judith K. Fitzgerald, United States Bankruptcy Judge having entered Findings of Fact and Conclusions of Law and Proposed Findings of Fact and Conclusions of Law and an Order Approving the Disclosure Statement but Recommending Withholding of Confirmation of the Plan of Reorganization for Ten Days; and the final order of the Bankruptcy Court having been made subject to the receipt by the Bankruptcy Court of additional submissions addressing certain discrete issues and further subject to an Order of the Bankruptcy [*8] Court resolving those issues and making final the previous Order regarding confirmation of the plan or reorganization and proposed findings in the above-referenced matter (the "Final Bankruptcy Court Order"); and for good cause appearing

IT IS this Date 2nd day of July 2003

ORDERED that, in the event any party elects to file a Notice of Appeal from the Final Bankruptcy Court Order, that party's brief and their designation of the record on appeal shall be filed and served on or before the fourteenth day following the date the Final Bankruptcy Court Order is entered by the Bankruptcy Court, and it is further

ORDERED that any response to an appeal taken as prescribed by the foregoing paragraph of this Order shall be filed on or before the twenty-first day following the date the Final Bankruptcy Court Order is filed by the Bankruptcy Court, and it is further

ORDERED that, in the event any party, excepting a debtor, files a motion for relief pursuant to *Federal Rule of Bankruptcy procedure 9024* following the entry of the Final Bankruptcy Court Order, then, in the alternative to the preceding paragraphs of this Order, the reference of this chapter 11 case to the Bankruptcy Court shall [*9] be withdrawn in its entirety without further Order of this Court, and it is further

ORDERED that any objection to the Proposed Findings of Fact and Conclusions of Law on Non-core Matters pursuant to *Federal Rule of Bankruptcy Procedure 9033* shall be filed on or before the fourteenth day following the entry of the Final Bankruptcy Court Order

2003 Bankr. LEXIS 1044, *

and any response to such objection shall filed on or before the twenty-first day following the entry of the Final Bankruptcy Court Order, and it is further

ORDERED that, simultaneously with a party's submission authorized by this Order, any party may submit a proposed opinion for the Court's consideration on all issues before it.

ALFRED M. WOLIN

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 221819 (S.D.N.Y.)
(Cite as: 2003 WL 221819 (S.D.N.Y.))

Page 1

H
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
In re: UNITED PAN-EUROPE COMMUNICATIONS
N.V., Debtor.
EUROPE MOVIECO PARTNERS LIMITED, Appellant,
v.
UNITED PAN-EUROPE COMMUNICATIONS N.V.,
Debtor-Appellee.
Nos. 02-16020 (BRL), M-47(RWS).

Jan. 30, 2003.

Chapter 11 debtor, which was Dutch holding company for cable television service provider, moved to reject distribution agreement with British broadcaster. The United States Bankruptcy Court for the Southern District of New York granted motion, and broadcaster sought expedited appeal. The District Court, Sweet, J., held that expedited appeal was not warranted absent showing of irreparable harm.

Relief denied.

West Headnotes

Bankruptcy ⟨⟩3778
51k3778 Most Cited Cases
Expedited appeal of bankruptcy court order, allowing debtor which provided cable television service to reject executory contract with broadcaster, was not warranted absent showing of irreparable harm; legal remedy existed for any economic harm, and allegations of reputational harm were conclusory. Fed.Rules Bankr.Proc. Rule 8019, 11 U.S.C.A.

Dewey Ballantine, New York, NY, By: Stuart Hirshfield, Dianne Coffino, for Appellant, of counsel.

White & Case, New York, NY, By: J. Christopher Shore, Howard S. Beltzer, for Debtor-Appellee, of counsel.

OPINION
SWEET, J.

*1 Appellant Europe Movieco Partners Limited

("Movieco") has moved on an emergency basis pursuant to Rules 8011 and 8019 of the Federal Rules of Bankruptcy Procedure for an expedited determination of Movieco's appeal from an Order of the United State Bankruptcy Court for the Southern District of New York entered on January 8, 2003 (the "Rejection Order"), permitting the debtor, United Pan-Europe Communications, N.V. ("UPC"), to reject an agreement between Movieco and UPC.

For the following reasons, that motion is denied.

Parties

UPC is a holding company organized under the laws of The Netherlands, with its statutory seat and principal place of business in Amsterdam, Holland. UPC has no business operations or employees in the United States. UPC's principal assets consist of its direct and indirect interests in approximately 200 operating subsidiaries, which own and operate broadband communication networks that provide telephone, cable and internet services to residential and commercial businesses in eleven countries in Europe.

Movieco is a limited liability company organized under the laws of England, with its principal place of business in London, England. Movieco possesses a broadcast license issued by the Independent Television Commission of the United Kingdom pursuant to Part 1 of the Broadcasting Act of 1990, as amended by the Broadcasting Act of 1996. Movieco operates and broadcasts two movie channels, Cinenova and Cinenova 2, from England via satellite uplink for reception by subscribers in Benelux countries. Movieco is regulated by British television authorities.

The Agreement

UPC and Movieco entered into a Cable Affiliation Agreement (the "Agreement") on December 21, 1999. Under the Agreement, Movieco licensed to UPC, for a period of seven years, the right and the obligation to receive and distribute the Cinenova movie channel to UPC's subscribers on its cable systems in The Netherlands and Flemish-speaking Belgium. In consideration for this license, UPC is required to pay a certain monthly fee to Movieco. UPC has been in breach of its payment obligations under the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 2003 WL 221819 (S.D.N.Y.)
**(Cite as: 2003 WL 221819 (S.D.N.Y.))**

Agreement since February 2002.

*The Dual Insolvency Proceedings*

On December 3, 2002, UPC filed a petition with the District Court of Amsterdam (Rechtbank) (the "Dutch Bankruptcy Court"), requesting that it grant UPC a suspension of payments or moratorium under Dutch bankruptcy law. With its petition, UPC filed a proposed plan of compulsory composition under the Dutch Faillissementswet ("Dutch Bankruptcy Code").

Also on December 3, 2002, UPC filed a voluntary bankruptcy petition under Chapter 11 of the United States Bankruptcy Code. With its petition, UPC filed a proposed plan of reorganization and an accompanying disclosure statement. On or about December 23, 2002, UPC filed an amended plan of reorganization (the "Amended Plan") and a related amended disclosure statement. The Amended Plan provides that holders of "rejection claims" will be provided the treatment accorded holders of pre-petition general unsecured claims and, thus, will be satisfied through the distribution of a *pro rata* share of equity in New UPC. Confirmation of the Amended Plan is scheduled to be heard on February 20, 2003.

*Rejection Order*

**\*2** Also on December 3, 2002, UPC filed a motion to reject the Agreement under section 365 of the U.S. Bankruptcy Code (the "Rejection Motion"). Movieco objected to the motion on the grounds that extending section 365 of the Bankruptcy Code to permit rejection of a contract between a Dutch company and an English company that is performed entirely overseas is contrary to the laws of the debtor's homeland and ran afoul of well-founded principles of international comity and the presumption against extraterritoriality. Movieco requested that the Bankruptcy Court abstain from hearing the Rejection Motion in deference to Dutch law and the proceedings pending before the Dutch Bankruptcy Court.

The Bankruptcy Court heard oral arguments on January 7, 2003. Concluding that no conflict existed between Dutch insolvency law and the U.S. Bankruptcy Code and that, in

any event, the appropriate foreign tribunal would determine the preemptive effect, if any, of the Amended Plan, the Bankruptcy Court granted the Rejection Motion, authorizing rejection of the Agreement as of March 1, 2003.

The Rejection Order was entered on the Bankruptcy Court's docket on January 8, 2003. On January 16, 2003, Movieco filed a timely Notice of Appeal.

In pleadings served on UPC on January 24, 2003, Movieco has applied for an injunction requiring UPC to perform the agreement on various grounds, including the alleged unavailability of voluntary termination under Dutch law and the purported violation of Dutch competition laws.

On January 24, 2003, Movieco made the instant motion. Movieco included in its motion a proposed schedule for briefing and argument of its appeal that would result in the first brief filed on February 3, 2003 and argument held on February 23, 2002. Oral argument was held on the instant motion on January 29, 2003, at which time the motion was considered fully submitted.

