IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| NORTHWESTERN CORPORATION, | : | |
| Reorganized Debtor. | : | Case No. 03-12872 (KJC) |
| | : | |
| THE PLAN COMMITTEE OF | : | |
| NORTHWESTERN CORPORATION, | : | |
| Appellant, | : | |
| v. | : | |
| | : | Civil Action No. 06-157 (JJF) |
| NORTHWESTERN CORPORATION, | : | |
| | : | |
| Appellee. | : | |

---

**RESPONSE OF MAGTEN ASSET MANAGEMENT CORPORATION
AND LAW DEBENTURE TRUST COMPANY OF NEW YORK
TO THE MOTION OF THE PLAN COMMITTEE FOR RELIEF FROM THE
STANDING ORDER ON MEDIATION IN THIS APPEAL AND
FOR EXPEDITED BRIEFING AND ORAL ARGUMENT**

Magten Asset Management Corporation ("Magten") and Law Debenture Trust Company

of New York ("Law Debenture"), in its capacity as Indenture Trustee of the Series A 8.45%

Quarterly Income Preferred Securities (the "QUIPS"), for their response (the "Response") to the

Motion of the Plan Committee (the "Motion"),[1] for Relief from the Standing Order on Mediation

in this Appeal (the "Appeal") and for Expedited Briefing and Oral Argument respectfully state as

follows:

---

[1]    All capitalized terms not expressly defined herein have the meanings ascribed to them in NorthWestern
Corporation's ("NorthWestern") Second Amended and Restated Plan of Reorganization Under Chapter 11
of the Bankruptcy Code (the "Plan").

## I. PRELIMINARY STATEMENT

The Plan Committee's Motion is simply its latest tactic to cause unnecessary burdens on Magten, Law Debenture and the Court and to try to distribute stock reserved for Magten and the holders of the QUIPS while delaying Magten and Law Debenture's prosecution of their claims. While Magten and Law Debenture do not object to bypassing mediation in the Appeal as a result of the Plan Committee's past failure to mediate in good faith, its dilatory tactics, and its interference with past settlement efforts, there is no basis to expedite the Appeal and, therefore, Magten and Law Debenture object to the request for expediting briefing and oral argument.

As a threshold matter, the Plan Committee has not demonstrated "good cause" to allow the appeal to proceed on an expedited briefing schedule under Rule 8019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). While the Plan Committee alleges that holders of the Allowed Claims will be "irreparably harmed' in the absence of an expedited decision in the Appeal, the Plan Committee fails to establish that these creditors will suffer any harm whatsoever, let alone irreparable harm. In fact, the only irreparable harm alleged by the Plan Committee is a preclusion of Allowed Creditors' ability to exercise their shareholder rights. As described in detail below, this argument is wholly without merit as holders of New Common Stock have been active in exercising their shareholder rights whereas Magten and certain holders of the QUIPS have been the only creditors deprived of their rights to receive shares under the Plan. To date, Magten and the holders of the QUIPS that chose to pursue claims against Northwestern for damages resulting from, among other things, the fraudulent transfer of certain Montana utility assets to Northwestern (the "QUIPS Litigation Claims") have received a zero recovery while holders of Allowed Claims in Classes 7 and 9 who were expected to receive a 63.6% recovery have received in excess of 100% on account of their claims. The Plan Committee, with no regard for the QUIPS Litigation Claims, seeks to decimate the Disputed

2

Claims Reserve (which was established to protect Magten and the holders of the QUIPS Litigation Claims) by providing holders of Allowed Claims with an *additional* recovery at the expense of the QUIPS. Magten and holders of the QUIPS Litigation Claims, therefore, face the very real possibility that their claims will become Allowed Claims, but that because of the additional distributions to other creditors, Magten and holders of the QUIPS Litigation Claims will receive a diminished recovery should they prevail on their claims. This result, whereby similarly situated creditors would receive disparate distributions solely because of the timing of when their claims became Allowed Claims, is contrary to both the principles of the Bankruptcy Code and the express language of the Plan.

The Bankruptcy Court, in denying the Plan Committee's request to make distributions from the Disputed Claims Reserve, made it explicitly clear that "if [the Plan Committee] want[s] to get a surplus [distribution], get a resolution of the Magten case. And until that case is resolved, there will be no [Surplus] Distribution Order . . . [they] can't have it both ways." [App. Des. No. 91 p. 64].[2]  In contrast to the harm caused to Magten and Law Debenture, the holders of Allowed Class 7 and 9 Claims will suffer no "irreparable harm" by allowing this Appeal to proceed in a normal fashion as opposed to an expedited schedule. While the Plan nominally provided holders of Allowed Class 7 and 9 Claims only an approximate 63.6% recovery on the face value of their claims, that percentage was based on valuing the consideration distributed to them (common stock of the reorganized NorthWestern) at only $20 per share.[3]  Once the stock (ticker symbol:

---

[2]    Throughout this Objection, references to items identified in the Plan Committee's Designation of Items to be Included in the Record on Appeal and Statement of Issue to be Presented on Appeal [03-12872 Bankr. Docket No. 3446], shall be referred to as *"App. Des. No. __"*.  Exhibit references to items identified in Magten and Law Debenture's Designation of Additional Documents for the Record on Appeal [03-12872 Bankr. Docket No. 3450], shall be referred to as *"Magten & Law Debenture Des. No. __"*.