*DISCUSSION*

Bankruptcy Rule 8019 permits a district court to suspend or modify the normal rules and procedures governing appeals from a bankruptcy court decision and expedite the determination of an appeal. Fed. R. Bankr.P. 8019 ("In the interest of expediting decision or for other cause, the district court or the bankruptcy appellate panel may suspend the requirements or provisions of the rules in Part VIII, except Rules 8001, 8002 and 8013 and may order proceedings in accordance with the direction."); *In re Island Helicopters, Inc.*, No. 97 Civ. 4584, 1997 WL 466973, at \*4 (E.D.N.Y. Aug.13, 1997) (permitting expedited appeal); *In re Mego Int'l Inc.*, 30 B.R. 479, 479-80 (S.D.N.Y.1983) (opinion issued on expedited appeal); 10 Collier on Bankruptcy ¶ 8019.01 (15th ed.2002) ("The primary purpose of Federal Rule of Bankruptcy Procedure 8019 is to give the district courts ... the power to expedite the consideration of cases that are 'of primary concern to the public or to the litigants." ') (*citing* Original Advisory Committee Note to Rule 2 of the Federal Rules of Appellate Procedure, from which Rule 8019 is drawn).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 221819 (S.D.N.Y.)
**(Cite as: 2003 WL 221819 (S.D.N.Y.))**

**\*3** "Courts will invoke the power given them by Rule 8019 if there are unusual time considerations or if unfairness to the litigants would otherwise result." 10 Collier on Bankruptcy ¶ 8019.01; *see also Groendyke Transp. Inc. v. Davis,* 406 F.2d 1158, 1162 (5th Cir.1969) (permitting expedited disposition because important public policy issues were involved and appellant's position was clearly correct as a matter of law); *In re Finley,* 135 B.R. 456, 458 (S.D.N.Y.1992) (relying on specific detailed allegations that the debtor's plan could not be implemented until all appeals were resolved, the court agreed to prompt resolution of appeal). For the purposes of determining this motion and in the absence of any discussion by the parties of the legislative history of Rule 8019 to the contrary, the "good cause" required by Rule 8019 will be equated to the requirement of "irreparable harm" required of emergency motions by Rule 8011. [FN1]

> FN1. UPC has cited to a number of cases explicitly brought pursuant only to Fed. R. Bankr.P. 8011(d) for the proposition that the law of this Circuit requires that Movieco show "irreparable harm" to expedite its appeal. *E.g., In re Dairy Mart Convenience Stores, Inc.,* 272 B.R. 66, 70 (S.D.N.Y.2002) ("[T]he appellant must show by affidavit that, to avoid irreparable harm, relief is needed in less time than would normally be required."); *In re Delco Dev. Mid-Island Ltd.,* No. 90 Civ. 3914, 1990 WL 263495, at \*1 (E.D.N.Y. Nov.29, 1990) (movant must "demonstrate[ ] that expedited consideration is necessary to avoid irreparable harm").
> Rule 8011 provides that "[w]henever a movant requests expedited action on a motion on the ground that, to avoid irreparable harm, relief is needed in less time than would normally be required for the district court or bankruptcy appellate panel to receive and consider a response, the word 'Emergency' shall precede the title of the motion." By the plain language of the provision, Rule 8011 appears to apply only to a court's determination of whether an "Emergency motion"--such as the one before this court--should be heard on an expedited basis. Thus, Movieco

would have had to submit, and label as an "Emergency," its appeal, in order for the requirement of "irreparable harm" to apply. Of course, it does not make any sense that a party could file an "Emergency motion" seeking permission for an expedited appeal, instead of directly filing their appeal, and thus avoid the higher showing of irreparable harm. Thus, the Court will read Rule 8019's requirement of showing "good cause" to mean a showing of irreparable harm, as explicitly required in Rule 8011.

Based on the papers and on the arguments presented at a hearing on January 29, 2003, the Court holds that Movieco has failed to present sufficient considerations to justify an expedited schedule.

Movieco points to the fast approaching March 1, 2003 date set by the Bankruptcy Court, at which time UPC can reject the Agreement to show that time is of the essence. Movieco claims that in the absence of an expedited appeal to address whether Section 365 applies to the Agreement (and thus whether any rejection by UPC of the Agreement would be excused under U.S. Bankruptcy law), it would suffer economic and reputational harm if UPC rejected the Agreement and ceased broadcast of Movieco's movie channel. Further, Movieco argues that it stands to lose a substantial source of revenue if the Agreement is rejected, as more than 50 percent of Movieco's revenues are derived from payments UPC is obligated to make under the Agreement.

As an initial matter, according to Movieco's Head of Legal Affairs, UPC has been in breach of its payment obligations to Movieco since February 2002. In light of the ongoing nature of UPC's nonpayment, it is difficult to discern a compelling need to prevent UPC from rejecting the Agreement. In any case, the harm complained of appears to be almost entirely economic in nature, and one for which a legal remedy would exist should Movieco be successful in arguing that Section 365 does not apply in this situation and should Movieco further be successful in its arguments in an extra-territorial court that UPC should not be allowed to reject the Agreement. *E.g., In re Dairy Mart,* 272 B.R. at 71

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                    Page 4
Not Reported in F.Supp.2d, 2003 WL 221819 (S.D.N.Y.)
**(Cite as: 2003 WL 221819 (S.D.N.Y.))**

n. 3 ("Monetary loss alone will generally not amount to irreparable harm ....") (citing *Borey v. Nat'l Union Fire Ins. Co. of Pittsburgh,* 934 F.2d 30, 34 (2d Cir.1991)); *Everest Capital Inv. Ltd. v. Editek, Inc.,* 1996 WL 695794, at *3 (S.D.N.Y. Dec.4, 1996) ("Irreparable harm is injury for which a monetary award cannot be adequate compensation") (citing *Int'l Dairy Foods Ass'n v. Amestoy,* 92 F.3d 67, 71 (2d Cir.1996)(internal citations omitted)).

*4 The only potential "irreparable harm" cited is the conclusory allegation that "reputational harm" will ensue if the Agreement is rejected. There are no specific allegations as to what Movieco's current reputation is in the Benelux countries and how that reputation would be affected by the rejection of the Agreement. Nor has Movieco alleged that it could not in any case obtain a contract with another corporation that would provide similar services as UPC had done--and perhaps lead to a better payment history. In light of these conclusory allegations, Movieco has failed to show irreparable harm. *E.g., In re Texaco, Inc.,* 81 B.R. 820, 829 (Bankr.S.D.N.Y.1988) (holding that conclusory statements of irreparable harm, without more, do not suffice to grant relief); *In re Penn-Dixie Indus., Inc.,* 6 B.R. 832, 837 (Bankr.S.D.N.Y.1980) (denying emergency relief because "there ha[d] been no demonstration by [p]laintiffs of any real injury whatsoever that would result from a denial of the relief sought"). In any case, because Movieco fails to establish what sort of reputational harm would occur, it is impossible to judge whether that too would be compensable with an eventual monetary award.

Movieco also points out that its appeal will raise important public policy issues regarding international comity and the extra-territorial reach of section 365 of the U.S. Bankruptcy Code. Movieco has failed to explain, however, why these public policy considerations merit an expedited appeal. Indeed, given the weighty nature of the issues involved, due time and consideration should be given to their briefing and argument by the parties and the measuring thereof by this Court.

Because Movieco has failed to establish the existence of irreparable harm, the motion for expedited treatment must be denied.

*Conclusion*

For the foregoing reasons, Movieco's motion is denied.

It is so ordered.

Not Reported in F.Supp.2d, 2003 WL 221819 (S.D.N.Y.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE 2005 DEL. CH. LEXIS 141

**Frenz, et al. v. Gencor Indus., Inc.**

**Civil Action No. 1204-N**

**COURT OF CHANCERY OF DELAWARE, SUSSEX**

*2005 Del. Ch. LEXIS 141*

September 8, 2005, Submitted
September 9, 2005, Decided
September 9, 2005, Filed

**NOTICE:** [*1] THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs sought an emergency motion to temporarily enjoin the September 12, 2005 annual shareholders' meeting of defendant corporation, or, in the alternative, amend proxy materials to include a specific nominee for independent director. This matter followed.

**OVERVIEW:** The instant court denied the emergency motion to temporarily enjoin the September 12, 2005 annual shareholders' meeting, or, in the alternative, amend proxy materials to include a specific person as a nominee for independent director. First, either request exceeded the scope of an action brought under Del. Code Ann. tit. 8. § 211. Second, the motion did not refer to other statutory authority. Third, the motion failed to sufficiently allege the required elements for injunctive relief. Further, the corporation has adhered to the prior order of the court and, therefore, was not responsible for plaintiffs' failure to nominate their candidate. But plaintiffs requested earlier notice of the rejection of their candidate's nomination and later explanation of such rejection. Such communications were not required by any order of the court. Finally, plaintiffs had ample opportunity to make a separate nomination by preparing their own proxy statement, perhaps only as an insurance policy, but they chose not to take such measures. Finally, the court declined to address certain proxy issues raised by plaintiffs, including the request that the court alter the corporation's proxy materials.

**OUTCOME:** The motion was denied.

**LexisNexis(R) Headnotes**

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Meetings & Voting*
[HN1] *Del. Code Ann. tit. 8, § 211* allows for, among other things, the Court of Chancery to set an annual meeting if, for certain reasons, such a meeting has not occurred. Postponement of an annual meeting or, alternatively, amendment of a company's proxy statement to nominate an independent director, are both outside the scope of § 211.