[3]    This information was calculated based on an informational chart obtained from NorthWestern's website, entitled "Additional Distribution to Class 7." According to the information contained therein, Class 7 has received 28,575,034 shares of New Common Stock x $20 per share Plan Value = $575,500,680 recovery /

NWEC) began trading freely following confirmation of the Plan, the market revealed that its true value was substantially higher. In fact, the stock closed on March 17, 2006 at $31.43 per share, implying a creditor recovery of over 100%. Further, according to NorthWestern, it has resolved all Disputed Class 9 Claims, with the exception of the claims asserted by Magten and holders of the QUIPS. Therefore, because holders of Allowed Class 7 and 9 Claims have already received a full recovery, the substantive rights of these creditors will not be affected by having this Appeal proceed in the ordinary course and not on an expedited basis.

## II. BACKGROUND

Magten holds approximately 40% of the QUIPS. Law Debenture is the Indenture Trustee for the QUIPS.

On April 16, 2004, Magten and Law Debenture filed an action in the Bankruptcy Court based on NorthWestern's fraudulent transfer of substantially all of the utility assets of its directly owned subsidiary, Clark Fork & Blackfoot LLC ("Clark Fork"), to NorthWestern for inadequate consideration (the "Transfer") on November 15, 2002 (the "NorthWestern Action"). Though the Clark Fork assets had a value well in excess of $1 billion, the total consideration received for the Transfer was the assumption of approximately $700 million of liabilities by NorthWestern. As a result of this Transfer, Clark Fork was rendered insolvent. Based on the Transfer, the Plaintiffs filed the NorthWestern Action against NorthWestern on behalf of the QUIPS holders seeking to set aside the fraudulent conveyance of the Clark Fork utility assets to NorthWestern. The QUIPS represented debt obligations of Clark Fork, which but for the Transfer would have remained solvent. The validity and effectiveness of a release purportedly exonerating Clark Fork from any

---

$898,264,683 in Allowed Class 7 Claims = 63.6% recovery. NorthWestern's website does not provide information on distributions of holders of Allowed Class 9 Claims, however, under the Plan holders of Allowed Class 9 Claims were to receive the same percentage recovery as holders of Allowed Class 7 Claims.

4

liability with respect to the QUIPS and compelling their holders to look only to the insolvent NorthWestern is one of the issues to be resolved in the NorthWestern Action.

On August 19, 2004, NorthWestern filed its Plan and the Second Amended and Restated Disclosure Statement (the "Disclosure Statement"). On August 31, 2004, NorthWestern filed its revised Plan and Disclosure Statement, and on September 2, 2004, the Bankruptcy Court entered an order approving the Disclosure Statement. Pursuant to the Plan, Magten and other holders of the QUIPS that chose to pursue the NorthWestern Action, which if successful, would receive an Allowed Class 9 Claim to be satisfied from the Disputed Claims Reserve. [App. Des. No. 7 pp. 36-37, § 4.8(b)(ii)].

On October 19, 2004, the Bankruptcy Court entered an order confirming the Plan (the "Confirmation Order"). The Confirmation Order required NorthWestern to "establish an initial reserve of 13.5% of New Common Stock allocated to Class 7 and Class 9 for the Disputed Claims Reserve . . . pursuant to Section 7.5 of the Plan."[4] [App. Des. No. 22 p. 80-81]. At all times during the confirmation hearing and the confirmation process, the information regarding the methodology for establishing the reserve and the sufficiency of the reserve was solely in NorthWestern's possession and control.

On November 1, 2004, NorthWestern and Law Debenture entered into a stipulation (the "Stipulation"), whereby NorthWestern agreed to set aside a portion of the Disputed Claims Reserve "solely to satisfy in full a $25 million Class 9 claim of the QUIPS Litigation Claims holders" (the "QUIPS Claims Reserve") and set forth the rights of the QUIPS Litigation Claims holders to recover on account of an Allowed Claim in excess of that amount. [Magten & Law

---

[4]    The 13.5% reserve proposed by NorthWestern was predicated on representation that 13.5% of the stock was an amount equal to the relevant percentage of Distributions to which the holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims in the amount of such Disputed Claim or such lesser amount as required by Final Order, as required by Section 7.5 of the Plan.