*Civil Procedure > Injunctions > Elements*
[HN2] In order to grant injunctive relief, a court must find irreparable harm threatened, and a high likelihood of success on the merits.

**COUNSEL:** Adam I. Frenz, Harvey I. Houtkin, Montvale, NJ.

Paul D. Brown, Greenberg Traurig, LLP, Wilmington, DE.

**OPINION:**

I deny plaintiffs' emergency motion to temporarily enjoin the September 12, 2005 annual shareholders' meeting of Gencor Industries, Inc. ("Gencor") or, in the alternative, amend proxy materials to include Mr. Houtkin as a nominee for independent director, for the reasons stated below.

Either request of the motion exceeds the scope of an action brought under *8 Del. C. § 211* ("*Section 211*"). [HN1] *Section 211* allows for, among other things, the

2005 Del. Ch. LEXIS 141, *

Court of Chancery to set an annual meeting if, for certain reasons, such a meeting has not occurred. Postponement of an annual meeting or, alternatively, amendment of a company's proxy statement to nominate an independent director, are both outside the scope of *Section 211*. Plaintiffs' motion does not make reference to other statutory authority; therefore, the Court cannot grant either request.

Further, the motion fails to sufficiently allege the elements requisite for injunctive relief.[HN2]  In order [*2]  to grant injunctive relief, the Court must find irreparable harm threatened, and a high likelihood of success on the merits. I will reserve judgment in respect to the first prong, as plaintiffs clearly fail to satisfy the second prong. Plaintiffs could allege (although fail to clearly do so) that interference with a shareholder's right to nominate an independent director constitutes an irreparable harm. Nonetheless, plaintiffs fail to successfully allege a high likelihood of success on the merits-that Gencor is responsible for the deprivation of such rights.

Gencor has adhered to the Order of the Court and, therefore, is not responsible for plaintiffs' failure to nominate Mr. Houtkin. Besides setting a time and place for the annual meeting, the Court instructed Gencor to inform plaintiffs of any specific deadlines for making nominations to the Board. Gencor communicated to plaintiffs on multiple occasions the fact that Gencor's proxy statement was to be mailed twenty days prior to the annual meeting, including in filings before the Court. But plaintiffs request more: earlier notice of the rejection of Mr. Houtkin's nomination and later explanation of such rejection. Such communications [*3]  were not required by any order of the Court. Finally, plaintiffs had ample opportunity to make a separate nomination by preparing their own proxy statement, perhaps only as an insurance policy; plaintiffs chose not to take such anticipatory measures, and must now suffer the consequences.

The Court need not address certain proxy issues raised by plaintiffs, including the request that the Court alter Gencor's proxy materials. For the reasons set forth above, plaintiffs' motion is denied.

IT IS SO ORDERED.

William B. Chandler III

LEXSEE 1991 DEL. CH. LEXIS 9

**R.D. Hubbard, Plaintiff, v. Hollywood Park Realty Enterprises, Inc., Hollywood Park Operating Company, Marjorie L. Everett, John Forsythe, Merv Griffin, Warren B. Williamson, Thomas W. Gamel, John V. Newman, Harry Ornest, Aaron Spelling, Allen E. Paulson, Bruce P. McNall, Gay Firestone Wray, Leo Jaffe, Jeffrey J. Rhodes, James M. Nederlander and Vernon O. Underwood, Jr., Defendants. Hollywood Park Operating Company, John Forsythe, Merv Griffin, Allen E. Paulson, Stanley Seiden and Aaron Spelling, Cross-Claimants, v. Hollywood Park Realty Enterprises, Inc., R.D. Hubbard, Warren B. Williamson, James Nederlander, Gay Firestone Wray, Leo Jaffe, John V. Newman, Thomas W. Gamel, Jeffrey J. Rhodes and Vernon O. Underwood, Jr., Cross-Defendants**

Civil Action No. 11779

Court of Chancery of Delaware, New Castle

*1991 Del. Ch. LEXIS 9*

December 31, 1990, Submitted
January 14, 1991, Decided

## CASE SUMMARY:

**PROCEDURAL POSTURE:** Cross-claimants, corporation and shareholders, brought an action against cross-defendants, second corporation and its directors, and moved for a preliminary injunction to restrain the second corporation and its directors from enforcing an advance notice by-law.

**OVERVIEW:** The corporation and the second corporation were co-owners of a racing facility. Both companies had an advance notice provision in their by-laws. A shareholder challenged this advance notice requirement and was appointed a director of the second corporation as a result of a settlement. The settlement also provided for a slate of candidates to be nominated for directors at the next annual meeting and stated that the advance notice by-law provision would not be waived. The corporation and shareholders brought an action against the second corporation and its directors and moved to enjoin the enforcement of the by-laws. The court issued the injunction and noted that shareholders had the right to exercise their franchise, which included the right to nominate candidates for the board of directors. The court found that legally permissible, but inequitable, director conduct could be invalidated. The court determined that, because the settlement would foreseeably generate controversy and opposition, the board had a duty to waive the ad-

vance notice requirement of the by-law to insure that the shareholders were afforded a fair opportunity to nominate an opposing slate.

**OUTCOME:** The court issued the preliminary injunction that was sought by the corporation and shareholders. The injunction directed the second corporation and its directors to waive the advance notice by-law requirement to allow any shareholder who so desires a reasonable opportunity to nominate a dissident slate of candidates for election.

**LexisNexis(R) Headnotes**

*Civil Procedure > Injunctions > Preliminary & Temporary Injunctions*
[HN1] On a motion for preliminary injunctive relief, the moving party must demonstrate a reasonable probability of success on the merits, that absent injunctive relief irreparable harm will occur, and that the harm the moving party will suffer if the requested relief is denied outweighs the harm the opponents will suffer if relief is granted.

1991 Del. Ch. LEXIS 9, *

**Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Meetings & Voting**

[HN2] The shareholders' right to vote includes the right to nominate a contesting slate. The unadorned right to cast a ballot in a contest for office, a vehicle for participatory decisionmaking and the exercise of choice, is meaningless without the right to participate in selecting the contestants. As the nominating process circumscribes the range of the choice to be made, it is a fundamental and outcome-determinative step in the election of officeholders. To allow for voting while maintaining a closed candidate selection process thus renders the former an empty exercise. This is as true in the corporate suffrage contest as it is in civic elections, where federal law recognizes that access to the candidate selection process is a component of constitutionally-mandated voting rights.

**Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Meetings & Voting**

[HN3] To elect a director slate pursuant to a consent solicitation, the shareholders must obtain consents representing a majority of all outstanding voting shares of a corporation. *Del. Code Ann. tit. 8, § 228(a)*. But to prevail at the annual shareholders' meeting (assuming a quorum is present), the shareholders need garner only a plurality of the votes represented at the meeting in person or by proxy. *Del. Code Ann. tit. 8, § 216.*

**Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities**

[HN4] Where directors take action that, while legally permissible, is done for an inequitable purpose, such action is a breach of fiduciary duty that may be remedied by equity.

**Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities**

[HN5] To be inequitable, the conduct of directors does not necessarily require a dishonest, selfish, or evil motive.

**Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Meetings & Voting**
**Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities**

[HN6] Director conduct intended to interfere with or frustrate shareholder voting rights is presumptively inequitable and will be invalidated, unless the directors are

able to rebut that presumption by showing a compelling justification for their actions.

**Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Meetings & Voting**

[HN7] The shareholders have a fundamental right to exercise their franchise, which includes the right to nominate candidates for the board of directors. That those rights are fundamental does not mean that their exercise cannot be restricted for valid corporate purposes by board-created procedural rules. However, those restrictions must not infringe upon the exercise of those rights in an unreasonable way.

**Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Meetings & Voting**
**Business & Corporate Entities > Corporations > Governance > Articles of Incorporation & Bylaws**

[HN8] An advance notice by-law will be validated where it operates as a reasonable limitation upon the shareholders' right to nominate candidates for director. More specifically, such a by-law must, on its face and in the particular circumstances, afford the shareholders a fair opportunity to nominate candidates.

**Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Meetings & Voting**
**Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities**

[HN9] Where post-deadline changes would foreseeably generate controversy and shareholder opposition, considerations of fairness and the fundamental importance of the shareholder franchise dictated that the shareholders be afforded a fair opportunity to nominate an opposing slate, thus imposing upon the board the duty to waive the advance notice requirement of the by-law. And that duty exists, even though concededly the board acts in good faith and took no steps overtly to change the electoral rules themselves.