Debenture Des. No. 46 pp. 2-3]. By its express terms, the Stipulation did not cap the recovery on account of the QUIPS Litigation Claims at $25 million. The Stipulation provided that an Allowed Claim in excess of $25 million would be satisfied from the Disputed Claims Reserve.

Law Debenture entered into the Stipulation in reliance on NorthWestern's assertions that the Disputed Claims Reserve was sufficiently funded to comply with the terms of the Plan and the Confirmation Order and provide the holders of the QUIPS Litigation Claims with the same recovery accorded to holders of Allowed Class 9 Claims.

NorthWestern emerged from bankruptcy on November 1, 2004, and the Plan became effective (the "Effective Date").

On March 2, 2005, only four months after the Effective Date, at a hearing before the Bankruptcy Court in connection with a motion by Magten and Law Debenture to enforce the terms of a settlement agreement that had been executed by Magten and Law Debenture and NorthWestern, counsel for each of NorthWestern, the Plan Committee, and an ad hoc committee of Class 7 noteholders argued that the Disputed Claims Reserve did not contain sufficient New Common Stock to satisfy the terms of the settlement – even though the settlement provided holders of the QUIPS Litigation Claims with a recovery of less than the full amount of their claims.

Questions surrounding the sufficiency of the Disputed Claims Reserve led Magten and Law Debenture to initiate an adversary proceeding on April 15, 2005, against NorthWestern and its senior management alleging that because the Disputed Claims Reserve had not been properly funded the order confirming the Plan had been procured by fraud and should be withdrawn pursuant to section 1144 of the Bankruptcy Code. This proceeding has been stayed pending resolution of Magten's appeal of the Confirmation Order. To date, it remains unclear whether

6

the Disputed Claims Reserve contains enough New Common Stock to afford the holders of Disputed Claims the same recovery afforded to holders of Allowed Class 9 Claims.

On September 29, 2005, the Plan Committee filed a Motion in Aid of Consummation and Implementation of the Plan for an Order Authorizing and Directing NorthWestern to Distribute Surplus Distributions (the "Surplus Distributions Motion") [App. Des. No. 73]. The Plan Committee asserted that pursuant to Section 7.7 of the Plan, holders of the Allowed Class 7 Claims are entitled to their Pro Rata Share of any surplus distribution held in the Disputed Claims Reserve after each disputed claim has been resolved [App. Des. No. 7 p. 58, § 7.7].

Magten and Law Debenture timely filed a joint objection to the Surplus Distributions Motion [App. Des. No. 77]. NorthWestern also filed a response to the Surplus Distributions Motion that recognized that surplus distributions cannot be made until the claims of Magten and Law Debenture have been resolved [App. Des. No. 85]. The Plan Committee, thereafter, filed an omnibus reply to Magten and Law Debenture's joint objection and NorthWestern's response [App. Des. No. 86].

On January 11, 2006, the Bankruptcy Court held a hearing with respect to the Surplus Distributions Motion and denied the relief requested by the Plan Committee [App. Des. No. 92]. In denying the Surplus Distribution Motion, the Bankruptcy Court held that "Section 7.7 [of the Plan] . . . require[es] a full resolution of all [D]isputed [C]laims before there can be a [surplus] distribution." [App. Des. No. 91 p. 55]. The Bankruptcy Court further held that "if [the Plan Committee] want[s] to get a [S]urplus [Distribution], get a resolution of the Magten case. And until that case is resolved, there will be no [Surplus] Distribution Order." Id. at p. 64.

The Bankruptcy Court entered the order denying the Surplus Distribution Motion on February 7, 2006 [App. Des. No. 92] and on the same day, the Plan Committee filed a Notice of

120087.01600/40160743v.1

Appeal of the Surplus Distributions Order. [App. Des. No. 93]. On February 16, 2006, the Plan

Committee filed its Appellant Designation of Contents for Inclusion in Record on Appeal and

Statement of Issue to be Presented on Appeal [03-12872 Bankr. Docket No. 3446] and, on

February 27, 2006, Magten and Law Debenture filed a Joint Designation of Additional Items to

be Included in the Record on Appeal [03-12872 Bankr. Docket No. 3450]. The transmittal of the

record to this Court occurred on March 8, 2006. [03-12872 Bankr. Docket No. 3459].

### III. RESPONSE

A.    Magten and Law Debenture Do Not Object to Relief from the Standing Order in
      Light of the Plan Committee's Past Failure to Mediate in Good Faith

Over the course of the last year and a half, the Plan Committee has employed

unreasonable tactics to upset any possibility of Magten and Law Debenture resolving their

disputes with NorthWestern. Like NorthWestern, who has continuously acted to avoid litigating

Magten and Law Debenture's claims and has filed a motion for a protective order that effectively

stays all discovery in the litigations before this Court, the Plan Committee has joined

NorthWestern in its "game of delay" by seeking expedited relief to distribute shares of New

Common Stock that may ultimately be recoverable by Magten and the holders of the QUIPS

Litigation Claims.