**COUNSEL:** [*1]

Lawrence C. Ashby, Stephen E. Jenkins, Keith R. Sattesahn, William P. Bowden, Philip Trainer, Jr., Esquires, of ASHBY, McKELVIE & GEDDES, Wilmington, Delaware; Hugh Steven Wilson, Charles S. Treat, Marc W. Rappel, Esquires, of LATHAM & WATKINS, Los Angeles, California, Attorneys for Cross-Complainants.

Michael D. Goldman, Donald J. Wolfe, Jr., Peter J. Walsh, Jr., Stephen C. Norman, Esquires, of POTTER, ANDERSON & CORROON, Wilmington, Delaware; Brian C. Leck, Marvin E. Garrett, Esquires, of ALLEN, MATKINS, LECK, GAMBLE & MALLORY, Los Angeles, California, Attorneys for Cross-Defendants, Hollywood Park Realty Enterprises, Inc., Warren B. Williamson, Gay Firestone Wray, John V. Newman, Thomas W. Gamel, Jeffrey J. Rhodes, and Vernon O. Underwood, Jr.

Lewis H. Lazarus, Esquire, of MORRIS, JAMES, HITCHENS & WILLIAMS, Wilmington, Delaware, Attorney for Cross-Defendants James M. Nederlander and Leo Jaffe.

A. Gilchrist Sparks, Alan J. Stone, David G. Thunhorst, Esquires, of MORRIS, NICHOLS, ARSHT & TUNNELL, Wilmington, Delaware, Attorneys for Cross-Defendant R.D. Hubbard.

**JUDGES:**

Jacobs, Vice Chancellor.

**OPINIONBY:**

JACOBS

**OPINION:**

OPINION

At issue on this motion for a preliminary injunction is the validity, as applied [*2] to the instant facts, of a by-law ("the advance notice by-law") of Hollywood Park Realty Enterprises, Inc. ("Realty"). That by-law requires shareholders who intend to nominate candidates for election to the board of directors to give the corporation notice of that intent in advance of the annual shareholders' meeting. Unless enjoined, the enforcement of the advance notice by-law will result in the "management" (i.e., the Realty incumbent board's) slate of candidates running unopposed at the annual shareholders meeting scheduled for January 28, 1991. The moving parties, who are Realty stockholders, seek to enjoin the enforcement of that by-law in order to nominate an opposition slate of director candidates at that meeting.

This action was originally filed by R. D. Hubbard ("Hubbard"), who is a substantial shareholder of Realty and its sister corporation, Hollywood Park Operating Company ("Operating"). Hubbard desires to change significantly the direction and management of both corporations. He commenced a proxy contest and consent solicitation to remove and replace those companies' respective boards of directors. Frustrated because those boards refused his request for a thirty-day [*3] extension of the advance notice by-law deadline, Hubbard brought this

action on October 26, 1990 against Realty, Operating, and their respective directors, for a judgment declaring that by-law invalid on its face. n1

> n1 Both Operating and Realty have the identical advance notice by-law. Hubbard also seeks a judgment declaring those companies' Rights Plans (i.e., "poison pills") inapplicable to certain proxy solicitation activities. That latter claim is not implicated on this motion.

A settlement was later reached between Hubbard and the Realty board on November 19, 1990. Pursuant to that settlement, Hubbard voluntarily dismissed his complaint as against Realty and its directors, but not Operating. Thereafter, on December 6, 1990, Operating and several of its directors, namely, John Forsythe, Merv Griffin, Allen E. Paulson, Aaron Spelling, and Stanley Seiden (the "cross-claimants" or "movants"), n2 instituted a cross-claim against Realty and its directors, including Hubbard, who had been appointed to the Realty board [*4] as part of the settlement. The cross-claimants also moved for a preliminary injunction to restrain the Realty board from enforcing the advance notice by-law as to them. After expedited briefing, the motion was argued on December 28, 1990, and supplemental post-argument memoranda were submitted on December 31, 1990.

> n2 These directors are also shareholders of Realty.

This is the decision of the Court on the cross-claimants' motion for preliminary injunctive relief.

I. THE PERTINENT FACTS

Together, Realty and Operating own and operate the Hollywood Park Race Track, a leading quarter horse and thoroughbred racing facility located near Los Angeles, California. That race track was originally owned and operated by Hollywood Park, Inc. ("HPI"). To gain certain tax advantages, HPI formed Realty and Operating, as wholly-owned Delaware subsidiaries, in 1981. HPI then transferred all of its non-real estate assets to Operating and merged into Realty. Pursuant to the merger, all former HPI shareholders received one share of [*5] Realty (the surviving corporation), and Realty then spun off to those shareholders all of its shares in Operating, on the basis of one Operating share for each Realty share.

Realty and Operating later entered into two agreements: (1) a lease under which Realty granted Operating the right to manage the operation of the race track; and

(2) a pairing agreement providing that the two companies' shares must be issued, traded, or transferred in tandem, and that neither corporation may become a party to a merger, sale of assets, or liquidation unless the other corporation is also a party. Thus, Realty and Operating are paired; that is, their common shares trade together as a unit consisting of one Realty share and one Operating share, and the stockholders of the two companies are essentially identical. However, the corporations' respective boards of directors are different. n3

> n3 Realty has nine directors: Warren B. Williamson, James Nederlander, Gay Firestone Wray, Leo Jaffe, John P. Newman, Thomas W. Gamel, Vernon O. Underwood, Jeffrey J. Rhodes, and (since November 19) R. D. Hubbard. Three of the aforementioned directors -- Messrs. Williamson, Gamel, and Newman -- were also directors of Operating as of October 31, 1990. The remaining directors of Operating's eleven person board are John Forsythe, Merv Griffin, Aaron Spelling, Allen E. Paulson, Stanley Seiden, Marjorie Everett, Harry Ornest, and Bruce P. McCall.

[*6]

For many years the dominant force at both companies has been Marjorie L. Everett ("Everett"), the Chairperson and Chief Executive Officer of Operating. As stated earlier, Hubbard, who is a businessman, the majority owner of two racetracks, and a 9.9% shareholder of Realty and Operating, seeks to oust and replace Everett as Operating's Chief Executive Officer, and also to replace those directors of both companies who remain loyal to her. n4

> n4 Except for Messrs. Williamson and Newman, who were nominees on Hubbard's proposed slate of directors, none of the Realty directors have any business or social relationship with Hubbard. Also, except for Messrs. Gamel and Rhodes, all of the Realty directors were invited to join the Realty board by Everett.

The advance notice by-law that is the subject of this controversy was adopted in mid-1989 under circumstances divorced from any contest for control. At that time, both companies amended their by-laws to require shareholders who desire to nominate candidates for director at the [*7] annual meeting to furnish certain information to the corporation, "not less than 90 days in advance of that meeting or, if later, the seventh day fol-

lowing the first public announcement of the date of such meeting." n5 Counsel for both companies' board of directors advised them that the purpose of the notice requirement was to ". . . assure that the directors and stockholders will have a reasonable opportunity to thoughtfully consider any such proposals or nominations and to allow for full information concerning them to be distributed to stockholders, along with the arguments on both sides." (Williamson Aff., Exh. E, p. 2).

> n5 The required notice must set forth: (i) the name and address of the stockholder who intends to make the nomination and of the person or persons to be nominated; (ii) a representation that the stockholder is a holder of record of stock of the corporation entitled to vote at such meeting and intends to appear in person or by proxy at the meeting and nominate the person or persons specified in the notice; (iii) a description of all arrangements or understandings between the stockholder and each nominee and any other person or persons (naming such person or persons) pursuant to which the nomination or nominations are to be made by the stockholder; (iv) such other information regarding each nominee proposed by such stockholder as would be required to be included in a proxy statement filed pursuant to the SEC's proxy rules, had the nominee been nominated, or intended to be nominated, by the board of directors; and (v) the consent of each nominee to serve as a director of the corporation if so elected.

[*8]

The advance notice by-laws were first invoked in connection with the December 8, 1989 annual stockholders' meetings of both companies. At that time, Thomas W. Gamel, a substantial shareholder of Realty and Operating, threatened a proxy contest to elect his slate of nominees to both boards. After the companies jointly and publicly announced the annual meeting date, Mr. Gamel submitted his proposed slate in timely fashion in accordance with the advance notice by-law. Twenty-three days after the deadline for nominations had expired, both companies reached an accommodation with Mr. Gamel, under which Mr. Gamel was added to the boards of both companies and to their slates of management nominees. Mr. Gamel, in turn, abandoned his proxy contest. The nominations were not reopened, but no shareholder of either company objected.

Hubbard came on the scene when he filed, on August 3, 1990, a Schedule 13D with the Securities and Exchange Commission, disclosing that he had purchased

9.9% of the shares of Operating and Realty and that he ". . . intended to seek representation on [both companies'] Boards of Directors for himself and his nominees, and possibly to obtain control of such boards of [*9] directors." On September 13, 1990, Hubbard proposed to both companies' boards that he and four of his designees be added as directors and be nominated for re-election at Operating's next annual meeting. Citing perceived deficiencies in the management of the race track, including a decline in its profitability, Hubbard also proposed that Everett retire and be replaced by himself as Operating's Chairperson and Chief Executive Officer.