The Plan Committee's lack of candor before this Court regarding its stance on mediating

Magten and Law Debenture's claims is evidenced by the previous failed mediations engaged in

between the parties. While the Plan Committee has insisted on being a part of the settlement

process of the claims of Magten and Law Debenture, the Plan Committee continues to obstruct

the effective resolution of Magten and Law Debenture's claims. Since the status conference held

before this Court on October 21, 2005 (the "October Status Conference"), the Plan Committee,

along with NorthWestern, has employed various strategies to delay the resolution of all the

8

related appeals and actions brought by Magten and Law Debenture. Despite having an order directing discovery in the action brought by Magten in Montana against the officers of Clark Fork, and despite Magten and Law Debenture's readiness to commence discovery in the litigations before this Court, on the eve of the October Status Conference, NorthWestern requested to engage in a second mediation. The Plan Committee supported NorthWestern's request by expressly stating to the Court that "[w]ith respect to settlement efforts, I want to be very clear as to what the Plan Committee's position is. We have advised the debtor and we've advised them in writing that we would be *pleased* to participate in mediation." See Exhibit A p. 23 (emphasis added). Further, the Plan Committee disputed Magten's assertion that mediation was simply a ploy to delay the beginning of discovery and the decision in the pending appeals.

Consistent with its past behavior, the Plan Committee was once again the obstacle in the settlement efforts of NorthWestern and Magten and Law Debenture at the second mediation. Magten and Law Debenture then sought to go forward with discovery in the litigations only to be stopped in their tracks by NorthWestern's belated and transparent filing of a motion for protective order from virtually all discovery. Likewise, not only is the Plan Committee's current Motion a further tactic to delay resolution of Magten and Law Debenture's claims, but the Plan Committee is seeking to harm Magten and the holders of the QUIPS by distributing shares from the claims reserve that was established to protect the recovery of Magten and QUIPS holders.

NorthWestern has also recognized the Plan Committee's tactics and noted that the Plan Committee's "aggressive stance against settling the Magten litigation . . . ha[s] made it abundantly clear that they will oppose any settlement . . . . Although NorthWestern has made numerous efforts to settle [Magten's and Law Debenture's] claims, the opposition of the Plan Committee has proven to be a significant obstacle." [Magten & Law Debenture Des. No. 124,

9

Docket No. 56 p.10]. In light of the Plan Committee's lack of good faith in mediating the disputes between the parties and its history of employing strategies to frustrate any settlement process, mediation of this Appeal would likely be unproductive and a waste of economic resources.

B.    The Plan Committee Has Failed to Establish Good Cause to Expedite Briefing the Appeal and Oral Argument

While there would likely be no productive basis for mediation in this Appeal, there is absolutely no basis to expedite briefing and oral argument.

Pursuant to Bankruptcy Rule 8019, the Plan Committee seeks an expedited briefing schedule in the Appeal and requests that, at the conclusion of briefing, the Court schedule oral arguments at its earliest convenience. Bankruptcy Rule 8019 provides in relevant part that:

> In the interest of expediting decision or for other cause, the district court or the bankruptcy appellate panel may suspend the requirements or provisions of the rules in Part VIII, except Rules 8001, 8002, and 8013, and may order proceedings in accordance with its direction.

The primary purpose of Bankruptcy Rule 8019 is to give the district courts the power to expedite the consideration of cases that are of primary concern to the public or to the litigants. See Original Advisory Committee Note to Rule 2 of the Federal Rules of Appellate Procedure. Specifically, FRAP 2 provides that "a court of appeals may - to expedite its decision or for other good cause – suspend any provision of the[] rules" in Part VIII.

In arguing that "good cause" exists to expedite briefing, the Plan Committee has articulated a standard of "irreparable harm". In order to demonstrate irreparable harm, the moving party "must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy . . . ." Instant Air Freight Co. v. CF Air Freight, Inc., 882 F.2d 797, 800 (3d Cir. 1989). The Supreme Court in Sampson v. Murray, 415 U.S. 61 (1974) has stated:

> [I]t seems clear that the temporary loss of income, ultimately to be

10

> recovered, does not constitute irreparable injury . . . . The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time, and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

Id. at 90 (citation and quotation omitted).

The Plan Committee has failed to establish that the holders of Allowed Class 7 and 9 Claims will be irreparably harmed if expedited briefing and oral argument is not granted when the holders of Allowed Class 7 and 9 Claims can be provided "corrective relief at a later date in the ordinary course" of the Appeal. Id.