On October 24, 1990, Operating and Realty publicly announced that their annual meetings would be held on January 28, 1991, and that pursuant to their advance notice by-laws, any shareholder intending to submit proposals or director nominations at either meeting must submit the required notice by no later than October 31, 1990.

Shortly thereafter, Hubbard formally advised the boards of both companies that Hollywood Park had no business need to receive the by-law-mandated information within the seven-day advance notice by-law period. He proposed that the by-laws be amended to allow him thirty days to submit the required notice. Both boards rejected Hubbard's proposals. Two days later, on October 26, Hubbard filed this action for a declaratory judgment that [*10] the companies' advance notice by-laws are invalid, both facially and as applied. On October 31, 1990, the deadline date for giving the required notice under the advance notice by-law, Hubbard supplied to both Realty and Operating the information required by that by-law, including his proposed slate of eleven nominees for election to both boards.

On November 19, 1990, three weeks after the deadline for further nominations, Hubbard and the Realty board resolved their dispute, and formalized that resolution in an agreement (the "Settlement Agreement"). The Settlement Agreement did not resolve or address Hubbard's ongoing claims against Operating and its directors.

Under the Settlement Agreement, Realty's board voted to create a new directorship, elected Hubbard to fill it, and also agreed to appoint a committee of directors to nominate the "management" slate of candidates at Realty's annual meeting scheduled for January 28, 1991. In return, Hubbard agreed to abandon his proxy contest and to drop his previously nominated "insurgent" director slate for Realty. n6

n6 Under the Settlement Agreement Hubbard must be included as a candidate on the Realty "management" slate; otherwise, he will be re-

lieved of his obligations under that agreement and remain free to mount a contested proxy solicitation.

[*11]

The Settlement Agreement provision of particular significance to this motion is the agreement of Realty's directors not to amend or waive the advance notice by-law to permit any stockholder to nominate an insurgent slate at the annual meeting:

Realty represents and warrants that no stockholder other than Hubbard delivered a notice to Realty relative to the Annual Meeting pursuant to the Notice Requirement. Realty also acknowledges and agrees that the Notice Requirement will not be amended or waived by the Board of Directors of Realty at or prior to the Annual Meeting in order to permit any stockholder to make nominations or proposals at the Annual Meeting. (emphasis added)

The members of the nominating committee created pursuant to the Settlement Agreement are Messrs. Williamson, Newman, and Gamel, and Ms. Wray. Except for Ms. Wray, the nominating committee members are on record as supporting Hubbard's effort to change the direction and management of Hollywood Park. Messrs. Williamson and Newman have agreed to serve on Hubbard's slate of candidates for election to both the Realty and Operating boards, and Mr. Gamel nominated Hubbard to the Operating board several months [*12] before. Those relationships, and the Realty board's contractual commitment not to waive the seven-day by-law notice provision, make it virtually certain that Hubbard and persons allied with him will be the uncontested "management" slate at Realty's forthcoming annual meeting and will represent the majority of its newly elected board.

On November 29, 1990, Hubbard issued a joint proxy statement soliciting proxies and consents to elect his slate of directors for Operating at the annual stockholders' meeting to be held on January 28, 1991. The contested consent solicitation concluded on December 31, 1990.

On November 30, 1990, the five cross-claimants proposed to Realty's board that Hubbard withdraw his proxy contest and participate as an active bidder in an auction of both companies. Alternatively, the cross-claimants requested that the Realty board waive the seven-day advance notice requirement (i) to permit them to nominate a new slate that would be allied with Everett and would favor the negotiated sale of both companies in an auction, and (ii) to permit the shareholders to choose

between the two contending sides at Realty's forthcoming annual meeting.

On December 5, 1990, Realty's [*13] board determined that a sale of the company was not in its shareholders' best interests, and rejected the cross-claimants' other proposals, including their request that the board waive Realty's advance notice by-law. The following day, the cross-claimants filed their cross-claim and motion for a preliminary injunction seeking to restrain the Realty directors from enforcing the by-law as against them.

On December 15, 1990, the cross-claimants and Everett mailed to Operating's shareholders new proxy materials disclosing that Operating's annual meeting date had been changed from January 28 to February 18, 1991, and that the cross-claimants were soliciting proxies for that meeting as well as revocations of consents to elect Hubbard's proposed slate of directors for Operating. The cross-claimants and Everett have also solicited proxies to elect their own slate of nominees to the Realty board, and to remove and replace the current Realty directors. n7

> n7 The meeting as to which the instant by-law challenge pertains is Realty's 1989 annual stockholders' meeting. Realty's 1990 annual meeting will take place on a date no later than June 30, 1991, i.e., within the next six months. That is because a September 17, 1990 Realty board resolution requires Realty to have its annual meeting within six months after the close of the fiscal year, which ends on December 31, 1990.

[*14]

## II. PRELIMINARY MATTERS

### A. The Nature of the Dispute

The present controversy is easily described. For some time Realty has had in place an advance notice by-law that prescribes a certain period during which shareholders may nominate candidates for election to the board of directors. The facial validity of that by-law is not contested, and the deadline for nominating candidates at Realty's upcoming annual meeting has already passed. Nonetheless, the cross-claimants now seek, and claim entitlement, to nominate an opposing director slate on the basis that (i) the post-deadline Settlement Agreement with Hubbard represented a material change of circumstances that Realty's shareholders could not have anticipated before October 31, 1990, and that (ii) those changed circumstances entitle the movants, in fairness, to propose a dissident slate notwithstanding the by-law's time constraints. Stated differently, the cross-

claimants argue that the incumbent board's continued interposition of the advance notice by-law is inequitable and a breach of fiduciary duty in these peculiar circumstances, and that irreparable harm to the shareholder franchise will result unless this [*15] Court intervenes.

Certain Realty directors, as cross-defendants, n8 vigorously oppose that position. They contend that Operating has no standing to assert the claim being advanced, and that in any event, the cross-claimants are not threatened with irreparable harm. But the Realty directors' prime contention -- and the one accorded paramount treatment in this Opinion -- is that there is no showing of probable success on the merits, because they have violated no fiduciary duty owed to Realty's stockholders.

> n8 Messrs. Nederlander and Jaffe do not support the position of their fellow Realty directors, and have formally dissociated themselves from that position. References in this Opinion to the parties opposing the motion as the "Realty directors", should be understood as not including Messrs. Jaffe and Nederlander.

[HN1] On a motion for preliminary injunctive relief, the moving party must demonstrate a reasonable probability of success on the merits, that absent injunctive relief irreparable harm will occur, and that the harm [*16] the moving party will suffer if the requested relief is denied outweighs the harm the opponents will suffer if relief is granted. *Ivanhoe Partners v. Newmont Mining Corp., Del. Supr., 535 A.2d 1334, 1341 (1987).* Because in my view the primary issue concerns the element of probable success on the merits, I address the standing and irreparable harm arguments at this point.

### B. Standing and Irreparable Harm

The Realty directors challenge Operating's standing to challenge its by-law on the ground that Operating is not a shareholder of Realty and, therefore, no fiduciary duties are owed to it. However, that contention need not be decided, because the individual cross-claimants are undisputed stockholders of Realty. It is suggested that the individual cross-claimants' claim to be suing in their capacity as Realty shareholders is mere pretense, because their sole interest is to protect their status as directors of Operating. But even if (arguendo) that were the movants' purpose, it does not necessarily conflict with the interests of Realty shareholders generally. Those shareholders have an interest in having an opportunity to choose, as between competing slates [*17] of candidates for director, which group should manage the corporation's affairs. In addition, the individual cross-claimants otherwise meet the technical requirements for standing. Flerlage v.

KDI Corp., Del. Ch., C.A. No. 8007, Hartnett, V.C. (January 29, 1986).