At the outset, the Plan Committee argues that the Appeal turns on a question of law and, thus, it is "susceptible to briefing, argument and consideration by the Court on an expedited basis." The Plan Committee erroneously characterizes the issue on appeal as a "purely" legal question, when a factual dispute exists: is there sufficient stock in the Disputed Claims Reserve to satisfy the claims of Magten and Law Debenture in full. Magten and Law Debenture have numerous outstanding litigations and appeals and the Stipulation provides for a $25 million recovery from the QUIPS Claims Reserve and any recovery in excess of that amount is to be satisfied from the Disputed Claims Reserve. [Magten & Law Debenture Des. No. 46 p. 3].

With the exception of statements by NorthWestern's counsel regarding the Disputed Claims Reserve during the Bankruptcy Court's hearing on the Surplus Distributions Motion, there has been no evidence to support the Plan Committee's contention that the Disputed Claims Reserve is adequately funded to provide a surplus distribution, if any, and to satisfy, in full, the claims of Magten and Law Debenture. In fact, the Bankruptcy Court denied the settlement agreement reached between the parties in January 2005 because at that time NorthWestern had represented that there was inadequate funds in the Disputed Claims Reserve to satisfy all

11

disputed claims. [App. Des. No. 46 p. 6]. At the hearing on the Surplus Distributions Motion, the Bankruptcy Court noted that in opposing the previous settlement, NorthWestern and the Plan Committee were "screaming . . . 'Well, there's [not] enough shares. You're invading the surplus.'" [App. Des. No. 91 pp. 39-40]. Despite NorthWestern's promise in the plain language of Section 7.5 of the Plan and despite its repeated representations to the Bankruptcy Court, NorthWestern did not set the Disputed Claims Reserve at 100%. Instead, the Disputed Claims Reserve was set based on NorthWestern's general estimation of "all contingent, unliquidated claims at 50% of the face amount of the stated claim" and the placing of New Common Stock sufficient to satisfy an Allowed Claim in that amount in the Disputed Claims Reserve.

Without regard for the sufficiency of the Disputed Claims Reserve or the rights of the creditors that hold Disputed Claims, the Plan Committee boldly asserts that because the claims of PPL Montana, LLC and PPL Global, LLC ("PPL") were settled for amounts less than the full amount of their claims, the New Common Stock set aside for PPL (the "PPL Reserve") should be used to further enhance the recovery of the holders of Allowed Class 7 and Class 9 Claims – claimants who have already received the value of a full recovery under the Plan. The Plan Committee seeks to have the PPL Reserve distributed as a Surplus Distribution in accordance with Section 7.7 of the Plan and argues that absent such expedited relief, holders of Allowed Class 7 and Class 9 Claims will be denied the full benefit of their bargain contained in the Plan. This argument lacks merit in light of the fact that such holders should not be receiving Surplus Distributions when there remains serious doubt that the Disputed Claims Reserve is sufficiently funded to provide Magten and Law Debenture with a full recovery.

In addition, it is the Plan Committee's contention that holders of Allowed Class 7 and 9 Claims will suffer irreparable harm because they are precluded from "their ability to exercise

12

fundamental stockholder rights."[5] Motion, p.12. Such conclusory statements are insufficient to show irreparable harm. See In re Texaco, Inc., 81 B.R. 820, 829 (Bankr. S.D.N.Y. 1988) (holding that conclusory statements of irreparable harm, without more, do not suffice to grant relief). Moreover, this argument is belied by the facts. Holders of Allowed Class 7 and 9 Claims received more than 91% of the New Common Stock issued pursuant to the Plan while the New Common Stock that remains in the Disputed Claims Reserve is only a fraction of the amount of shares issued and outstanding. Moreover, holders of the Allowed Class 7 and 9 Claims are currently exercising their shareholder rights through the New Common Stock they received. [App. Des. No. 8 pp. 7-11]. NorthWestern's largest shareholder and a member of the Plan Committee, Harbinger Capital Partners Master Fund ("Harbinger")(f/k/a Harbert Distressed Investment Master Fund Ltd.), received its shares pursuant to the Plan and has been active in exercising its shareholder rights throughout. Harbinger has filed numerous Schedule 13D's with the Securities Exchange Commission regarding its opposition to the actions of the Board of Directors of NorthWestern, and has filed a lawsuit seeking relief from NorthWestern's "poison pill" to allow it to commence a proxy solicitation and nominate a new slate of directors to replace the current directors of NorthWestern. But for the exercise of Harbinger's shareholder