Nor have the Realty directors persuaded me that no irreparable harm would result if injunctive relief were denied. The claim is that the Realty directors' interposition of the advance notice by-law to block the nomination of any competing slate is an actionable interference with the shareholders' exercise of their corporate franchise. Whether or not the Realty directors' actions are actionable is, of course, heavily controverted. However, if they are, then a denial of injunctive relief would result in irreparable harm by thwarting shareholders' voting rights. See, *International Banknote Co., Inc. v. Muller, 713 F. Supp. 612, 623 (S.D.N.Y. 1989)* ("Courts have consistently held that corporate management subjects shareholders to irreparable harm by denying them the right to vote their shares or unnecessarily frustrating them in their attempt to obtain representation on the board of directors."); *Aprahamian v. HBO & Co., Del. Ch., 531 A.2d 1204, 1208 (1987)* [*18] (Irreparable harm can be assumed where the postponement of a shareholders' meeting potentially defeats the will of the majority of shareholders); *Blasius Industries, Inc. v. Atlas Corp., Del. Ch., 564 A.2d 651, 659 (1988)* ("The shareholder franchise is the ideological underpinning upon which the legitimacy of directorial power rests."). [HN2] The shareholders' right to vote includes the right to nominate a contesting slate. The Third Circuit has so recognized:

We rest our holding as well on the common sense notion that the unadorned right to cast a ballot in a contest for office, a vehicle for participatory decisionmaking and the exercise of choice, is meaningless without the right to participate in selecting the contestants. As the nominating process circumscribes the range of the choice to be made, it is a fundamental and outcome-determinative step in the election of officeholders. To allow for voting while maintaining a closed candidate selection process thus renders the former an empty exercise. This is as true in the corporate suffrage contest as it is in civic elections, where federal law recognizes that access to the candidate selection process is a component [*19] of constitutionally-mandated voting rights.

*Durkin v. National Bank of Olyphant, 772 F.2d 55, 59 (3rd Cir. 1985).*

The Realty directors challenge the movants' basic factual premise. They contend that the movants' right to nominate a director slate will not be thwarted, because the cross-claimants and Everett are conducting a consent solicitation to elect their slate of candidates for control of the Realty board, and the advance notice by-law is not an obstacle to that effort. It is claimed that because the cross-claimants can achieve through their consent solici-

tation precisely that which they seek to accomplish by way of injunctive relief (i.e., the nomination of their slate unencumbered by the by-law), enforcement of the by-law in connection with the annual meeting cannot cause irreparable harm.

Were the matter so straightforward this application could easily be denied on that ground. However, as with much in life, the issue is not quite that simple, because the directors' argument overlooks one critical fact: [HN3] To elect their director slate pursuant to a consent solicitation, the cross-claimants must obtain consents representing a majority of all outstanding [*20] voting shares of Realty. *8 Del. C. § 228(a).* But to prevail at the annual shareholders' meeting (assuming a quorum is present), the cross-claimants need garner only a plurality of the votes represented at the meeting in person or by proxy. *8 Del. C. § 216.* Hence, the cross-claimants could well have to win substantially more votes to succeed in their consent solicitation, than would be the case for them to win a proxy contest at the shareholders' meeting. To that proposition the Realty directors offer no cogent response.

* * *

Thus, the critical issue concerns the element of probable success on the merits. As later discussed, the question that must be decided is whether, at the time the Realty directors entered into the Settlement Agreement with Hubbard, there devolved upon them a fiduciary duty not to enforce the advance notice by-law. If there did, the motion must be granted; if not, it must be denied.

### III. THE MERIT-RELATED CLAIMS

#### A. The Contentions

In order properly to identify, and then address, the legal issue presented on this motion, a somewhat detailed recital of the parties' merit-related contentions is necessary.

The movants contend that the continued enforcement [*21] of the advance notice by-law against them is inequitable, because during the window of time prescribed by the advance notice by-law, they had no reason to suppose that it would be necessary for them to nominate a dissident slate. At that point in time, both boards were united in their opposition to Hubbard, and the movants believed with good reason that Hubbard's effort to wrest control of Realty would be opposed by the Realty directors themselves. Accordingly, the movants contend that they had no cause to anticipate that after the by-law deadline had passed, a majority of Realty's directors would suddenly choose to ally themselves with Hubbard, agree to arrangements designed to result in a board supportive of Hubbard and his agenda, and contractually bind themselves not to waive the by-law specifically to prevent any opposition to their slate from being mounted.

The movants do not claim that the Realty directors lacked entitlement to shift their allegiance to Hubbard after the by-law deadline had expired. What the movants do contend is that in these circumstances that entitlement did not encompass the right to "lock up" the election by denying to those shareholders who might [*22] disapprove of that alliance and agenda the opportunity to nominate an opposing slate. Stated differently, the movants argue that the directors' right to make this material post-deadline change of position carried with it the concomitant duty to allow shareholders to be heard in opposition. That duty (they say) obligated the directors to waive the advance notice by-law requirement.

The movants urge that the basis for that duty is found in two lines of case authority. The first is the well-established doctrine that [HN4] where directors take action that, while legally permissible, is done for an inequitable purpose, such action is a breach of fiduciary duty that may be remedied by equity. *Schnell v. Chris-Craft Industries, Inc., Del. Supr., 285 A.2d 437 (1971).* n9 That doctrine has been applied to invalidate board action constituting an inequitable manipulation of the corporate machinery that affected adversely the shareholders' right to conduct a contested election of directors. See, *Schnell v. Chris-Craft Industries, Inc., supra; Aprahamian v. HBO & Co., Inc., supra; Lerman v. Diagnostic Data, Inc., Del. Ch., 421 A.2d 906 (1980);* [*23] See also, *Condec Corp. v. Lunkenheimer Co., Del. Ch., 230 A.2d 769 (1967).* n10 The movants rely in particular upon *Lerman,* a case where 63 days before the annual shareholders' meeting, the incumbent directors enacted a by-law that required 70 days' advance notice of nominations for directors. Because compliance with that notice requirement was impossible ab initio and automatically precluded any election contest, this Court found the application of the by-law inequitable and granted injunctive relief. The movants maintain that while the Lerman facts are different from those presented here, the Lerman rationale applies with equal force, because the actions taken by Realty's directors here also unfairly preclude an election contest.

n9 [HN5] To be "inequitable", such conduct does not necessarily require a dishonest, selfish, or evil motive. Stahl v. Apple Bancorp, Inc., Del. Ch., C.A. Nos. 11510, 11248, Allen, C. (May 18, 1990); *Lerman v. Diagnostic Data, Inc., Del. Ch., 421 A.2d 906, 912 (1980).*

n10 In Schnell, the incumbent board advanced the annual meeting date, thereby precluding a meaningful proxy contest. In Aprahamian, on the eve of the annual meeting date, the board postponed the meeting for several months; as a result, the proxies of the opposing slate would have been voided and their effort to gain control thereby defeated.

[*24]

The cross-claimants also invoke the doctrine articulated in *Blasius Industries v. Atlas Corp., supra,* that where a board acts intentionally to impede or thwart the shareholders' exercise of voting power, those actions, even if taken in good faith, will be invalidated unless the directors can show a compelling justification. In Blasius, this Court invalidated action by incumbent directors to expand the board and fill the newly created directorships. Those actions were taken purposefully to thwart the insurgent stockholder's attempt to expand the board and to obtain majority control through a written consent solicitation. Conceptually speaking, Blasius breaks no new ground, but it does represent a particularized application of the Schnell doctrine to specifically defined circumstances. Stahl v. Apple Bancorp, Inc., Del. Ch., C.A. Nos. 11510, 11248, Allen, C. (May 18, 1990). Because of the fundamental importance of shareholder voting rights to our system of corporate governance, Blasius may be viewed as holding that [HN6] director conduct intended to interfere with or [*25] frustrate shareholder voting rights is presumptively inequitable and will be invalidated, unless the directors are able to rebut that presumption by showing a compelling justification for their actions.

The movants argue that Blasius is directly applicable, because the Realty directors' contractual covenant not to waive the advance notice by-law intentionally interferes with and thwarts the exercise of the cross-claimants' legitimate right to nominate an anti-Hubbard slate. They claim, moreover, that the absence of any compelling justification is conclusively established by the explicit Settlement Agreement recital that that covenant is intended ". . . [not] to permit any stockholders to make nominations or proposals at the Annual Meeting."

The Realty directors, not surprisingly, vigorously dispute these contentions. They contend that the Blasius rule is inapplicable to these facts, and, alternatively, that there were compelling justifications for their actions. The directors claim that they never took action to impede the movants from nominating an opposing slate, and that no shareholder voting rights have been thwarted, because the notice deadline had expired and the shareholders [*26] had lost their right to nominate any slate three weeks before the Settlement Agreement was reached. They further point out that no claim is made that they (the directors) deliberately delayed or timed the execution of the Settlement Agreement so that it would occur after the shareholders' nomination rights had expired. Moreover, the directors argue, if any compelling justifi-

cation need be shown, that showing has been made, because: (i) the by-law serves a salutary purpose and its facial validity is not disputed, and (ii) the Settlement Agreement was reached to resolve a potentially disruptive dispute with Hubbard, and the directors in good faith believed that it will serve the corporation's best interests.