---

[5]    The Plan Committee cites to Allen v. Prime Computer, Inc., 540 A.2d 417 (Del. 1988), Frenz v. Gencor Indus. 2005 Del. Ch. LEXIS 141 (Del Ch. 2005) and R.D. Hubbard v. Hollywood Park Realty Enters., 1991 Del. Ch. LEXIS 9 (Del. Ch. 1991) in support of its proposition that Delaware law views a deprivation of fundamental shareholder rights as irreparable harm not reasonably compensable by damages. However, each of these cases is based upon facts that are entirely different from the facts and circumstances in this Appeal. Specifically, the Plan Committee relies on cases that primarily deal with present shareholders who are being deprived of their shareholder rights in light of certain impediments, such as impediments imposed by the bylaws of the company. For instance, in Prime Computer, the company adopted a consent solicitation bylaw in order to delay the effectiveness of shareholder action taken by written consent for a minimum of 20 days in response to a tender offer for the company's outstanding shares. The court found that such bylaws were "so pervasive as to intrude upon fundamental stockholder rights guaranteed by statute." Id. at 421. Nothing in the facts of this case are analogous to the facts in this Appeal and the Plan Committee's reliance on this case, as well as the above-cited cases, is misplaced as these cases fail to establish any irreparable harm that will be caused to the holders of Allowed Class 7 and 9 Claims by not expediting briefing or oral argument.

13

rights and its membership on the Plan Committee, the claims of Magten and Law Debenture would have been settled more than a year ago. The only parties that have been deprived of their shareholder rights are Magten and the holders of the QUIPS Litigation Claims because, to date, they have not received their rightful recovery under the Plan.

Accordingly, it is of no consequence whether holders of Allowed Claims receive *additional* shares of New Common Stock in the immediate future or at a later point in time. Fundamentally, there are no shareholder rights being taken away or impaired. Further, it does not follow that holders of Allowed Class 7 and 9 Claims will suffer irreparable harm because it has not yet been determined whether a surplus in fact exists that would even entitle these holders to an additional distribution of New Common Stock. Ultimately, the holders of Allowed Class 7 and 9 Claims cannot be said to suffer irreparable harm since such harm is contingent upon future events, which do not constitute a basis for irreparable harm. See Hoxworth v. Blinder, Robinson & Co., 903 F.2d 186, 205 (3d Cir. 1990) (court found that a plaintiff has the burden of proving a clear showing of *immediate* irreparable harm and that establishing a risk of irreparable harm is not enough) (emphasis added).

While the Plan Committee has failed to meet the threshold requirement of "irreparable harm" necessary to give the Court cause to expedite the appeal process, it should be emphasized that time is not critical. Nearly a year and a half has passed since the Effective Date, and the only creditors that can assert any harm are Magten and Law Debenture, as they have yet to receive any recovery on account of their claims. Holders of Allowed Class 7 and 9 Claims have already received in excess of their recovery under the Plan because the shares of New Common Stock that were given to these holders were valued in the Plan at approximately $20.00 per share, representing a recovery of approximately 63.6% of their claims based on the Plan Value of the

14

New Common Stock.  As Magten demonstrated at the Confirmation Hearing, NorthWestern grossly understated the value of the New Common Stock, which has increased more than 50% since the Effective Date, rising at times to prices as high as $31.43 per share, as of March 17, 2006, allowing for more than 100% recovery on account of their Allowed Claims.  Accordingly, the holders of Allowed 7 and 9 Claims will not be irreparably harmed by allowing this Appeal to proceed in its ordinary course.   The Plan Committee has simply failed to provide adequate justification to expedite briefing and oral argument of this Appeal.

## IV. CONCLUSION

WHEREFORE, Magten and Law Debenture respectfully request that (i) this Motion be

denied in part and granted in part for the reasons set forth herein; and (ii) the Court grant any such

other relief it deems just and proper.

Dated: Wilmington, Delaware
       March 20, 2006

BLANK ROME LLP

*Dale R. Dubé*

Dale Dubé (DE No. 4048)
Elio Battista, Jr. (DE No. 3814)
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 425-6400
Facsimile: (302) 425-6464

- and -

FRIED, FRANK, HARRIS, SHRIVER
    & JACOBSON LLP
Bonnie Steingart
Gary L. Kaplan
John W. Brewer
One New York Plaza
New York, NY 10004
Telephone: (212) 859-8000
Facsimile: (212) 859-4000

Counsel for Magten Asset Management Corporation

16

SMITH, KATZENSTEIN & FURLOW, LLP

___/s/ Kathleen M. Miller_____
Kathleen M. Miller (DE No. 2898)
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE 19899
Telephone: (302) 652-8400
Facsimile:  (302) 652-8405

- and -

NIXON PEABODY LLP
John V. Snellings (BBO No. 548791)
Francis C. Morrissey (BBO No. 567589)
Lee Harrington (DE No. 4046)
100 Summer Street
Boston, MA 02110
Telephone: (617) 345-1202
Facsimile:  (866) 947-1732