Those same arguments also form the basis for the directors' contention that they are not guilty of any inequitable or manipulative conduct. The directors argue that (i) for the movants to prevail, they must show director action involving affirmative, inequitable manipulation of the election process that in some way materially disadvantaged the shareholders, and (ii) this case involves no inequitable manipulation similar to that stricken down in Schnell, Aprahamian, and Lerman. [*27] No inequity has been visited upon the shareholders by the commitment not to waive the by-law, because at the time the Settlement Agreement was reached, the shareholders were no longer entitled to nominate an opposing slate. That being the case (the directors argue), their conduct cannot be wrongful or actionable, unless they are found to have been subject to a continuing duty to oppose Hubbard after the nomination period had expired. But, they claim, no basis for any such obligation has been shown. Nor were the movants entitled to assume that the Realty board would continue to oppose Hubbard, because they had been given ample notice, in a memorandum by company counsel, of the possibility that a settlement might be reached. That that possibility was far from theoretical is evidenced by the settlement reached with Mr. Gamel only one year before under similar circumstances, after the by-law notice deadline had already passed. Accordingly, the directors conclude, the movants had ample notice and opportunity to comply with the by-law, but chose not to do so.

Finally, the Realty directors contend that no material change of circumstances has occurred from which an equitable duty to waive the by-law can be implied. Specifically, there was no "seizure of control" of the board by Hubbard -- only a decision to support Hubbard's takeover effort and managerial agenda by certain Realty directors who are independent of Hubbard in every significant way. Nor (it is argued) would the election of the "settlement" management slate represent a significant change in the direction of the company, and the movants' claim that a policy dispute exists over whether or not the racetrack business should be sold is a bogus afterthought, contrived by the Everett faction solely for electioneering purposes. Thus, far from any material change of circumstances, all that occurred here was a 13th hour change of strategy by the cross-claimants, who belatedly want to nominate an opposing slate. The Realty directors suggest that if injunctive relief is justified in these circumstances, corporate directors would be required to waive an otherwise valid advance notice requirement whenever a shareholder group demands it -- a result that would effectively emasculate all such by-laws because corporate boards could never be certain of their right to enforce them.

B. The Problem

The foregoing recital [*29] identifies an important element missing in both parties' analyses. The movants argue that Blasius compels injunctive relief, yet Blasius applies only if there has been director action intended to thwart the exercise of shareholder voting rights. The only director action that could have that effect is the directors' covenant in the Settlement Agreement not to waive the by-law, but at the time the directors made that agreement, no shareholder had an existing right to nominate a dissident slate because the by-law deadline for nominations had already expired. Thus, in terms of Blasius, no right to nominate a competing slate (and, concomitantly, no shareholder right to vote) has been impaired, unless one posits that at the time they entered into the Settlement Agreement the directors had a duty to waive the by-law notice requirement. Thus, the existence of such a duty is central to the movants' Blasius argument, yet that argument, as presented by the movants, presupposes -- but does not of itself establish -- that that duty existed.

The same problem inheres in the movants' inequitable manipulation theory. It is conceded that the Realty directors did not act improperly in [*30] reaching an accord with Hubbard. That being the case, on what basis can an agreement not to waive the advance notice by-law, reached after the notice deadline had expired, be found inequitable, unless again one posits that at that point the Realty directors had a duty to waive that by-law? Thus, the inequitable manipulation argument also raises -- but does not fully answer -- the question that is pivotal to this case: At the time the Settlement Agreement was executed, did the Realty directors become equitably obligated to waive the advance notice by-law? Stated differently, although the by-law notice requirement is facially valid and was equitable at the time it originally became applicable, was the Realty directors' subsequent refusal to waive the by-law requirement inequitable? In my opinion the answer is yes." n11

n11 "Because the duty found to exist here is predicated upon the more comprehensive doctrine of Schnell and Lerman, I need not, and therefore do not, apply Blasius in determining that relief should be granted.

[*31]

C. The Governing Standard

One might start by asking whether the Court should even undertake this inquiry at all. A cogent argument might be made that it should not. If, in order to establish the movants' Blasius or inequitable manipulation claims it becomes necessary to imply judicially a duty not previously recognized, should not that fact counsel against extending those doctrines to situations not involving any overt manipulation of or tampering with the election machinery? The Realty directors so argue (albeit in different words and in a different context), by contending that these doctrines apply only to "affirmative" board action that changes the rules of the game in the midst of an election contest, but they do not reach conduct amounting simply to a board refusal or failure to change the rules at a stockholder's behest.

However, the case-by-case development of the law governing fiduciary obligations -- a process that is integral to our common law tradition -- cannot be constrained by so facile a distinction. From a semantic and even legal viewpoint, "inaction" and "action" may be substantive equivalents, different only in form. Moreover, occasions do arise where board [*32] inaction, even where not inequitable in purpose or design, may nonetheless operate inequitably. If that occurs, it cannot tenably be maintained that equity is without power to grant relief to an aggrieved party in an appropriate case. n12

> n12 Certainly a board cannot be heard to argue that it has no obligation even to consider whether or not to redeem a poison pill rights plan in the face of a noncoercive tender offer, simply because its refusal amounts to "inaction" rather than affirmative board "action." *Moran v. Household International, Inc., Del. Supr., 500 A.2d 1346, 1354 (1985).* For present purposes, a refusal to waive a nomination by-law cannot be meaningfully distinguished from a refusal to redeem a rights plan.

A hypothetical example suggested by the movants aptly illustrates the point. Suppose that a board of a corporation which has an advance notice by-law, announces an annual meeting date at a time when there is no public controversy over corporate control or policy. The deadline for [*33] nominations passes without any dissident slate emerging. The board then (in good faith and without having previously planned or considered it) decides upon and announces a radical proposal to change the corporation's basic business or to embark upon a similar program that, if announced before the nomination deadline, would have foreseeably generated controversy and led to the nomination of a dissident slate. In this hypo-

thetical case opposition does, in fact, develop, and a shareholders' group makes a request -- which the board refuses -- to waive the advance notice by-law requirement to enable a dissident slate opposing the incumbents' radical agenda to be nominated. In such circumstances, it cannot be supposed that a court of equity must turn aside a claim by shareholders for relief solely because the board's refusal to waive the by-law takes the form of "inaction."

The question, thus, is not whether the Court has the power to imply an equitable duty of directors to waive the by-law requirement, but whether it should exercise that power in these circumstances. That question can only be answered by reference to a governing legal (or equitable) standard, and by then determining whether [*34] the facts of this case measure up to that standard.

Blasius, Schnell, and the other authorities cited by the parties, while not articulating such a standard, clearly inform any inquiry into the subject. Those precedents reaffirm the fundamental nature of [HN7] the shareholders' right to exercise their franchise, which includes the right to nominate candidates for the board of directors. That those rights are fundamental does not mean that their exercise cannot be restricted for valid corporate purposes by board-created procedural rules. However, those restrictions must not infringe upon the exercise of those rights in an unreasonable way. See, e.g., *Datapoint Corp. v. Plaza Securities Co., Del. Supr., 496 A.2d 1031, 1036 (1985)* (permitting directors to adopt a by-law that imposes minimal essential provisions for ministerial review of action taken by shareholder written consent). Subject to that limitation, this Court has upheld the validity of an advance notice by-law which, by its very nature, restricts the shareholders' right to nominate candidates for the board. Compare, *Nomad Acquisition Corp. v. Damon Corp., Del. Ch., C.A. No. 10173, Hartnett, V.C.* [*35] (September 20, 1988) (upholding facial validity of advance notice by-law) with *Lerman v. Diagnostic Data, Inc., supra* (holding that a nomination by-law cannot be applied inequitably to thwart the right to conduct an election contest).

From these principles it may be inferred that [HN8] an advance notice by-law will be validated where it operates as a reasonable limitation upon the shareholders' right to nominate candidates for director. More specifically, such a by-law must, on its face and in the particular circumstances, afford the shareholders a fair opportunity to nominate candidates. Because the facial validity of the Realty by-law is not contested, the inquiry ultimately focuses on whether the by-law, as applied in these circumstances, has afforded the shareholders a fair opportunity to nominate director candidates.

D. The Standard Applied

As previously noted, the Realty directors argue that the movants were on notice of the plausible possibility that an accommodation with Hubbard might be reached after the nomination deadline had expired, but the movants took no timely action to nominate a slate. If that view were accepted, relief should be denied, since the [*36] movants would have been afforded a fair opportunity to nominate their slate. However, that view of the law would place an unreasonable burden of clairvoyance upon these movants and from a policy standpoint would be unsound.

The argument would impose unreasonable burdens, because the only "fact" of which these movants had fair notice was a speculative possibility of a radical shift in the board's position. That shift was inherently unknowable until after the nomination deadline had expired. Even if it could fairly be said that the movants had constructive notice of a potential radical shift in board allegiance, such notice did not encompass the possibility that the board would also contractually agree to foreclose the nomination of any competing slate. Further, the directors' argument, if accepted, would encourage undesirable corporate board behavior. For example, in corporations having a majority of independent directors, the minority directors might believe themselves compelled (in their capacity as shareholders) to nominate a "dissident" slate to protect their positions, lest the majority faction suddenly decide to stage a surprise electoral coup after the nomination window had [*37] closed. In these circumstances a rule that imposes upon shareholders the burden of anticipating such perfidious contingencies, no matter how remote, and that encourages election-related behavior that may unnecessarily disrupt otherwise harmonious board relationships, is unsound.