Counsel for Law Debenture Trust Company
of New York

17

# EXHIBIT A

1

```
1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                              - - -

4    IN RE:                        :    CASE NO. 03-12872 (JLP)
     NORTHWESTERN CORPORATION,     :
5         Reorganized Debtor       :
     -----------------------------------
6    MAGTEN ASSET MANAGEMENT       :    CIVIL ACTION
     CORPORATOIN and LAW DEBENTURE :
7    TRUST COMPANY OF NEW YORK,    :
              Plaintiffs           :
8                                  :
              vs.                  :
9                                  :
     NORTHWESTERN CORPORATION,     :
10            Defendant            :    NO. 04-01494 (JJF)
     ----------------------------------:
11   MAGTEN ASSET MANAGEMENT       :    CIVIL ACTION
     CORPORATION, individually and :
12   Derivatively on behalf of     :
     Clark Fork and Blackfoot, LLC,:
13            Plaintiff            :

14            v.                   :
                                   :
15   PAUL, HASTINGS, JANOFSKY &    :
     WALKER, LLP,                  :
16            Defendant           :    NO. 04-01256 (JJF)

17                             - - -

18                                 Wilmington, Delaware
                                   Friday, October 21, 2005
19                                 9:33 o'clock, a.m.

20                             - - -

21   BEFORE:  HONORABLE JOSEPH J. FARNAN, JR., U.S.D.C.J.

22                             - - -

23

24                                 Valerie J. Gunning
                                   Official Court Reporter
25
```

2

```
 1   APPEARANCES:

 2            GREENBERG TRAURIG, LLP
             BY:  WILLIAM E. CHIPMAN, JR., ESQ.
 3
                      -and-
 4
             PAUL, HASTINGS, JANOFSKY & WALKER LLP
 5           BY:  JESSE H. AUSTIN, III, ESQ. and
                  (Atlanta, Georgia)
 6
                      -and-
 7
             CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
 8           BY:  JOSEPH D. PIZZURRO, ESQ. and
                  STEVEN J. REISMAN, ESQ.
 9                (New York, New York)

10            Counsel for Northwestern Corporation

11
             BLANK ROME LLP
12           BY:  DALE R. DUBE, ESQ.

13                    -and-

14           FRIED FRANK
             BY:  BONNIE STEINGART, ESQ. and
15                GARY L. KAPLAN, ESQ.
                  (New York, New York)
16
              Counsel for Magten Management Corporation
17

18           SMITH, KATZENSTEIN FURLOW LLP
             BY:  ROBERT J. KATZENSTEIN, ESQ.
19
              Counsel for Magten Asset Management
20            Corporation and Law Debenture Trust Company
              of New York
21

22           STORCH AMINI MUNVES PC
             BY:  BIJAN AMINI, ESQ.
23                (New York, New York)

24            Counsel for Magten Asset Management
              Corporation
25
```

3

```
 1   APPEARANCES (Continued):

 2           THE BAYARD FIRM
             BY:  NEIL GLASSMAN, ESQ.
 3
                    -and-
 4
             PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
 5           BY:  ALAN W. KORNBERG, ESQ. and
                  MARGARET PHILLIPS, ESQ.
 6                (New York, New York)

 7                Counsel for the Plan Committee

 8
             NIXON PEABODY LLP
 9           BY:  JOHN V. SNELLINGS, ESQ.
                  (Boston, Massachussetts)
10
                  Counsel for Law Debenture Trust Company of
11                New York

12
             EDWARDS & ANGELL
13           BY:  DENISE KRAFT, ESQ.

14                  -and-

15           BROWNING, KALECZYC, BERRY & HOVEN, P.C.
             BY:  STANLEY T. KALECZYC, ESQ. and
16                KIMBERLY A. BEATTY, ESQ.
                  (Helena, Montana)
17
                  Counsel for Mike J. Hanson and
18                Ernie J. Kindt

19
             MORRIS, NICHOLS, ARSHT & TUNNELL.
20           BY:  ROBERT J. DEHNEY, ESQ.

21                    -and-

22           DAVIS POLK & WARDWELL
             BY:  D. SCOTT TUCKER, ESQ.
23                (New York, New York)

24                Counsel for Paul, Hastings, Janofsky &
                  Walker, LLP
25
```