Lastly, the directors contend that their accommodation with Hubbard did not represent a radical shift in position, or a material change in circumstances, such that their refusal to waive the advance notice by-law would unfairly deprive Realty's stockholders of a fair opportunity to nominate a dissident slate. As earlier noted, the directors argue that Hubbard did not seize control of the board (in the sense of dominating a majority of its members), and the agenda of the newly nominated "Hubbard slate" will not threaten a significant change in corporate direction or policy.

Again, I cannot agree. For present purposes, the fact that Hubbard may not dominate a majority of the Realty board is not critical. It is sufficient -- and the movants have preliminarily established to my satisfaction -- that certain Realty directors formed an alliance with Hubbard that, assuming their election, would represent a majority [*38] of the Realty board. That alliance intends to replace the present management of Realty (and Operating) and to change significantly the existing operating and management policies at the race track. Hubbard himself so conceded in a joint proxy and consent statement, wherein he represented his belief that "the interests of all of the shareholders require that fundamental changes be made in the operation and management of Hollywood Park." n13

> n13 Although that statement appears in Hubbard's proxy and consent solicitation materials for Operating, it necessarily is applicable to Realty as well. Realty and Operating jointly own and operate the race track whose policies would be fundamentally changed. Because those two corporations are "joined at the hip" both legally and as a matter of practical business reality, any significant change at one corporation would inevitably affect the other.

My conclusion that the post-deadline agreements and accommodations with Hubbard represented a "material change of circumstances" should [*39] not be read to imply any view of this Court that those developments (including the management slate's agenda) are either "good" or "bad" in the business or electoral sense. That judgment is solely for the shareholders to make. All that this Court can decide is whether, in these circumstances, the shareholders can be asked to make that judgment without presently being afforded a fair opportunity to nominate a dissident slate and to consider its opposing views. In my view the answer must be no.

This is not a case where the shareholders, unprovoked by any board action, unilaterally and belatedly changed their minds and decided to nominate a slate of candidates for director. In such a situation, relief should clearly be denied. Rather, this is a case where the Realty board itself took certain action, after the by-law nomination deadline had passed, that involved an unanticipated change of allegiance of a majority of its members. It was foreseeable that that shift in allegiance would result in potentially significant changes in the corporation's management personnel and operational changes in its business policy and direction. Such material, post-deadline changes would also foreseeably [*40] generate controversy and shareholder opposition. Under those circumstances, [HN9] considerations of fairness and the fundamental importance of the shareholder franchise dictated that the shareholders be afforded a fair opportunity to nominate an opposing slate, thus imposing upon the board the duty to waive the advance notice requirement of the by-law. And that duty exists, even though concededly the Realty board has acted in good faith and took no steps overtly to change the electoral rules themselves.

1991 Del. Ch. LEXIS 9, *

Finally, policy, as well as purely equitable, considerations also require this result. The Realty by-law serves the proper purpose of assuring that stockholders and directors will have a reasonable opportunity to thoughtfully consider nominations and to allow for full information to be distributed to stockholders, along with the arguments on both sides. (Williamson Aff., para. 5 and Exh. E). Unless the advance notice requirement is waived here, that purpose will be frustrated, at least to the extent that there will be no "arguments on both sides" for shareholders to consider. Moreover, the by-law's other purpose -- to afford adequate time for information and reflection -- can be achieved [*41] by a modest adjustment in the date of the annual meeting, if needed. For these reasons, the policy underlying the shareholders' fundamental right to exercise their franchise significantly outweighs the policies favoring the continued enforcement of the by-law. The harm caused to shareholders from enforcing the by-law will greatly outweigh its benefits.

* * *

Accordingly, a preliminary injunction will issue directing the cross-defendants to waive the advance notice by-law requirement so as to afford any shareholder who so desires a reasonable opportunity to nominate a dissident slate of candidates for election to the Realty board. n14 Counsel shall submit an appropriate form of order implementing the rulings in this Opinion.

    n14 Although the relief granted is mandatory in nature, I find that the movants have made a showing entitling them to that relief. See, TW Services, Inc. v. SWT Acquisition Corp., Del. Ch., C.A. No. 10427, Allen, C. (March 2, 1989); Kingsbridge Capital Group v. Dunkin' Donuts Inc., Del. Ch., C.A. Nos. 10907, 10809, 10825, 10829, 10831, and 10899, Chandler, V.C. (Aug. 7, 1989).

[*42] 42

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| NORTHWESTERN CORPORATION, | ) | Case No. 03-12872 (JLP) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |
| THE PLAN COMMITTEE | ) |  |
| OF NORTHWESTERN CORPORATION, | ) |  |
|  | ) |  |
| Appellant, | ) |  |
|  | ) | Civil Action No. 06-157 |
| v. | ) |  |
|  | ) |  |
| NORTHWESTERN CORPORATION, | ) |  |
|  | ) |  |
| Appellee. | ) |  |

**ORDER GRANTING MOTION OF THE PLAN COMMITTEE**
**FOR RELIEF FROM THE STANDING ORDER ON MEDIATION**
**AND FOR EXPEDITED BRIEFING AND ORAL ARGUMENT**

This matter came before the Court upon the motion of the Plan Committee, dated

March 9, 2006, (the "Motion"), for entry of an order for relief from the standing order on

mediation and for expedited briefing and oral argument; the Court having reviewed the Motion

and finding that: (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 158(a)

and 1334; notice of the Motion was sufficient under the circumstances; and the Court having

determined that the legal and factual bases set forth in the Motion establish just cause for the

relief granted herein; it is hereby

ORDERED that the Motion is granted; and it is further

ORDERED that the Standing Order shall not apply in this appeal; and it is further

ORDERED that the Plan Committee shall filed its appellate brief within ___ days of the date of entry of this Order; and it is further

ORDERED that responsive briefs, if any, shall be filed within ___ days of the filing of the appellate brief; and it is further

ORDERED that the Plan Committee shall filed its reply brief to the response(s), if any, within ___ days of the filing of the response(s); and it is further

ORDERED that oral argument on this appeal shall be held on _____, 2006; and it is further

ORDERED that this Court retains jurisdiction to enter all further orders that it deems necessary, appropriate and just.

Dated: _____ ___, 2006
      Wilmington, Delaware


_____
United States District Court Judge

## CERTIFICATE OF SERVICE

I, Eric M. Sutty, do hereby certify that on this 9th day of March, 2006, I caused a true and correct copy of the attached **Motion of The Plan Committee for Relief from the Standing Order on Mediation in This Appeal and for Expedited Briefing and Oral Argument** to be served on the attached service list via hand delivery to local parties and via U.S. First Class mail to all remaining parties.

Eric M. Sutty (No. 4007)

# North Western Corp.

# Service List

Alan W. Kornberg, Esquire
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York    NY    10019-6064
*Counsel to Plan Committee*

Victoria Counihan, Esquire
Dennis A. Meloro, Esquire
.
Greenberg Traurig, LLP
Suite 1540
The Brandywine Building
1000 West Street
Wilmington    DE    19801
*Counsel for Debtor*

Mark  Kenney, Esquire
Office of the United States Trustee
Suite 2313
844 King Street
Wilmington    DE    19801

Adam G. Landis, Esquire
Kerri K. Mumford, Esquire
Landis Rath & Cobb LLP
919 Market Street
Sutie 600
Wilmington    DE    19801
*Avista Energy Inc.*

Mark J Packel, Esq.
Dale R. Dube, Esq.
Elio Battista, Jr., Esq.
Blank Rome LLP
1201 Market Street
Suite 800
Wilmington    DE    19801
*Magten Asset Management Corp.*

Gary L. Kaplan, Esq.
Brad Eric Scheler, Esq.
Bonnie Steingart, Esq.
Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York    NY    10004
*Magten Asset Management Corp.*

Amanda D. Darwin, Esq.
John V.  Snellings, Esq.
Lee  Harrington, Esq.
Nixon Peabody LLP
100 Summer Street
Boston    MA    02110-1832
*Law Debenture Trust Company of NY*

Kathleen M. Miller , Esq.
David A. Jenkins, Esq.
Smith, Katzenstein & Furlow LLP
800 Delaware Avenue
7th Flr.
P.O. Box 410
Wilmington    DE    19899
*Magten Asset Management Corp.*

Phillip Bentley, Esq.
Matthew J. Williams, Esq.
Kramer Levin Naftalis & Frankel
1177 Avenue of the Americas
New York    NY    10036