4

```
 1   APPEARANCES (Continued):

 2              LANDIS, RATH & COBB
               BY:  JAMIE EDMONSON, ESQ.
 3
                   Counsel for the Ad Hoc Committee of
 4                 Note Holders

 5
               FINGER & SLANINA, LLC.
 6             BY:  DAVID L. FINGER, ESQ.

 7                 Counsel for Northwestern

 8                     - - -

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

22

1          I think that your Honor's suggestion would be

2   fine with us, which is we agree with Northwestern that the

3   confirmation appeal and the motion to dismiss the

4   confirmation appeal on the grounds of mootness really

5   are the foundation for everything in this case.   And you

6   certainly could address those matters and the 9019 at the

7   same time.

8          Obviously, if Magten were successful in its

9   appeal of the confirmation order, they would be in a very,

10  very different position than they are today and I think many

11  of their problems would go away.

12         Similarly, the plan being upheld on appeal is

13  very critical to the analysis of the 9019 motion because,

14  again, as Northwestern mentioned, the principal basis for the

15  Bankruptcy Court's decision was not based on contract issues

16  mentioned by Ms. Steingart, but really on the narrow issue

17  that the proposed settlement violated a substantially

18  consummated plan.   And under Section 1127(b), you cannot

19  modify a plan after it has gone effective.

20         So there is that narrow issue, legal issue that's

21  presented by the 9019 motion that was absolutely key.

22         Now, obviously, if the plan were to go away, I

23  suppose the bankruptcy Court's decision on that point has

24  very limited vitality.

25         So we think that whether you do them at the same

1  time or you do, or you look at plan confirmation immediately

2  prior to the 9019, the confirmation of the plan has to be in

3  the mix because it's the foundation for everything that

4  follows.

5          I just want to respond to a couple of other

6  points that Ms. Steingart made.  The Plan Committee never

7  took the position that the Class 9 reserve was underfunded.

8  To the extent those arguments were made below, that was by

9  somebody else, not by the Plan Committee.

10          We took the position, again, that you can't

11  modify a substantially consummated plan, and that the

12  proposed settlement violated that plan.

13          With respect to settlement efforts, I want to be

14  very clear as to what the Plan Committee's position is.  We

15  have advised the debtor and we've advised them in writing

16  that we would be pleased to participate in mediation.  There

17  were a few conditions that we had to that mediation.  One was

18  that the mediator be any of the four people that Northwestern

19  mentioned or anyone else that was mutually acceptable to us.

20          Second, that the mediation take place within the

21  next 30 days and that it take place in New York, although

22  Wilmington would be just fine.  We just didn't want to have

23  to travel to far away places.

24          And that the terms of the mediation, including

25  with respect to procedure and confidentiality, be acceptable

1    in all respects.

2            And finally, and this was an important -- this is

3    important to us:  That the Plan Committee did not participate

4    in the settlement discussions that gave rise to the

5    settlement that the Bankruptcy Court declined to approve

6    that's now on appeal before your Honor.

7            And we don't want a replay of the situation where

8    the Plan Committee is not included in settlement discussions

9    that relate to stock that's held in a reserve for the people

10   that we represent, the unsecured creditors.

11           So our final condition on mediation is that if we

12   all agree to commit to mediation, that there be no

13   extracurricular settlement discussions, that the settlement

14   discussions take place as supervised by the mediator and that

15   all of the parties are included, except as the mediator may

16   wish to conduct it with, you know, in shuttle format.

17           So that is the position of the Plan Committee

18   with respect to mediation.

19           The other point I'd like to make, your Honor, is

20   that I know there is some appeal to Ms. Steingart's view

21   that, you know, if you resolve the 9019 appeal in their

22   favor, all of these other matters, lawsuits against Paul

23   Hastings, lawsuits against directors, et cetera, go away.

24   And that is, frankly, quite unappealing to the Plan Committee

25   not because we want to see the Court burdened with these many

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of March, 2006, I served by hand delivery and electronically filed the RESPONSE OF MAGTEN ASSET MANAGEMENT CORPORATION AND LAW DEBENTURE TRUST COMPANY OF NEW YORK TO THE MOTION OF THE PLAN COMMITTEE FOR RELIEF FROM THE STANDING ORDER ON MEDIATION IN THIS APPEAL AND FOR EXPEDITED BRIEFING AND ORAL ARGUMENT using CM/ECF which will send notification of such filing(s) to the following:

Neil B. Glassman
Charlene D. Davis
Eric M. Sutty
THE BAYARD FIRM
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899

Kathleen M. Miller, Esquire
SMITH KATZENSTEIN & FURLOW LLP
800 Delaware Avenue
P. O. Box 410
Wilmington, DE 19899
kmm@skfdelaware.com

Victoria Watson Counihan, Esquire
Dennis A. Meloro, Esquire
GREENBERG TRAURIG LLP
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801
counihanv@gtlaw.com
melorod@gtlaw.com

I also certify that, on this 20th day of March, 2006, I served the aforementioned document, by e-mail and Federal Express, upon the following non-registered participants:

Alan W. Kornberg
Kelley A. Cornish
Margaret A. Phillips
PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064

John V. Snellings
Francis C. Morrissey
Lee Harrington
NIXON PEABODY LLP
100 Summer Street
Boston, Massachusetts 02110-2131

Steven J. Reisman
Joseph D. Pizzurro
Nancy E. Delaney
Miriam K. Harwood
CURTIS, MALLET-PREVOST,
    COLT & MOSLE LLP
101 Park Avenue
New York, New York 10178-0061

Dale R. Dubé

Dale R. Dubé  (I.D. No. 2863)

2

120087.01600/40160721v.1