IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

In re:                                          )
                                                )
NORTHWESTERN CORPORATION,                       )    Chapter 11
                                                )
              Reorganized Debtor                )    Case No. 03-12872 (KJC)
                                                )
_____        )
                                                )
THE PLAN COMMITTEE OF                           )
NORTHWESTERN CORPORATION,                       )
                                                )
              Appellant,                        )
                                                )    Civil Action No. 06-157
                                                )
              \                                 )
                                                )    **Oral Argument Requested**
NORTHWESTERN CORPORATION, *et al*,              )
                                                )
              Appellees.                        )
                                                )
                                                )

## OPENING BRIEF OF APPELLANT, THE PLAN COMMITTEE

**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
Alan W. Kornberg
Kelley A. Cornish
Margaret A. Phillips
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000

Dated: April 26, 2006

**THE BAYARD FIRM**
Neil B. Glassman (No. 2087)
Charlene Davis (No. 2336)
222 Delaware Avenue, Suite 900
Post Office Box 25130
Wilmington, Delaware 19899
Telephone: (212) 655-5000

Attorneys for the Plan Committee

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................... ii

I.    PRELIMINARY STATEMENT ........................................................... 1

II.   STATEMENT OF APPELLATE JURISDICTION ................................... 3

III.  STATEMENT OF ISSUE PRESENTED ON APPEAL ............................. 3

IV.   STATEMENT OF FACTS ................................................................. 3

V.    SUMMARY OF ARGUMENT ............................................................ 12

VI.   STANDARD OF APPELLATE REVIEW .............................................. 13

VII.  ARGUMENT ................................................................................. 14

      A.   The Bankruptcy Court Erred in Disregarding the Clear and Unambiguous
           Language of the Plan ........................................................... 14

      B.   Section 1127(b) of the Bankruptcy Code Prohibits The Bankruptcy Court
           From Amending the Substantially Consummated Plan ................. 19

VIII. CONCLUSION .............................................................................. 21

**TABLE OF AUTHORITIES**

Page

FEDERAL CASES

Ad Hoc Committee of CTA Bondholders v. Continental Airlines, Inc., (In
    re Continental Airlines), 1994 U.S. Dist. LEXIS 20531 (D. Del. June
    8, 1994) ............................................................................20

Almeroth v. Innovative Clinical Solutions, Ltd. (In re Innovative Clinical
    Solutions, Ltd.), 302 B.R. 136 (Bankr. D. Del. 2003) ......................20

Beal Bank, S.S.B. v. Jack's Marine, Inc. (In re Beal Bank, S.S.B.), 201
    B.R. 376 (E.D. Pa. 1996) ....................................................13

Brokers Title Co. v. St. Paul Fire & Marine Insurance Co., 610 F.2d 1174
    (3d Cir. 1979) ...............................................................16

Cohen v. TIC Fin. Sys. (In re Ampace Corp.), 279 B.R. 145 (Bankr. D.
    Del. 2002) ...................................................................21

Duquesne Light Co. v. Westinghouse Electric Corp., 66 F.3d 604 (3d Cir.
    1995) ........................................................................16

Gillman v. Continental Airlines (In re Continental Airlines), 203 F.3d 203
    (3d Cir. 2000) ...............................................................13

Glenn Distributors Corp. v. Carlisle Plastics, Inc., 297 F.3d 294 (3d Cir.
    2002) ........................................................................16

Manus Corp. v. NRG Energy, Inc. (In re O'Brien Environmental Energy,
    Inc.), 188 F.3d 116 (3d Cir. 1999) .........................................13

In re Montgomery Ward Holding Corp., 306 B.R. 489 (Bankr. D. Del.
    2004) ........................................................................15

Northwestern Corp. v. McGreevey (In re Northwestern Corp.), 2005
    Bankr. LEXIS 2146 (Bankr. D. Del. 2005) ..................................15

In re NVF Co., 309 B.R. 698 (Bankr. D. Del. 2004) ................14, 16, 17

Official Creditors Committee of Stratford of Tex., Inc. v. Stratford of
    Tex., Inc. (In re Stratford of Tex., Inc.), 635 F.2d 365 (5th Cir. 1981) ..........14

In re Phoenix Petroleum Co., 278 B.R. 385 (Bankr. E.D. Pa. 2001) ...............21

Stonington Partners v. Lernout & Hauspie Speech Products N.V., 310
    F.3d 118 (3d Cir. 2002)......................................................................13

In re Sugarhouse Realty, 192 B.R. 355 (E.D. Pa. 1996)..................13, 14, 15, 16

United States v. Energy Resources Co., 495 U.S. 545 (1990)......................21

Windsor Sec., Inc. v. Hartford Life Ins. Co., 986 F.2d 655, 667 (3d Cir.
    1993).................................................................................15, 16

## STATE CASES

Adams-Baez v. General Accident Co., 2005 WL 2436220, at *1 (Del.
    Super. 2005).............................................................................16

Fleet National Group, Inc. v. Advanta Corp., 2001 WL 1333405, at *11
    (Del. Ch. 2001)..........................................................................17

Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1009
    (3d. Cir. 1980)...........................................................................16

In the Matter of Penn Central Transportation Co., 831 F.2d 1221, at 1227
    (3d. Cir. 1987)...........................................................................16

## FEDERAL STATUTES

11 U.S.C. § 1127(b)..............................................................3, 11-13, 19-21

11 U.S.C. § 1141                                                                14-15

28 U.S.C. § 158......................................................................................3

Rule 8001 of Fed.R.Bank. P. .................................................................3

## OTHER

RICHARD A. LORD, WILLISTON ON CONTRACTS, § 60:6 (4th ed. 2005)................16

Appellant, the Plan Committee of NorthWestern Corporation (the "Plan Committee" or the "Appellant"), appointed in the chapter 11 case of NorthWestern Corporation ("NorthWestern" or the "Debtor") under NorthWestern's Second Amended and Restated Plan of Reorganization, dated August 18, 2004 (as modified, the "Plan")[1] [App. Des. No. 10],[2] submits this brief in support of its appeal of the order of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") entered on February 7, 2006 (the "Order")[3] [App. Des. No. 92] denying the Motion of the Plan Committee in Aid of Consummation and Implementation of the Plan for Order Authorizing and Directing NorthWestern Corporation to Distribute Surplus Distributions (the "Surplus Distribution Motion") [App. Des. No. 73]

By the Order, the Bankruptcy Court denied the Surplus Distribution Motion, which sought entry of an order authorizing and directing NorthWestern to distribute in excess of 2.3 million shares of New Common Stock currently valued at more than $80 million that are being held in a disputed claims reserve, and that should be distributed to unsecured creditors pursuant to clear and unambiguous Plan provisions.

## I.
## PRELIMINARY STATEMENT

The Plan Committee is charged with protecting the interests of NorthWestern's unsecured creditors during the final stages of NorthWestern's chapter 11

---

[1]    Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Plan.

[2]    References to items identified in Appellant's Designation of Items to be Included in the Record on Appeal and Statement of the Issues to be Presented on Appeal [Docket No. 2] are referred to as "App. Des. No. __."

[3]    The Order was issued by the Honorable John L. Peterson, who presided over the hearing for the Surplus Distribution Motion (as defined above). On March 16, 2006, NorthWestern's chapter 11 case was reassigned to the Honorable Kevin J. Carey. See [Bankr. Docket No. 3462]

case. The primary purpose of the Plan Committee is to oversee the "[c]laims reconciliation and settlement process" to ensure that all unsecured creditors timely receive their rightful recoveries under the Plan. Plan at § 7.9. The Plan Committee brought the Surplus Distribution Motion in furtherance of this purpose.

This appeal is necessitated by the Bankruptcy Court's misreading of Section 7.7 of the Plan, which governs the timing and amount of distributions to be made to unsecured creditors of NorthWestern's shares of common stock held in a disputed claims reserve. The Bankruptcy Court erroneously found, in direct contravention of Section 7.7's express terms, that a Surplus Distribution of New Common Stock currently held in the Disputed Claims Reserve cannot be made to unsecured creditors prior to the resolution of *each and every* Disputed Claim, specifically including certain large and complex litigation claims (the "QUIPS Litigation Claims") asserted by Magten Asset Management Corporation ("Magten") and Law Debenture Trust Company of New York ("Law Debenture"). To the contrary, Section 7.7 plainly provides that all Surplus Distributions held in the Disputed Claims Reserve in excess of $50,000 must be distributed to unsecured creditors every six months after the Effective Date of the Plan, *regardless of whether there are Disputed Claims still unresolved at the time.* As of the filing of the Surplus Distribution Motion, the Disputed Claims Reserve held more than 2.3 million shares of New Common Stock that constituted Surplus Distributions as defined in the Plan.

The Bankruptcy Court's Order wrongfully precludes unsecured creditors from receiving shares of New Common Stock currently valued at more than $80 million to which they are entitled. The Order has effectively stayed further implementation of

the substantially consummated Plan, impermissibly modifying it in violation of

fundamental principles of contract law and section 1127(b) of the Bankruptcy Code. For

the reasons set forth below, the Plan Committee respectfully requests this Court to

reverse the Order.

## II.
## STATEMENT OF APPELLATE JURISDICTION

On February 7, 2006, the Plan Committee timely filed its Notice of Appeal

from the Order [App. Des. No. 93]. As a result, this Court has jurisdiction over this

appeal under 28 U.S.C. § 158 and Rule 8001 of Fed. R. Bankr. P.

## III.
## STATEMENT OF ISSUE PRESENTED ON APPEAL

Whether the Bankruptcy Court erred in denying the Surplus Distribution

Motion on the grounds that the Plan does not require NorthWestern to make any Surplus

Distributions under Sections 1.183 and 7.7 of the Plan prior to the resolution of all

Disputed Claims.

## IV.
## STATEMENT OF FACTS

### The Chapter 11 Case and the Plan

On September 14, 2003 (the "Petition Date"), NorthWestern filed with the

Bankruptcy Court a voluntary petition for reorganization relief under title 11 of chapter

11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code").

On October 8, 2004, the Bankruptcy Court confirmed NorthWestern's

Plan, overruling each of the numerous objections filed by Magten and Law Debenture

which, among other things, disputed the classification and treatment of the claims they

asserted with respect to certain Series A 8.45% Quarterly Income Preferred Securities

("QUIPS") issued under an Indenture for Unsecured Subordinated Debt Securities (the

"Indenture").[4]  [App. Des. No. 30].  Magten appealed the Bankruptcy Court's order

confirming the Plan (the "Confirmation Order") and twice sought to stay its

effectiveness.  However, both the Bankruptcy Court, by order dated October 25, 2004

[App. Des. No. 29], and this Court, by order dated October 29, 2004 [App. Des. No. 104],

denied Magten's request for a stay.  Accordingly, the Plan became effective as of

November 1, 2004 (the "Effective Date"), and was substantially consummated on

December 29, 2004.[5]

## The QUIPS Litigation

Prior to entry of the Confirmation Order, on April 16, 2004, Magten and

Law Debenture jointly filed a complaint in which they alleged that NorthWestern was the

recipient of substantial public utility assets fraudulently transferred from Clark Fork and

Blackfoot LLC ("Clark Fork"), a subsidiary of NorthWestern (the "QUIPS Litigation").

Through the QUIPS Litigation, as purported creditors of Clark Fork, Magten and Law

Debenture are attempting to strip NorthWestern's estate of a material portion of its assets

by, among other things, (a) avoidance of the alleged fraudulent transfer and

(b) imposition of a constructive trust over the transferred assets for the benefit of Clark

Fork's creditors.

---

[4]   Law Debenture is the current Indenture Trustee under the Indenture.

[5]   See Notice of (A) Entry of Order Confirming The Debtor's Second Amended and Restated Plan of
      Reorganization under Chapter 11 of the Bankruptcy Code and (B) The Occurrence of the Effective
      Date [App. Des. No. 31] and the Notice of Substantial Consummation of the Debtor's Second
      Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code.  [App. Des.
      No. 35].

At the request of Magten and Law Debenture, the Bankruptcy Court stayed the QUIPS Litigation pending this Court's decision on Magten's appeal of the Confirmation Order by order dated December 7, 2004. [App. Des. No. 100]. Subsequently, on September 22, 2005, this Court granted Magten and Law Debenture's request for an order withdrawing the reference to the Bankruptcy Court of the QUIPS Litigation, assigning it Civil Action Number 04-1494.

**Treatment of QUIPS Under the Plan**

Section 4.8(b)(ii) of the Plan provides, in pertinent part, that "[o]n the Effective Date . . . each holder of an Unsecured Subordinated Note Claim represented by the QUIPS Notes and related Claims and Causes of Action[6] who accepts or rejects the Plan may opt to receive in full satisfaction, settlement, release, extinguishment and discharge of such Claims either, but not both" of the following:

> (1)    a Pro Rata Share of 505,591 shares of New Common Stock . . . , plus Warrants exercisable for an additional 2.3% of New Common Stock (collectively, "Option 1"); or
>
> (2)    a Pro Rata Share of recoveries, if any, upon resolution of the QUIPS Litigation ("Option 2")."

Section 4.8(b)(ii) of the Plan further provides that if a Class 8(b) claimant elects Option 2:

> then: (i) such holder's claims shall be treated as a Class 9 General Unsecured Claim, subject to estimation and reserves for Disputed Claims as provided for by Section 7.5 of the Plan, with Distributions to holders of Class 8(b) Unsecured Subordinated Note Claims which choose Option 2 being made, if at all, only upon entry of a Final Order

---

[6]    The Claims of such holders are classified in Class 8(b) under the Plan.

resolving the QUIPS Litigation (unless otherwise agreed to
by the Debtor and Committee); and

(ii) any New Common Stock which otherwise would have
been distributable to such holder if such holder had chosen
Option 1, shall be distributed, pro rata to Class 7 and Class
9, and the Warrants which otherwise would have been
distributable will be cancelled.

Thus, pursuant to the Plan, holders of QUIPS, such as Magten, who

elected under Option 2 to pursue the QUIPS Litigation did not receive any reorganization

securities upon the substantial consummation of the Plan. Rather, the Plan provides that

those claimants electing to pursue the QUIPS Litigation hold a contingent, unliquidated

litigation claim which will be satisfied, if necessary, from the Disputed Claims Reserve

established pursuant to Section 7.5 of the Plan, and which will be treated as a Class 9

General Unsecured Claim.

**The Disputed Claims Reserve**

The Plan provides that NorthWestern will continue to resolve Disputed

Claims after the Effective Date. When Disputed Claims become Allowed Claims, they

are to be satisfied with shares of New Common Stock held in the Disputed Claims

Reserve. Specifically, Section 7.5 of the Plan provides that:

Reorganized Debtor shall maintain the Disputed Claims
Reserve equal to the aggregate of any distributable amounts
of Cash and New Common Stock equal to the relevant
percentage of the Distributions to which holders of
Disputed Claims would be entitled under this Plan if such
Disputed Claims were Allowed Claims in the amount of
such Disputed Claim or such lesser amount as required by a
Final Order.

For the purposes of effectuating the provisions of this
Section and the Distributions to holders of Allowed Claims,

the Debtor may, at any time and regardless of whether an objection to the Disputed Claim has been brought, request that the Bankruptcy Court estimate, set, fix or liquidate the amount of Disputed Claims pursuant to Section 502(c) of the Bankruptcy Code, in which event the amounts so estimated, fixed or liquidated shall be deemed the Allowed amounts of such Claims for purposes of distribution under this Plan.

In lieu of estimating, fixing or liquidating the amount of any Disputed Claim, the Bankruptcy Court may determine the amount to be reserved for such Disputed Claim (singularly or in the aggregate), or such amount may be fixed by an agreement in writing by and between the Debtor and the holder of a Disputed Claim.

In connection with Plan confirmation, NorthWestern filed separate motions to estimate two of its largest Disputed Claims: (i) Magten and Law Debenture's Claims in the QUIPS Litigation (the "Magten Claim Estimation Motion") [App. Des. No. 9]; and (ii) claims (the "PPL Claims") by PPL Montana LLC ("PPL Montana") asserted in a lawsuit pending in the United States District Court for the District of Montana, captioned *NorthWestern Corporation* v. *PPL Montana, LLC* v. *Clark Fork and Blackfoot, LLC*, CV-02-94-BU-SEH (the "PPL Claim Estimation Motion") [App. Des. No. 13].

The PPL Claim Estimation Motion was resolved consensually by establishing a segregated sub-reserve (the "PPL Segregated Reserve") containing shares of New Common Stock having a value of $50,000,000 as of the Plan's Effective Date.[7] Under the PPL Reserve Stipulation, to the extent PPL Montana's Disputed Claim was Allowed in an amount less than the PPL Segregated Reserve, the unused portion of the

---

[7] See Stipulation and Order Resolving Section III of the Limited Objection of PPL Montana, LLC to Confirmation of the Debtor's First Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code and the Debtor's Motion Pursuant to Sections 105(a), 363(b) and 502(a) of the Bankruptcy Code for Estimation of PPL Montana LLC's Claim and to Establish Disputed Claims Reserve (the "PPL Reserve Stipulation") at p. 3, ¶ 2. [App. Des. No. 18].

specifically segregated shares is to be released into the general Disputed Claims Reserve. See PPL Reserve Stipulation at 4.

To resolve the Magten Claim Estimation Motion, NorthWestern established a segregated sub-reserve for the holders of QUIPS Litigation Claims (the "QUIPS Litigation Reserve") containing shares of New Common Stock sufficient to satisfy a $25 million Class 9 General Unsecured Claim.[8] In the aggregate, the QUIPS Litigation Reserve and the PPL Segregated Reserve comprised more than 50% of the shares of New Common Stock initially held within the Disputed Claims Reserve. As of the Effective Date, the Disputed Claims Reserve held 4,409,100 shares of New Common Stock.[9]

**Post-Effective Date Subsequent Distributions**

Section 7.7 of the Plan requires that every six months after the Effective Date, NorthWestern must make subsequent distributions of New Common Stock to holders of Allowed Class 7 and Class 9 Claims from Surplus Distributions held in the Disputed Claims Reserve, as follows:

> On each Subsequent Distribution Date, the holders of Allowed Claims shall receive a Pro Rata Share in the Surplus Distributions attributable to such holders' Class; provided, however that the Reorganized Debtor shall not be under any obligation to make Surplus Distributions on a Subsequent Distribution Date unless the aggregate market

---

[8]    See Order Approving Stipulation By and Between the Debtor and Law Debenture Trust Company of New York ("QUIPS Litigation Reserve Stipulation"). [App. Des. No 36]

[9]    See Transcript of Hearing of the Bankruptcy Court held on January 11, 2006 at p. 43 (the "Hearing Transcript") [App. Des. No. 91] in which NorthWestern stated that the initial reserve was 4,409,100 shares equivalent to $140 million of Class 9 Claims; and Notice of Establishment of Claim Reserve Pursuant to Section 7.5 of the Plan and Paragraph 27 of the Confirmation Order [App. Des. No 28], establishing the Disputed Claims Reserve containing approximately 13.5% of the New Common Stock issued on the Effective Date.

> value of the Surplus Distributions (which value shall be
> determined based on the intrinsic value as of the Effective
> Date) to be distributed on such Subsequent Distribution
> Date exceeds $50,000 in any Class; provided, further that if
> the Final Distribution required under this Plan is less than
> $25,000 in aggregate market value in any Class such
> Surplus Distributions shall revest in Reorganized Debtor.

Section 7.7 of the Plan in turn defines "Surplus Distributions" as follows:

> The following assets shall constitute Surplus Distributions:
> (i) Unclaimed Property; and (ii) to the extent that a
> Disputed Claim is not Allowed or becomes an Allowed
> Claim in an amount less than the Disputed Claim Amount,
> any excess of the amount of Cash or New Common Stock
> in the Disputed Claims Reserve attributable to such
> Disputed Claim over the amount of Cash or New Common
> Stock actually distributed on account of such Disputed
> Claim plus any interest, dividends or other Distributions
> earned thereon.

Finally, "Subsequent Distribution Date" is defined in the Plan as "each six (6) month

anniversary of the Effective Date." Plan at §1.183.

In sum, the Plan unambiguously requires that all shares constituting

Surplus Distributions held in the Disputed Claims Reserve in excess of $50,000 must be

distributed to unsecured creditors every six months after the Effective Date, regardless of

the number or amount of Disputed Claims still unresolved as of each distribution.

**Approval of the PPL Settlement Motion**

As part of its ongoing efforts to resolve Disputed Claims, NorthWestern

reached a settlement of the PPL Claims (the "PPL Settlement"), whereby PPL Montana

agreed to withdraw all claims against NorthWestern, dismiss its pending lawsuit against

NorthWestern, and pay NorthWestern $9 million. Further, PPL Montana released any

claim or interest it had with respect to the PPL Segregated Reserve, thus allowing

2,204,550 shares reserved for it to be released into the Disputed Claims Reserve for

distribution in accordance with the Plan.[10]  By order dated September 29, 2005 [App.
Des. No. 72], the Bankruptcy Court approved the PPL Settlement and, among other
things, ordered all of the shares held in the PPL Segregated Reserve to be released into
the Disputed Claims Reserve.  In accordance with Section 7.7 of the Plan, because the
2,204,550 shares were specifically "attributable" to PPL Montana's Disputed Claim,
those shares constitute Surplus Distributions which must be distributed to holders of
Class 7 and 9 Claims.

**The Surplus Distribution Motion**

On September 29, 2005, the Plan Committee filed the Surplus Distribution
Motion seeking an order (i) designating the shares of New Common Stock released from
the PPL Segregated Reserve as Surplus Distributions, (ii) directing NorthWestern to
provide the Plan Committee with information regarding the total number of shares held in
the Disputed Claims Reserve constituting Surplus Distributions and (iii) authorizing and
directing NorthWestern to make a supplemental distribution of all shares constituting
Surplus Distributions to holders of Allowed Class 7 and Class 9 Claims as required by
Section 7.7 of the Plan.  Magten and Law Debenture jointly objected to the Surplus
Distribution Motion [App. Des. No. 77], and NorthWestern filed a response to the
Surplus Distribution Motion in which it represented that all legitimate Disputed Claims,
except for those involving the QUIPS Litigation, had been resolved.  [App. Des. No. 85,
at p. 8].[11]

---

[10]    See Motion for Order Pursuant to Bankruptcy Rule 9019 Authorizing and Approving Settlement
        Agreement with PPL Montana, LLC and PPL Global, LLC [App. Des. No. 71].

[11]    NorthWestern's response also raised the specter of a potential claim by the Securities Exchange
        Commission (the "SEC") against shares of New Common Stock in the Disputed Claims Reserve.
        However, because it had failed to file a proof of claim, the SEC is barred from asserting such a claim,

At the hearing on the Surplus Distribution Motion, NorthWestern acknowledged that the Disputed Claims Reserve did indeed contain "surplus shares,"[12] and Bankruptcy Judge Peterson determined that there were "surplus" shares in the Disputed Claims Reserve. Nonetheless, the Bankruptcy Court denied the Surplus Distribution Motion, deeming it "premature." See Hearing Transcript at pp. 51 and 53. The Order denying the Surplus Distribution Motion found that:

- the Surplus Distribution Motion was premature in view of the litigation surrounding the unresolved and disputed claims of [Magten and Law Debenture];

- there are surplus shares in the Disputed Claim Reserve established pursuant to Section 7.5 of the Plan at the date of the Hearing, subject however to the [QUIPS Litigation] for Final Surplus determination;

- Section 7.7 of the Plan requires full resolution of all disputed claims before there can be any Surplus Distribution and does not require NorthWestern to distribute Surplus Distribution [sic] from the Disputed Claim Reserve every six (6) months from the Effective Date of the Plan;

- The QUIPS Litigation Reserve Stipulation applies to protect potential distributions to Magten and Law Debenture in the event their recovery exceeds the segregated reserve provided for therein; and

- Section 7.7 of the Plan and the QUIPS Litigation Reserve Stipulation preclude any distribution from the Disputed Claim Reserve until the disputed claims of Magten and Law Debenture with respect to the QUIPS Litigation are resolved.

See Order at ¶ ¶ H through L.

---

and the Bankruptcy Court so ruled. See Order at p 4, ¶ 2. By this Appeal, the Plan Committee does not challenge ¶ 2 of the Order.

[12] At the hearing, NorthWestern stated that, taking into account the QUIPS Litigation Reserve of approximately 787,339 shares, there was a "rough balance" of 2.3 million shares available for distribution. See Hearing Transcript at pp. 43-44.

The Bankruptcy Court's denial of the Surplus Distribution Motion was based on a misreading of clear and unambiguous Plan provisions. By barring any Surplus Distributions pending resolution of *all* Disputed Claims, the Order has effectively stayed implementation of Section 7.7 of the Plan indefinitely and impermissibly modified the Plan contrary to section 1127(b) of the Bankruptcy Code.

On February 7, 2006, the Plan Committee timely filed its Notice of Appeal from the Order.[13]

# V.
# SUMMARY OF ARGUMENT

The Order should be reversed because the Bankruptcy Court's findings (i) are contrary to the express and unambiguous language of the Plan and (ii) effect an impermissible modification of the Plan in violation of section 1127(b) of the Bankruptcy Code.

*First*, the plain language of the Plan obligates NorthWestern to make Surplus Distributions every six months after the Effective Date, regardless of whether or not *all* Disputed Claims are resolved. The Bankruptcy Court's finding to the contrary ignores the express language of the Plan.

*Second*, modifications to a confirmed plan may only be made in compliance with section 1127(b) of the Bankruptcy Code. That provision, however,

---

[13]    On March 9, 2006, the Plan Committee filed its Motion for Relief from the Standing Order on Mediation in This Appeal and for Expedited Briefing and Oral Argument (the "Motion to Expedite") NorthWestern filed a joinder to the Motion to Expedite on March 23, 2006 in support of the relief requested, and Magten and Law Debenture filed a joint response by which they supported bypassing mediation, but opposed an expedited briefing schedule  On April 11, 2006, the Court entered a memorandum order granting the Plan Committee's request to bypass mediation and setting forth a briefing schedule for this appeal

permits modifications only until such time as a plan has been substantially consummated, which indisputably occurred in this case on December 29, 2004. Thus, the Bankruptcy Court's finding more than a year after substantial consummation of the Plan that "Section 7.7 of the Plan together with the QUIPS Litigation Stipulation preclude any distribution from the Disputed Claims Reserve until the disputed claims of Magten and Law Debenture with respect to the QUIPS Litigation are resolved" effects a prohibited post-consummation modification of the Plan in violation of section 1127(b) of the Bankruptcy Code.

For the foregoing reasons, and as more fully set forth below, the Bankruptcy Court's Order should be reversed.

## VI.
## STANDARD OF APPELLATE REVIEW

When acting as an appellate court, this Court applies a clearly erroneous standard to a bankruptcy court's findings of fact and a plenary standard to its legal conclusions. See Gillman v. Continental Airlines (In re Continental Airlines), 203 F.3d 203, 208 (3d Cir. 2000); In re Sugarhouse Realty, Inc., 192 B.R. 355, 361-62 (E.D. Pa. 1996); Beal Bank, S.S.B. v. Jack's Marine, Inc. (In re Beal Bank, S.S.B.), 201 B.R. 376, 378 (E.D. Pa. 1996). "A bankruptcy court abuses its discretion when its ruling is founded on an error of law or a misapplication of law to the facts." Stonington Partners, Inc. v. Lernout & Hauspie Speech Prods. N.V., 310 F.3d 118, 122 (3d Cir. 2002) (citing Manus Corp. v. NRG Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 188 F.3d 116, 122 (3d Cir. 1999)).

The Bankruptcy Court committed clear errors of law by misreading the
unambiguous language of the Plan and by *sua sponte* effectuating a modification of a
substantially consummated confirmed plan in violation of section 1127(b) of the
Bankruptcy Code.

## VII.
## ARGUMENT

A.     **The Bankruptcy Court Erred in Disregarding
the Clear and Unambiguous Language of the Plan**

The Bankruptcy Court erred by misreading Section 7.7 of the Plan.
Specifically, the Bankruptcy Court found that the relief sought by the Surplus
Distribution Motion was "premature"[14] based on its finding that "Section 7.7 of the Plan
requires full resolution of *all* disputed claims before there can be *any* Surplus
Distributions, and *does not* require NorthWestern to distribute Surplus Distributions from
the Disputed Claims Reserve every six (6) months from the Effective Date of the Plan."
See Order, ¶ J (emphasis added).  The Plan says otherwise, clearly and unambiguously.

Confirmed plans of reorganization are contracts binding upon the debtor
and its creditors and subject to basic principles of contract law.  See Official Creditors
Comm. of Stratford of Tex., Inc. v. Stratford of Tex., Inc. (In re Stratford of Tex., Inc.),
635 F.2d 365, 368 (5th Cir. 1981) (stating that the confirmed arrangement "is tantamount
to a judgment" and "should be construed basically as a contract"); Sugarhouse, 192 B.R.
at 362 ("Confirmed bankruptcy plans of reorganization are binding contracts that must be
interpreted in accordance with applicable contract law."); In re NVF Co., 309 B.R. 698,

---

[14]     See Order at ¶ H.

701 (Bankr. D. Del. 2004) ("A confirmed plan 'becomes a legally binding agreement' and 'a creditor's rights are governed exclusively by the terms of that plan.'") (quoting In re Montgomery Ward Holding Corp., 306 B.R. 489, 494 (Bankr. D. Del. 2004)). Indeed, section 1141(a) of the Bankruptcy Code expressly provides that "the provisions of a confirmed plan bind the debtor." 11 U.S.C. § 1141(a); see also Northwestern Corp. v. McGreevey (In re Northwestern Corp.), 2005 Bankr. LEXIS 2146 at *18 (Bankr. D. Del. 2005) ("The confirmed plan and order control under 11 U.S.C. § 1141, defining the effect of confirmation, and acts like a contract that binds the parties who participate in the bankruptcy case or should have participated in the case.").

Furthermore, Section 14.7 of the Plan provides that "this Plan shall be binding upon and inure to the benefit of the Debtor, the holders of Claims and Equity Interests, and their respective successors, including, without limitation, Reorganized Debtor." In construing and enforcing the Plan, Section 14.11 of the Plan provides that "the laws of the State of Delaware" shall govern. See Plan at §14.11.

The rights of the parties are fixed and the plan becomes binding upon entry of a confirmation order. See Sugarhouse, 192 B.R. at 368. Only those documents that are approved in connection with the plan and which form an integrated contract are binding. See Id. at 363. Therefore, as with all contracts, a court should not consider extraneous evidence when interpreting a plan of reorganization absent a threshold finding that such plan is ambiguous.

When a dispute arises as to the interpretation of a plan, the "paramount consideration" of the court is to "ascertain and give effect to the contracting parties' objectively manifested intent." Sugarhouse, 192 B.R. at 363, (quoting Windsor Sec., Inc.

v. Hartford Life Ins. Co., 986 F.2d 655, 667 (3d Cir. 1993)). The court must first look to the words the parties chose to determine if they are ambiguous. Id. If unambiguous, the court must look only to the contract itself for interpretation and give the terms their plain meaning. Brokers Title Co. v. St. Paul Fire & Marine Ins. Co., 610 F.2d 1174, 1178 (3d Cir. 1979); Sugarhouse, 192 B.R. at 364; see also RICHARD A. LORD, WILLISTON ON CONTRACTS, § 60:6 (4th ed. 2005) ("If the language used by the parties is plain, complete, and unambiguous, the intention of the parties must be gathered from that language, and from that language alone . . . .").

> A contract is ambiguous:
>
> if, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning. A contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends; and a contract is not rendered ambiguous by the mere fact that the parties do not agree on the proper construction.

Glenn Distrib. Corp. v. Carlisle Plastics, Inc., 297 F.3d 294, 300 (3d Cir. 2002) (quoting Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 614 (3d Cir. 1995)). In determining whether a contract is ambiguous, the court must be mindful not to "modify the plain meaning of the words under the guise of interpretation." Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1009 (3d. Cir. 1980). See Adams-Baez v. General Accident Co., 2005 WL 2436220, at *1 (Del. Super. 2005) (must interpret contract in a common sense manner, allowing each term its plain meaning within the contract). Nor should a court find ambiguity as the result of a strained or contrived interpretation, see In the Matter of Penn Central Transportation Co., 831 F.2d 1221, at 1227 (3d. Cir. 1987), because courts should not rewrite the contract or give it a

construction in conflict with the accepted plain meaning of the language used. See Fleet National Group, Inc. v. Advanta Corp., 2001 WL 1333405, at *11 (Del. Ch. 2001).

If terms are found to be ambiguous, under Delaware law, they are to be construed against the drafter. NVF, 309 B.R. at 704. Therefore, where the contract in question is a debtor's plan of reorganization, the interpretation of plan language will be construed against the debtor where it has drafted the plan, as was the case here. Id. at 704-05. In addition, in the event of an inconsistency between the Plan and any other document, Section 14.15 of the Plan dictates that the Plan governs.

An application of these fundamental principles of contractual interpretation here leads to the inexorable conclusion that the Bankruptcy Court's denial of the Surplus Distribution Motion must be reversed. Section 7.7 is plain and unambiguous; it dictates that on "each Subsequent Distribution Date," which is defined by Section 1.182 of the Plan as "each six (6) month anniversary of the Effective Date," "the holders of Allowed Claims *shall* receive a Pro Rata Share in the Surplus Distributions attributable to such holders' Class." (emphasis added). In turn, the term "Surplus Distribution" is defined in Section 7.7 to include "any excess of the amount of . . . New Common Stock in the Disputed Claims Reserve attributable to . . . Disputed Claim[s] over the amount of . . . New Common Stock actually distributed on account of . . . Disputed Claim[s] . . . ." Importantly, Section 7.7 *nowhere* says that *all* Disputed Claims must be resolved before *any* Surplus Distributions can be made.

Quite simply, Section 7.7 requires NorthWestern to distribute "Surplus Distributions" to holders of Allowed Claims *every* six months after the Effective Date whether or not *all* Disputed Claims have been resolved. There is simply no language, or

ambiguity, in the Plan that would support the Bankruptcy Court's finding that Section 7.7 of the Plan only permits Surplus Distributions upon the resolution of *all* Disputed Claims. Indeed, neither the Bankruptcy Court nor any of the parties even suggested that the Plan was ambiguous.

NorthWestern's obligation to distribute Surplus Distributions is automatically triggered upon the satisfaction of two simple conditions: 1) there are shares in the Disputed Claims Reserve that constitute Surplus Distributions, as defined by Section 7.7 of the Plan, as of a Subsequent Distribution Date; and 2) the aggregate market value of those shares exceeds $50,000 in any Class. It is beyond dispute that both of these conditions were satisfied as of the hearing on the Surplus Distribution Motion as a result of the PPL Settlement.

First, the PPL Settlement, among other things, directed the release into the Disputed Claims Reserve of all 2,204,550 shares of New Common Stock being held in the PPL Segregated Reserve, since PPL Montana had agreed to waive all claims against NorthWestern. Those shares, by definition, constitute "Surplus Distributions" because they were indisputably the "excess of the amount of . . . New Common Stock in the Disputed Claims Reserve attributable to [PPL's Disputed Claim] over the amount of . . . New Common Stock actually distributed on account of such Disputed Claim . . . ." See Plan at § 7.7. Significantly, at the hearing on the Surplus Distribution Motion, NorthWestern represented that all Disputed Claims, other than the QUIPS Litigation Claims, had been resolved, leaving approximately 3.1 million shares of New Common Stock in the Disputed Claims Reserve, including the 787,339 shares set aside for the QUIPS Litigation Reserve. See Hearing Transcript at pp. 43-44 and NorthWestern's

response at p. 5.[15] Second, the value of those shares indisputably exceeds $50,000. Accordingly, both required conditions for a Surplus Distribution have been satisfied, and NorthWestern's obligation to make Surplus Distributions was triggered.

Because Section 7.7 is not ambiguous, and neither the Bankruptcy Court nor any party has asserted that it is, the Bankruptcy Court was required to look only to the language of the Plan. However, despite the express mandate of Section 7.7 and the Bankruptcy Court's own finding that there was indeed a surplus of shares in the Disputed Claims Reserve, the Bankruptcy Court found that a Surplus Distribution can only be made once *all* Disputed Claims are resolved. See Hearing Transcript at p. 51 and 53 and Order at ¶ H. This conclusion was clearly incorrect and in plain disregard of the terms of the confirmed Plan. Thus, the Order should be reversed.

**B.    Section 1127(b) of the Bankruptcy Code Prohibits The Bankruptcy Court From Modifying the Substantially Consummated Plan**

The Bankruptcy Court further erred in its findings that:

- There are surplus shares in the Disputed Claims Reserve established pursuant to Section 7.5 of the Plan at the date of the Hearing, subject however to the [QUIPS Litigation] for Final Surplus determination;[16]

- the QUIPS Litigation Reserve Stipulation applies to protect potential distributions to Magten and Law Debenture in the event their recovery exceeds the segregated reserve provided for therein;[17] and

- Section 7.7 of the Plan and the QUIPS Litigation Reserve Stipulation preclude any distribution from the Disputed Claim Reserve until the

---

[15]  Based on this representation, the Plan Committee believes that there are likely more than the 2,204,550 shares from the PPL Segregated Reserve in the Disputed Claims Reserve that constitute Surplus Distributions.

[16]  See Order at ¶ I.

[17]  See Order at ¶ K.

> disputed claims of Magten and Law Debenture with respect to the QUIPS Litigation are resolved.[18]

The Bankruptcy Court's findings that gave effect to the QUIPS Litigation Reserve Stipulation as a modification of Section 7.7 of the Plan were clear error, because section 1127(b) of the Bankruptcy Code prohibits modification of a substantially consummated plan.

A confirmed Plan may only be modified pursuant to section 1127(b) of the Bankruptcy Code. Section 1127(b) provides, in pertinent part, that: "[T]he proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and *before substantial consummation* of such plan . . . . Such Plan as modified under this subsection becomes the plan only if circumstances warrant such modification and the court, after notice and a hearing, confirms such plan as modified, under section 1129 of this title." (emphasis added). Accordingly, because the Plan had been confirmed, the Bankruptcy Court had no authority to modify the Plan except in compliance with the Bankruptcy Code.

The case law is clear that once a plan has been substantially consummated, a court cannot approve its modification. See, Ad Hoc Comm. of CTA Bondholders v. Continental Airlines, Inc. (In re Continental Airlines), 1994 U.S. Dist. LEXIS 20531, at *15 (D. Del. June 8, 1994) (section 1127(b) provides "substantive and procedural limitations on plan modifications" including the requirement that all modifications be made prior to substantial consummation); Almeroth v. Innovative Clinical Solutions, Ltd. (In re Innovative Clinical Solutions, Ltd.), 302 B.R. 136, 144 (Bankr. D. Del. 2003)

---

[18]    See Order at ¶ L.

(section 1127(b) provides the sole means for modifying a confirmed plan, and a plan that has been substantially consummated can no longer be modified); Cohen v. TIC Fin. Sys. (In re Ampace Corp.), 279 B.R. 145, 153 (Bankr. D. Del. 2002) ("unless the Plan is otherwise modified in accordance with § 1127(b), both parties are bound to the terms of the Plan"); In re Phoenix Petroleum Co., 278 B.R. 385, 398 (Bankr. E.D. Pa. 2001) (section 1127(b) precludes the modification of a confirmed chapter 11 plan once substantial consummation of the plan has occurred).

Although a bankruptcy court may exercise its equitable powers at its own discretion, it cannot contravene specific provisions of the Bankruptcy Code. United States v. Energy Resources Co., 495 U.S. 545, 549-50 (1990). In deciding the Surplus Distribution Motion, the Bankruptcy Court *sua sponte* modified the substantially consummated Plan by concluding that Section 7.7 should not be given effect absent resolution of the QUIPS Litigation, thereby imposing an indefinite stay of a key feature of the Plan providing for the amount and timing of substantial distributions to unsecured creditors. It is without question that the Plan was substantially consummated at the time of entry of the Order. Thus, the Bankruptcy Court erred in denying the Surplus Distribution Motion, by effectively materially modifying the substantially consummated Plan in violation of section 1127(b) of the Bankruptcy Code.

## VIII.
## CONCLUSION

The Plan could have provided that, after initial distributions were made on the Effective Date, there would only be one subsequent distribution of surplus shares of New Common Stock from the Disputed Claims Reserve after all Disputed Claims were

resolved. However, that is not what the Plan provides. Rather, the Plan, which was

overwhelmingly accepted by creditors and confirmed by the Bankruptcy Court, plainly

provides for subsequent distributions of surplus shares of New Common Stock *every six*

*months* after the Effective Date, whether or not *all* Disputed Claims have been resolved.

As a matter of law, the Bankruptcy Court did not have the authority to modify the

substantially consummated Plan. Thus, the Order should be reversed.

Dated: April 26, 2006

THE BAYARD FIRM

By: _____

Neil B. Glassman (#2087)
Charlene D. Davis (#2336)
Eric M. Sutty (#4007)
222 Delaware Avenue, Suite 900
Post Office Box 25130
Wilmington, Delaware 19899
Telephone: (302) 650-5000

- and -

PAUL, WEISS, RIFKIND, WHARTON
 & GARRISON LLP
Alan W. Kornberg
Kelley A. Cornish
Margaret A. Phillips
1285 Avenue of the Americas
New York, New York 10019
Telephone (212) 373-3000

Attorneys for the Plan Committee

Unreported Decisions

LEXSEE 2005 BANKR LEXIS 2146

**In re: NORTHWESTERN CORPORATION, Debtor. NORTHWESTERN CORPORATION and CLARK FORK AND BLACKFOOT LLC, Plaintiffs, -vs- MARGARET A. MCGREEVEY, JO ANN BARKELL, and JOSEPH MARTELLI, on behalf of themselves and the class of similarly situated individuals, Defendants.**

**Chapter 11, Case Nos. 03-12872 (JLP), Adv. No. 05-52525 (JLP)**

**UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

*2005 Bankr. LEXIS 2146*

**October 25, 2005, Decided**

COUNSEL: [*1] For Northwestern Corporation and Clark Fork and Blackfoot LLC, Plaintiff: Dennis A. Meloro, Greenberg Traurig, Wilmington, DE; William E. Chipman, Jr., Greenberg Traurig, LLP, Wilmington, DE.

For McGreevey Class Action Claimants, Defendant: Steven K. Kortanek, Klehr Harrison Harvey Branzburg & Ellers, Wilmington, DE.

For Northwestern Corporation and Clark Fork and Blackfoot LLC, Counter-Defendant: Dennis A. Meloro, Greenberg Traurig, The Nemours Building, Wilmington, DE.

For Northwestern Corporation aka Northwestern Public Service aka The Montana Power, L.L.C. aka Northwestern Energy, L.L.C. aka Northwestern Energy-SD/NE aka Northwestern Energy-Montana, Debtor: Charles Michael Terribile, William E. Chipman, Jr., Greenburg Traurig LLP, The Brandywine Building, Wilmington, DE; Dennis A. Meloro, Scott D. Cousins, Victoria Watson Counihan, Greenberg Traurig, The Nemours Building, Wilmington, DE; Evelyn J. Meltzer, Pepper Hamilton LLP, Hercules Plaza, Wilmington, DE; Monica Leigh Loftin, Paul D. Brown, Greenberg Traurig, LLP, The Nemours Building, Wilmington, DE; Robert Lee Striker, Leonard Street and Deinard, Minneapolis, MN; William Pierce Bowden, Ashby & Geddes, Wilmington, [*2] DE.

Mark S. Kenney, U.S. Trustee, Office of the U.S. Trustee, Wilmington, DE.

For OFFICIAL COMMITTEE OF UNSECURED CREDITORS, Creditor Committee: Charlene D. Davis, Eric Michael Sutty, GianClaudio Finizio, The Bayard Firm, Wilmington, DE; Donna L. Harris, Cross & Simon, LLC, Wilmington, DE; John C. Phillips, Jr, Phillips, Goldman & Spence, Wilmington, DE.

JUDGES: JOHN L. PETERSON, United States Bankruptcy Judge.

OPINIONBY: John L. Peterson.

OPINION:

### *MEMORANDUM OF DECISION and ORDER*

In Cause No. 05-52525, Plaintiff Northwestern Corporation ("NOR") filed an adversary complaint and objections to claims against the defendants Margaret A. McGreevey, *et al.*, who represent a class of former shareholders of the Montana Power Company ("MPC") which seek damages and other relief against a number of individuals and entities arising out of the divestiture of MFC. The McGreevey class filed an action on August 11, 2005, styled *McGreevey, et al v. MPC, NOR and the Clark Fork and Blackfoot LLC* ("CFB"), as defendants, Cause No. DV-05199, Montana Second Judicial District Court, Butte-Silver Bow County, Montana, seeking a judgment to impress a constructive or equitable trust on utility assets [*3] of the NOR purchase in 2002 from MPC, as more fully explained herein. NOR has removed the action to the United States District Court for the District of Montana, where it is now pending on McGreevey's motion for remand.

The present action seeks to enjoin the McGreevey state court action on the basis that it violates provisions of the confirmed chapter 11 plan of reorganization of NOR, has no basis in law or fact and seek an award of attorney's fees and costs. The matter is before this Court on NOR's Motion for Order to Show Cause why a Per-

2005 Bankr. LEXIS 2146, *

manent or Preliminary Injunction should not be issued enjoining the continued prosecution of the cause DV-05199. Hearing on the Motion was held October 19, 2005, with counsel for each party present. Each party has filed pre-hearing memoranda in support of their respective positions and oral argument was made by counsel at the hearing. At the conclusion of the hearing the Court took the matter under advisement and is now prepared to rule.

The gravamen of the dispute is based on NOR's purchase of the utility assets, namely the transmission and distribution system of the MPC, under a Unit Purchase Agreement ("UPA") dated September 29, 2000, between [*4] NOR, as Buyer and Touch America Holdings, Inc., MPC and MPC LLC as sellers. One of the provisions of the UPA (sec. 2.23) required the sellers to obtain the affirmative vote of the holders of record of at least 2/3rds of the outstanding common stock of MPC approving the sale. While the McGreevey state court complaint alleges MPC wrongfully sold "all or some of its assets without obtaining shareholders approval in violation of § 35-1-823, MCA", that allegation is not true as to the purchase of the utility assets of MPC by NOR because on October 2, 2000, MPC and NOR announced the sale, and MPC represented in its 8-K filing with the SEC that purchase needed approval of MPC's shareholders, which MPC sought and received n1.

> n1 Allegations from *Plan Trust of Touch America Holdings, Inc. v. Goldman, Sachs et al.* (DV-04-250), attached as an agenda item.

In the McGreevey class Fourth Amended Complaint, Cause No. DV-01-141, Montana Second Judicial District, Butte Silver Bow County, now pending in U.S. District Court, [*5] attached as a hearing agenda item, the plaintiff alleges as true allegations in paragraph 6, p. 7, and paragraph 9(c), p. 9, as follows:

> 7. The final step of the original integrated plan to exit the energy business involved selling defendant Montana Power company's gas and electric distribution system to Northwestern Corp. for more than $ 1 billion, and then converting the old company into Touch America, Defendant Montana Power Company's telecommunication subsidiary. Defendant Montana Power Company has merged Defendant Montana Power Company into a Montana Power L.L.C., a subsidiary of Touch America Holding with Montana Power

LLC being the surviving entity. The Montana Power L.L.C. entity has been sold to Northwestern Corp., leaving Touch America Holdings with only two companies, those being Touch America, Inc. And Tetragenics Co., which develops computer based monitoring systems. Under the scheme, shareholders of Defendant Montana Power Company have or will become shareholders of Touch America Holdings.

> ***

> 9. (C) As a final phase, Defendant Montana Power agreed to sell its transmission facilities to Northwestern Corp. and guaranteed that Montana Power Company would [*6] either obtain shareholder approval or pay $ 10 million liquidated damage sum to Northwestern Corp. (Emphasis added)

It is noteworthy this Complaint notes lack of shareholder's approval on divestiture of the generation, coal and oil and gas businesses, and independent power production licenses as a prime claim for relief, but does not assert such lack of shareholder approval on the Northwestern sale of the energy component. Moreover, nothing is alleged that the Northwestern purchase was somehow clouded with fraud. In the Memorandum of Understanding ("MOU") in Cause DV-01-141, contained in NOR's Motion for Order under *Rule 9019*, NOR noted it was joined in cause DV-01-141 to cover any judgment against NWE, because the McGreevey class had filed Proof of Claim No. 744 against NOR asserting the assets of NWE LLC were transferred to NOR in violation of fraudulent transfer law. The MOU covered the D & O policies of Montana Power Company, which were to contribute $ 67,000,000.00 to the settlement fund with attendant full release of the claims. It was not approved, but the reason is not in this record. Thereafter, upon stipulation of the parties, the Bankruptcy Court approved a stipulation [*7] that the McGreevey claimants "shall have until 4:00 p.m. (EDT") on August 13, 2004, to file their objections to the Debtor's proposed plan." The stipulation was signed by the parties on August 2, 2004. The class failed to file any objection. The amended plan was confirmed with this provision (p. 62):

> 3. Binding Effect. In accordance with *section 1141(a) of the Bankruptcy Code*, the Plan and its provisions shall be, and hereby are, binding upon the Debtor, any Person acquiring or receiving a distribu-

tion under the Plan, any entity issuing se-curities under the Plan, any lessor of property to the Debtor, any lessee from the Debtor, any creditor of the Debtor and any holder of a claim against or Equity in-terest in the Debtor, and their respective successors and permitted assigns, whether or not the Claim or Equity Interest of such holder is impaired under the Plan and whether or not such holder has accepted or rejected the Plan, or will or will not re-ceive a distribution under the Plan" (Em-phasis added).

Thus the MPC shareholders, now represented by the McGreevey class, approved the sale by over 2/3rd of the outstanding shares voting affirmatively [*8] in favor of the UPA, thus satisfying the provisions of § 35-1-823 n2 Nevertheless, the McGreevey class now seeks an order avoiding the transfer and directing the return of the utility assets as being fraudulent, with an intentional hin-drance of creditors, unjust enrichment, rendering CFB insolvent, so as to impose under the provisions of the Montana Uniform Fraudulent Transfer Act, § § 31-2-328(3) and (4), 333 (1)(a) and (b), and 334(1), an actual and constructive trust in the Montana utility assets held by NOR for the benefit of the MPC shareholders

> n2 No basis is alleged in the state court com-plaint which resulted in an order in that court es-tablishing the McGreevey class in Cause DV-05199 pursuant to Mont R. Civ P. (Mont.) Rule 23 or 23 1. Certainly it could not certify as a vio-lation of § 35-1-823

The UPA provided that NOR would pay for the util-ity assets the sum of $ 602 million dollars cash and as-sume MPC liabilities of just under $ 500 million, for a total consideration of $ 1 1 billion dollars [*9] NOR made the payment pursuant to the UPA and assumed the debt in 2002 and on November 15, 2002, transferred the assets from CFB and NWE LLC to NOR.

The structure used to facilitate the transfer of the utility assets by MPC involved the creation of MPC LLC by MPC, and CFB together with Northwestern Energy LLC (NWli) by NOR, so that MPC LLC merged with CFB to take the assets to pass on to NOR through NWE. This has been called a "going flat" transaction or up-streaming the assets to NOR McGreevey argues that when the CFB/N WE merger took place, CFB received no consideration for the transfer, except for the assump-tion of some debts, which thus left CFB insolvent. McGreevey contends that such structure invoked the provision of § 35-8-1203 MCA which provides "all

debts, liabilities and other obligations of each [merging party] that are party to the merger become the obligations of the surviving entity", namely CFB, a limited liability company in which the shareholders of MPC never had an ownership interest After MPC utility assets were merged in MPC LLC, that entity was joined in the UPA. State court legal action by McGreevey has ensued against a number of entities, but as to NOR, it [*10] joined that action as party defendant so that it would be responsible for any judgment which McGreevey might recover against NWE to the extent NWE is liable to satisfy the judgment. NOR's joinder by stipulation retained all legal defenses of NOR. Thus, the McGreevcy class contends it has creditor status against NOR

NOR filed for chapter 11 bankruptcy relief in Sep-tember, 2004 In the case, McGreevey filed two proofs of claim, to which objection has been filed by NOR. More-over, McGreevey moved the bankruptcy court for relief from the automatic stay under 11 U S C § 362 so it could file an adversary proceeding against NOR to estab-lish the constructive trust. McGreevey's motion attached a specimen Adversary Complaint under the heading "In the United States Bankruptcy Court for the District of Delaware". After objection to the motion was filed by NOR claiming the claims allowance and disallowance procedure would govern and resolve the matter, the bankruptcy court, based upon the stipulation made by NOR when added as a defendant in the class action suit filed in 2001, would survive and thus the proper method to resolve the issues of alleged fraudulent transfer [*11] would be to allow McGreevey to file the adversary com-plaint attached to their motion However, that complaint was never filed. Moreover, the McGreevey class never filed any objections to the Second Amended Plan of Re-organization asserting the constructive trust to the utility assets, and thereby preserving their legal position.

Ironically, another creditor, Magten Asset Manage-ment Corp ("Magten") a holder of "QUIP" debentures assumed by NOR pre-petition, asserted the very same constructive trust/fraudulent conveyance position as McGreevey In the order confirming the plan, the presid-ing Bankruptcy Judge Case stated:

> "The court hereby finds that the going flat' transaction is all of one transaction and but for the going flat' transaction the Debtor would have no liability on the QUIPS notes."

In addition, Judge Case found that Magten, like McGrccvcy in the state court action, asserted "in rem" property interests in the Montana assets and that such

2005 Bankr. LEXIS 2146, *

assets were being held in a constructive trust for the benefit of the QUIPS holders. Judge Case found that Magten

> "took no action to impose a constructive trust in the Montana assets and presented no evidence whatsoever [*12] as to why they should be entitled to a constructive trust with respect to the Montana assets . Moreover Magten . . . failed to cite a statute or case in support of their in rem property interest. The court finds persuasive Section 7 of the Uniform Fraudulent Transfer Act, as adopted in Montana, which contemplates that money damages are an adequate remedy for fraudulent transfer claims. Accordingly, the court finds no constructive trust has been established and money damages are an appropriate remedy for the holders of the QUIPS Litigation Claims."

The Court concluded the QUIPS notes were nothing more than general unsecured claims under section 7.5 of the plan, and indeed the confirmed plan specifically provides for such treatment in Class 8 of the plan.

It is noteworthy here, that unlike Magten, McGreevey made no effort whatsoever to establish a constructive trust from the "going flat" transaction, in the bankruptcy court, pre-confirmation. McGreevey now claims under fraudulent conveyance/constructive trust theory that claim survived the plan process and passed through unaffected due to a provision in the confirmed plan, sec. 5:13b, which provides:

> "Except as otherwise [*13] expressly provided in this plan, effective automatically on the Effective Date, the Released Parties, their respective representatives and one Additional Indemnities, shall not be released from any and all claims and causes of action arising under Sections 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy code or similar claims or cause of action arising under state or any other law, including, if applicable, claims in the nature of fraudulent transfer, successor liability, corporate veil piercing, or alter ego claims, as a consequence of transactions, events or circumstances involving or affecting the Debtor (or any of its predecessors or any of their

respective businesses or operations that occurred or existed prior to the Effective Date."

The McGreevey argument may carry some weight if they had a viable fraudulent conveyance action under the Montana Fraudulent Conveyance Act. They do not.

The corporate mechanisms established by the seller MPC and the buyer NOR, mat is, the creation of MPC LLC, CFB and NWR LLC, were established to separate the MPC utility assets from the telecommunication assets of Touch America ("TA") so as to allow MPC to divest and sell the utility [*14] assets separate and apart from the telecommunication assets, which were retained by TA and MPC. McGreevey's argument that CFB was left insolvent is a fiction which exalts form over substance. The substance of the transaction, under the UPA, concurred in by the MPC shareholders, plainly provided for the sale and purchase of the utility assets between MPC and NOR for $ 1.1 billion dollars. That sum was paid and received by MPC for its benefit and the benefit of its concurring shareholders. That feet is a given! Thus, when the transaction was completed by November 15, 2002, and the assets passed on to NOR through the various limited liability companies, the debtor/creditor relationship between NOR and MPC and its shareholders was satisfied, and therefore terminated. As a result, when NOR sought bankruptcy relief under chapter 11, MPC and its shareholders were no longer a creditor of NOR. This situation is fatal to the McGreevey class's state court action under the Montana Fraudulent Transfer Act as a matter of law. It is clear that in order for a party to seek the remedies under § 31-2-339, by the express definition of § 31-2-328(3) and (4) the creditor/plaintiff must have a claim, [*15] i.e., right to payment, as a predicate to maintain the action. It is further clear from the undisputed facts here that the McGreevey class does not have such claim, and is thus not a creditor because the UPA was satisfied by NOR's payment. As Judge Case held, and as I adopt, the "going flat" transaction is "all one transaction". The mechanism of creation of LLC's to effect the transfer and payment was indeed all one transaction, and it defies logic to argue otherwise. The McGreevey class simply cannot parse one aspect of the transfer and call it fraudulent. That would stand the confirmed plan of reorganization on its head, for the entire basis of the chapter 11 plan rested upon the utilization, implementation and consummation of the acquired Montana utility assets. The Montana court litigation now pending in the U.S. District Court has thus no basis for relief in law or fact. The claims filed by the McGreevey class in the bankruptcy case have no merit.

It is a well established principle of bankruptcy jurisprudence that an alleged creditor which files a claim in a bankruptcy case triggers the process of "allowance and

disallowance of claims", thereby subjecting that person to the bankruptcy [*16] court's equitable powers. *Langenkamp v. Culp, 498 U.S. 42, 44 (1990); Gardner v. New Jersey, 329 U.S. 565, 573, 67 S. Ct. 467, 91 L. Ed. 504 (1947). In re Carnell Construction Corp., 424 F.2d 296, 298 (3rd Cir. 1970)* (quoting *In re Beasley-Gilbert's, Inc., 285 F. Supp. 359, 361 (S.D. Ohio 1968))* plainly holds:

> "It is settled that a creditor who proves a claim submits himself to the summary jurisdiction of the Bankruptcy court in respect of preferences or voidable transfers, including the jurisdiction of the Bankruptcy Court to enter a monetary judgment or order a return,"

Moreover, it is axiomatic that a bankruptcy court possesses the inherent authority to enforce its own orders, such as an order confirming a chapter 11 plan of reorganization. *In re Continental Airlines, Inc., 236 B.R. 318, 325-26 (Bankr. Del. 1999); see, also, F.R.B.P. Rule 3020(d).* Finally, to preserve the plan post-confirmation by the bankruptcy court, *Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.), 372 F.3d 154 (3rd Cir. 2004)* and *In re Pegasus Gold Corporation, 394 F.3d 1189 (9th Cir. 2004)* [*17] hold "the essential inquiry appears to be whether there is a close nexus between the bankruptcy plan or proceeding sufficient to uphold jurisdiction over the matter." Not only is there a close nexus in the cause *sub judice*, there is complete nexus for this Court to entertain jurisdiction to preserve the implementation and consummation of the plan for the plan creditors where, as here, the McGreevey class seeks erroneously, and without legal basis, to upset the entire underpinnings of the confirmed plan or reorganization by asserting a constructive trust over the Montana utility assets which form the bases of the success of the plan and are assets of the bankruptcy estate. This is so, because a person subject to constructive trust which arises under Montana state law, being involuntary in nature, has a duty to convey it to another on grounds that the person holding bare legal title would be unjustly enriched if he were permitted to retain it. *In re Estate of McDermott, 2002 MT 164, 51 P.3d 486, 310 Mont. 435 (2002).* That would be an unjust result in this case where full consideration under the UPA was paid by NOR.

It is also well established that where a creditor or person files [*18] a proof of claim, and has the opportunity to contest the disclosure statement or proposed plan of reorganization particularly to assert a constructive trust or fraudulent conveyance action and does not do so

in the bankruptcy case, when it could or should have done so, is barred from asserting that claim in another forum. The confirmed plan and order control under *11 U.S.C. § 1141*, defining the effect of confirmation, and acts like a contract that binds the parties who participate in the bankruptcy case or should have participated in the case. *Knupfer v. Wolfberg (In re Wolfberg), 255 B.R. 879 (Bankr. 9th Cir. 2000); Eastern Air Lines, Inc. v. Brown & Williamson Tobacco Corp. (In re Ionosphere Clubs, Inc.), 262 B.R. 604 (Bankr. S.D. N.Y. 2001).* It is undisputed that the McGreevey class participated in the debtor's chapter 11 case by filing proofs of claim and a motion for relief from stay to file an adversary proceeding in the bankruptcy case, which they did not pursue. Consequently, now asserting after confirmation of the plan in a state court forum, that the Montana utility assets were not property of the bankruptcy estate n3, the McGreevey class is precluded from litigating that issue in the state court action because [*19] they failed to take any steps to raise the issue before the court and litigate to conclusion their contentions prior to confirmation. *Miller v. U.S., 363 F.3d 999 (9th Cir. 2004); In re PWS Holding Corp., 303 F.3d 308, 315 (3rd Cir. 2002); Celotex Corp v. Edwards, 514 U.S. 300, 313 (1995)* ("Respondents chose not to pursue this cause of action [appeal of the bankruptcy court's decision], but instead to collaterally attack the Bankruptcy Court's *section 105* injunction in the federal court of Texas. This they cannot be permitted to do without undercutting the orderly process of law."); *Haskell v. Goldman, Sachs & Co. (In re Genesis Health Ventures, Inc.), 324 B.R. 510, 521 (Bankr. Del 2005)* ("The application of res judicata, or claim preclusion, bars a party from litigating a claim that it would have raised or did raise in a prior proceeding in which it raised another claim on the same cause of action"). The excuse for not pursing the adversary proceeding, filing objection to plan so as to raise the constructive trust issue, as Magten did, was that a proposed settlement was on the table dealing with the availability of MPC D & O insurance policy proceeds [*20] to be funneled to the McGreevey class, which proposal was later rejected by the Montana U.S. District Court since title to the proceeds is in issue. Such is a weak and unacceptable excuse at best since the McGreevey class could still have pursued its adversary proceeding if it truly believed it had merit, or at a minimum requested a delay in the confirmation process until the settlement issue was resolved. It did neither.

n3 *Section 1141(b)* provides: "Except as otherwise provided in the plan or order confirming the plan, the confirmation of a plan vests all property of the estate in the debtor."

2005 Bankr. LEXIS 2146, *

It is the position of NOR that plan provisions also bar the pending state court action because the McGreevey class claims were channeled into a D & O Trust, and the claims are thus discharged as to NOR with an attendant injunction against the McGreevey class allowing it to pursue their remedy in another forum Arguing that the McGreevey class disagreement with that position is misplaced, NOR states if the McGreevey class [*21] did not like such plan treatment it should have filed an appropriate objection to confirmation of the plan, which it did not do NOR's argument, based on the plan language of the plan provisions (provisions L0.5(a) and (e), 13.1, 5.13(b), 1.47 and 4.12) has merit, particularly where the McUreevey class was served with the second amended plan, and did not seek any clarification from the court during the confirmation hearing by way of objection, as to the plan's intent, and how it would affect its constructive trust claim, particularly in light of NOR's position that the MPC D & O policies were not property of NOR's estate. In sum, the McGreevey class slept on its rights. However, due to my finding and conclusion that the McGreevey class was not and is not a creditor of NOR pre-petition I need not pass on NOR's position This is particularly true since the Bankruptcy Court specifically found that the "Montana assets are property of the estate" in confirming the plan

*Rubin v Pringle (In re Focus Media Inc ), 387 F 3d 1077, 1085 (9th Cir 2004)*, involving a fraudulent conveyance action by a bankruptcy trustee to freeze potential estate assets, the court adopted the traditional test for [*22] preliminary injunction as follows:

To determine whether a preliminary injunction should issue, a court

> balances the plaintiff's likelihood of success against the relative hardship to the parties To receive a preliminary injunction, [a plaintiff is] required to show either a likelihood of success on the merits and the possibility of irreparable injury, or that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor. These two alternatives represent extremes of a single continuum, rather than two separate tests

*Sun Microsystems, Inc v Microsoft Corp , 188 F 3d 1115, 1119 (9th Cir 1999)* (internal citations and quotations omitted)

To establish a substantial likelihood of success on the merits, NOR must show that it will have a fair chance of success on the merits. *Id* By reason of my conclusion

that the McGreevey class was not and could not be a pre-petition creditor of NOR, it has no chance to establish a constructive trust under Montana's Fraudulent Transfer Act. NOR and its creditors and shareholders in the reorganized company will suffer immediate and irreparable harm if the McGreevey class [*23] is permitted to continue to prosecute the state court action in any forum. Under settled law, where a party unilaterally violates a bankruptcy court order, that violation, standing alone, constitutes the only harm necessary for an injunction. *American Gen Fin v Tippins (In re Tippins), 221 B R 11, 27-28 (Bankr N D Ala 1998)*; *In re Steffan, 97 B R 741, 746 (Bankr N D N Y 1989)*; *In re McNeil, 128 B R 603, 615 (Bankr E D Pa 1991)* In sum, the McGreevey class cannot be permitted to "end run" the confirmation process and order confirming the plan by erroneously asserting an equitable interest in the Montana utility assets which were and are a necessary and essential part of the confirmed plan of reorganization. The preliminary injunction will preserve the rights of the debtor and creditors who relied upon the plan and thus preserve the status quo If the McGreevey class wishes to preserve its alleged pre-petition claims, it must do so in the bankruptcy forum where it initially sought relief by filing their proofs of claim and seeking permission to tile an adversary proceeding to assert its rights It is in the public interest to preserve the integrity of the bankruptcy [*24] process from collateral attack post-confirmation. Accordingly, for all the above reasons, a preliminary injunction must be issued against the McGreevey class enjoining the class from continuing the litigation in Cause No. DV-05199, presently pending on removal in the Montana U.S. District Court n4

n4 While not raised as an issue, by either party, since the alleged McGreevey class claims exceed $ 5 million dollars in value, the jurisdiction of state court is highly questionable due to the passage of the "Class Action Fairness Act of 2005", P.L. 109-2, February 18, 2005, 119 Stat. 4, Sec. 4. Federal District Court Jurisdiction for Interstate Class Actions

**IT IS ORDERED:**

1. The plaintiffs Margaret A. McGreevey, Jo Ann Barkell and Joseph Martelli, on behalf of themselves and the class of similarly situated plaintiffs, are hereby preliminarily enjoined from further prosecution of Cause No. DV-05199, filed against Montana Power company, a Montana corporation, Northwestern Corporation, a Delaware corporation [*25] and the Clark Fork and Blackfoot LLC, a Montana Limited Liability company, defendants, presently pending in the Montana U.S. Dis-

2005 Bankr. LEXIS 2146, *

trict Court, until further Order of this Court, with leave of the plaintiffs NOR and CFB to seek an award of attorneys' fees and costs

    DATED this 25th day of October, 2005,

BY THE COURT

HON. JOHN L. PETERSON

    United States Bankruptcy Judge District of Delaware

Westlaw.

Not Reported in A 2d                                                                          Page 1
Not Reported in A 2d, 2005 WL 2436220 (Del Super )
**(Cite as: Not Reported in A.2d)**

Only the Westlaw citation is currently available
UNPUBLISHED    OPINION    CHECK    COURT
RULES BEFORE CITING.
Superior Court of Delaware
Yvonne ADAMS-BAEZ, Guardian Ad Litem for
Nicholas Adams Plaintiff,
v
GENERAL ACCIDENT CO , Defendant
**No. C.A. 04C-02-219WCC.**

Submitted June 6, 2005
Decided Sept 30, 2005

Plaintiff's Motion for Summary Judgment Denied
Defendant's Motion for Summary Judgment Granted

L Vincent Rammuno. Rammuno Rammuno &
Scerba, P A , Wilmington, Delaware, for Plaintiff.
David J. Soldo, Reger & Rizzo, LLP, Wilmington,
Delaware for Defendant

MEMORANDUM ORDER

CARPENTER, J

*1 On or about January 19, 2002, Robert B Neel, Jr
(the "Decedent"), the father of Nicholas Adams' (the
"Plaintiff" or "Adams"), died as a result of an
automobile accident negligently caused by Mark
Johnson ('Johnson') The Decedent was a passenger
in Johnson's car at the time of the accident, and
Johnson did not have automobile insurance coverage
for his vehicle As a result, Adams, through his
mother Yvonne Adams-Baez ("Adams-Baez") as
guardian *ad litem.* commenced this wrongful death
suit against General Accident Insurance Company
("GAIC"), to recover damages through his mother's
uninsured motorist coverage

While Adams resided with his mother at the time of
the accident, his father was not a member of their
household Adams-Baez was never married to the
Decedent, nor did they ever live together On the date
of the accident, the Decedent was residing in New
Castle. Delaware with his wife, Cynthia Santillo, and
was never a named insured under Adams-Baez's
policy

As such, this litigation raises the issue of whether a
child covered under his mother's insurance policy can

recover wrongful death benefits relating to the death
of his father, who is not a member of that household
The Court finds that coverage is not available and
will grant summary judgment for the Defendant.

*Standard of Review*

Summary judgment is appropriate when the moving
party has shown there are no genuine issues of
material fact, and as a result, it is entitled to judgment
as a matter of law In considering such a motion, the
court must evaluate the facts in the light most
favorable to the non-moving party    Summary
judgment will not be granted when the record
reasonably indicates that a material fact is in dispute
or if it seems desirable to inquire more thoroughly
into the facts in order to clarify the application of law
to the circumstances     In the instance of cross
motions for summary judgment, the parties implicitly
concede the lack of disputed material facts and
acknowledge adequacy of the record to support the
party's respective motion.

FN1. *Moore v. Sizemore,* 405 A.2d 679, 680
(Del.1979); *Schueler v. Martin,* 674 A.2d
882, 885 (Del.Super.Ct.1996)

FN2 *Pierce v. Int'l Ins. Co. of Ill.,* 671 A.2d
1361, 1363 (Del.1996)

FN3. *Ebersole v. Lowengrub,* 180 A.2d 467,
468-9 (Del.1962).

FN4. *Browning-Ferris, Inc., v. Rockford
Enterprises, Inc.,* 642 A .2d 820, 823
(Del.Super.Ct.1993)

*Discussion*

1 Interpretation of the Insurance Policy

The first issue that must be resolved is whether there
is even a compensable injury under the policy. In
interpreting an insurance policy, this Court must
respect clear and unambiguous language   If parties
dispute the terms of an insurance policy, the Court
must treat such dispute as a matter of law and
interpret the policy in a common sense manner,

© 2006 Thomson/West No Claim to Orig. U.S Govt. Works

Not Reported in A 2d
Not Reported in A 2d, 2005 WL 2436220 (Del Super )
(Cite as: Not Reported in A.2d)

Page 2

allowing each term its plain meaning within the contract. Ambiguity in a contract exists only when the language allows more than one interpretation. The Court will not create an ambiguity to allow further interpretation since doing so potentially creates a new contract not agreed to by the parties

> FN5. *Engerbretsen v. Engerbretsen.* 642 A 2d 13, 17 (Del Super Ct 1995)

> FN6. *Engerbretsen.* 642 A 2d at 17 (citing *Hallowell v. State Farm Mut. Auto. Ins.,* 443 A.2d 925, 926 (Del.1981)); *Emmons v. Hartford Underwriters Ins.,* 697 A.2d 742, 745 (Del.1997) (citing *Penn Mut. Life Ins. v. Oglesby,* 695 A.2d 1146 (Del.1997))

> FN7. *Hallowell,* 443 A.2d at 926

> FN8. *Engerbretsen.* 642 A 2d at 17 (citing *Hallowell,* 443 A.2d at 926).

The insurance policy before this Court states compensatory damages will be paid by GAIC to the insured in the event of bodily injury caused by an uninsured motorist. In an effort of clarification, the insurance policy specifically defines material terms. Those relevant to the issue before the Court are:

> FN9. Specifically, the insurance policy states as follows:
> We will pay compensatory damages which an "insured" is legally entitled to recover from the owner or operator of an "uninsured motor vehicle" because of "bodily injury":
> 1 Sustained by an "insured"; and
> 2 Caused by an accident
> The owner's or operators' liability for these damages must arise out of the ownership, maintenance or use of the "uninsured motor vehicle."
> Def's Br Summ J, Ex E

**\*2** 1 "Insured" is defined as "You or any 'family member'"

> FN10. *Id*

2 "You" is defined as "The 'named insured' shown in the Declarations; and. The spouse if a resident of the same household."

> FN11. *Id*

3 "Family member" is defined as "a person related to you by blood, marriage or adoption who is a resident of your household."

> FN12. *Id*

4 "Bodily injury" is defined as "bodily harm, sickness or disease, including death that results."

> FN13. *Id*

The Plaintiff requests payment from GAIC through the insurance policy's uninsured motorist coverage for the wrongful death of his father. Adams-Baez is the only listed insured of the insurance policy, and Adams is in fact a family member under the terms of the policy. The initial question is whether Adams did in fact sustain bodily injury within the meaning of the insurance policy, and is therefore insured. Obviously, recognizing that the definition of bodily injury set forth in the policy is problematic to its position, Plaintiff instead requests the Court to rely on the definitions of "harm" in 1) the American Heritage Dictionary, which defines it as a "physical or psychological injury or harm," and 2) the Webster's Dictionary which uses the definition of a "physical or material injury; hurt; damage; detriment; misfortune." However, it is important for this Court to respect clear and unambiguous language within the insurance policy and to interpret the insurance policy with common sense, unless ambiguity exists. Here, the Court finds that no ambiguity exists

> FN14. Pl's Mot. Summ. J., ¶ 11. (citing to The American Heritage Dictionary, 4th Edition, (1992) and Webster's Dictionary (citation omitted by counsel)).

> FN15. *Engerbertsen,* 642 A 2d at 17 (citing *Hallowell,* 443 A.2d at 926).

The policy precisely defines "bodily injury" and there is nothing here to suggest that the Plaintiff has suffered any injuries specifically covered within that definition. Because Adams did not suffer bodily harm, as clearly defined by the policy, he is not able to recover wrongful death damages under a policy in which his deceased father had no interest

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 2436220 (Del.Super.)
(Cite as: Not Reported in A.2d)

## II Public Policy

The second issue argued by the parties is whether public policy reasons allow or require GAIC to pay damages to Adams with respect to this particular incident. First, uninsured motorist coverage protects an insured party injured by an uninsured tortfeasor by providing coverage of the insured through the terms of their own policy.   Thus, uninsured motorist coverage is intended to protect insured parties who are unable to receive damages from a negligent uninsured party. However, this Court determined in _Temple_ that an insurance company has the right to place reasonable limits on the policy, including restricting coverage to the named insured; a standard practice throughout the industry. This Court further reasoned in _Temple_ that so long as the insurance policy was in compliance with 18 Del. C. § 3902, the insurance policy is valid. Here, the insurance policy does in fact comply with the statute, and does not limit coverage inappropriately.

> FN16. _Jones v. State Farm Mut. Auto. Ins._, 610 A.2d 1352, 1354 (Del.1992).

> FN17. _State Farm Mut. Auto. Ins. v. Abramowicz_, 386 A.2d 670, 672-4 (Del.1978); _Nat'l. Union Fire Ins. Co. of Pittsburgh v. Fisher_, 692 A.2d 892, 895-6 (Del.1997).

> FN18. _Temple v. The Travelers Indemnity Co._, 2000 WL 33113814, *5 (Del.Super.).

> FN19. 18 Del. C. § 3902(a) states in pertinent part:
> No policy insuring against liability   shall be delivered or issued for delivery
>    unless coverage is provided therein or supplemental thereto for the damages from owners or operators of uninsured or hit-and-run vehicles for bodily injury, sickness, disease. including death, or personal property damage resulting from the ownership, maintenance or use of such uninsured or hit-and-run motor vehicle.

Similarly to the _Temple_ case, this insurance policy limits coverage to "the insured." In _Temple_, Mrs. Temple received deadly injuries at the hands of an under-insured motorist. Mrs. Temple did not have insurance, and Mr. Temple and Mrs. Temple did not reside together. Mr. Temple and his children filed a claim to recover under-insured motorist benefits against his insurance company. The Court held coverage was not available through Mr. Temple's insurance company for the injuries suffered by his wife since she was not an insured under his policy.

> FN20. _Temple_, 2000 WL 33113814, at *5. ("  this theory would allow coverage to an individual, who was in no way connected to my automobile insurance policy, who did not reside in my household, nor who, if had survived the accident, would have had any right of recovery under my policy.").

**\*3** While the facts at hand differ slightly, the standard remains. Adams is in fact insured under his mother's policy, but that is not the issue. The Decedent was not insured by GAIC, thus Adam's claim against GAIC is not valid. Had the Decedent survived the accident, there is no dispute that the Decedent would not have a claim against GAIC. As a wrongful death plaintiff, Adams files a cause of action as if he stands in the shoes of the Decedent. Since coverage under GAIC would not be available to the Decedent, it is not available to Adams, and as in _Temple_, the Adams-Baez insurance policy cannot be stretched to encompass Adams' claim.

> FN21. _Temple_, 2000 WL 33113814, *6. ("The Court finds that a fair reading of 18 Del. C. § 3902(b) limits recovery to bodily injuries suffered by the policy's insured or if those injuries had led to the death of the insured, those benefits may flow to his/her legal representative. It does not allow coverage for injuries sustained by non-insured individuals regardless of their relationship to the policyholder.").

Adams concedes the Decedent was not insured by GAIC, yet further argues that he personally sustained bodily injury from the death of his father and therefore has an independent and separate cause of action. Adams relies on _Emmons v. Harford Underwriters Insurance_ and argues he should recover via a separate claim through GAIC since the at-fault tortfeasor was uninsured.   However, even if this Court was to conclude that Adams suffered some injury and it was a separate and independent claim, his argument continues to be unpersuasive. The clear distinction between this case and _Emmons_ is that in _Emmons_ the decedent was an insured party under the policy. That is not the case here. While the public

Not Reported in A 2d                                                                    Page 4
Not Reported in A 2d, 2005 WL 2436220 (Del Super )
**(Cite as: Not Reported in A.2d)**

policy requires an innocent, insured party injured by
an uninsured tortfeasor to be paid through uninsured
motorist coverage, neither public policy nor Section
3902(b) requires an insurance company to provide
benefits to an insured due to the death of a parent,
who resides in a separate household, was never
married to the insured mother and who it was never
contemplated by any party would be covered by the
insurance policy

> FN22. *Emmons, 697 A.2d 742 (Del.1997)*
> (Mrs & Mr Emmons, as husband and wife,
> were insured under a joint automobile
> policy Upon Mr Emmons death at the
> hands of a negligent uninsured motorist, Ms.
> Emmons commenced a wrongful death
> action and Mr Emmon's Estate commenced
> a survival action Both parties were able to
> recover damages through the joint insurance
> policy )

> FN23 *Temple, 2000 WL 33113814, *6*

### Conclusion

The policy here clearly indicated who is insured and
explicitly indicated what "bodily injury" entailed As
such, it should be interpreted using the plain meaning
of the words within the confines of the policy
Extending coverage as suggested by the Plaintiff
would stretch the policy beyond any reasonable
meaning and would violate the clear unambiguous
terms of the policy Neither the insurance policy or
public policy requires such coverage

For the reasons set forth above, Plaintiff's Motion for
Summary Judgment is DENIED and Defendant's
Motion for Summary Judgment is GRANTED

IT IS SO ORDERED

Del Super ,2005
Adams-Baez ex rel Adams v General Acc Co
Not Reported in A 2d, 2005 WL 2436220
(Del Super )

END OF DOCUMENT

© 2006 Thomson/West No Claim to Orig U S Govt Works.

Westlaw.

Not Reported in A.2d                                                    Page 1
Not Reported in A.2d, 2001 WL 1333405 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Only the Westlaw citation is currently available
UNPUBLISHED OPINION CHECK COURT
RULES BEFORE CITING
Court of Chancery of Delaware.
FLEET NATIONAL GROUP, INC.; Fleet National
Bank; Fleet Bank (RI), National Association; Fleet
Credit Card Services, LP; and Fleet Credit Card
Holdings, Inc., Plaintiffs,
v.
ADVANTA CORP.; Advanta National Bank;
Advanta Insurance Company; and Advanta Life
Insurance Company, Defendants,
**No. C.A. 16912.**

Submitted: July 7, 2001
Decided: Oct. 11, 2001
Revised: Oct. 15, 2001

Arthur G. Connolly, III, Esquire, of Connolly, Bove,
Lodge & Hutz LLP, Wilmington, Delaware; and
Peter J. Kahn, Dennis M. Black, Glen Donath and
David H. Angeli, Esquires, of Williams & Connolly
LLP, Washington, D.C.; and John A. Houlihan and
Steven M. Cowley, Esquires, of Edwards & Angell,
LLP, Boston, Massachusetts; Attorneys for Plaintiffs
and Counterclaim-Defendants

Todd Charles Schiltz and Michael L. Temin,
Esquires, of Wolf, Block, Schorr and Solis-Cohen
LLP, Wilmington, Delaware; and Jay A. Dubow,
Matthew A. White, Nathan E. Kase and Robyn D.
Kotzker Esquires, of Wolf Block, Schorr and Solis-
Cohen LLP, Philadelphia, Pennsylvania; Attorneys
for Defendants and Counterclaim-Plaintiffs

MEMORANDUM OPINION

JACOBS, Vice Chancellor

*1 Pending are motions for summary judgment in
this action brought by Fleet National Group, Inc.,
Fleet National Bank, Fleet Bank (RI), National
Association, Fleet Credit Card Services, LP and Fleet
Credit Card Holdings, Inc. (collectively "Fleet").
These plaintiffs seek (among other things)
approximately $141 million in damages against the
defendants Advanta Corp., Advanta National Bank,
Advanta Insurance Company and Advanta Life
Insurance Company (collectively, "Advanta") This
lawsuit arises out of Fleet's acquisition of Advanta's
$12.1 billion consumer credit card business in

February 1998.

Fleet's primary claim in its complaint is that the
consideration Advanta received for its consumer
credit card business (the "Business") was at least
$97.2 million more than what the parties agreed to.
Fleet contends that Advanta's refusal to refund that
overpayment breached the Contribution Agreement
that the parties entered into on October 28, 1997 and
that defined the parties' rights and obligations. Fleet
asserts additional claims as well, and advances
alternative theories of recovery including conversion,
money had and received, and unjust enrichment.

> FN1. In this action Fleet seeks over $140
> million from Advanta. On these motions
> Fleet seeks summary judgment awarding it
> $97.2 million of that larger total.

> FN2. As used herein, "Contribution
> Agreement" means the October 28, 1997
> Contribution Agreement as amended on
> February 20. 1998.

In its answer Advanta denied Fleet's material
allegations, and asserted counterclaims against Fleet
seeking (among other things) $101 million in
damages for breach of contract, breach of fiduciary
duty, and tortious interference with contractual
relations.

Thereafter, Fleet moved for summary judgment
seeking the dismissal of Counts I and II of Advanta's
counterclaim. This Court granted that motion in its
Opinion dated January 5, 2000. Thereafter, Fleet
moved for summary judgment on Counts III through
V, and for partial summary judgment on Count IX, of
its complaint. Concurrently, therewith, Fleet also
filed a separate motion for summary judgment
seeking the dismissal of all of Count VII, and of
portions of Counts III and IV, of Advanta's
counterclaim. These two motions are presently *sub
judice*.

> FN3. *Fleet Financial Group v. Advanta
> Corp.* Del. Ch., C.A. No. 16912, Jacobs,
> V.C., mem. op at 12 (Jan. 5, 2000).

For the reasons next discussed, the Court concludes

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 1333405 (Del.Ch.)
(Cite as: Not Reported in A.2d)

that: (i) partial summary judgment will be granted on Count IX for breach of contract, and that the precise amount of damages must be determined at trial; (ii) because partial summary judgment will be granted on Count IX of Fleet's claim, the Court need not and does not address Counts III through V of Fleet's complaint, since those Counts allege alternate theories of recovery; (iii) Fleet's motion for summary judgment dismissing Counts III and IV of Advanta's counterclaim, insofar as they relate to Advanta's claim for $68.3 million, will be granted; (iv) Fleet's motion to dismiss Count VII of Advanta's counterclaim insofar as it relates to payments allegedly owed to Jeffery Denton, a former Advanta employee, will be denied; and (v) Fleet's motion to dismiss the balance of Count VII of Advanta's counterclaim will be granted.

## I. FACTUAL BACKGROUND

### A. The Mechanics Of The Transaction

On October 28, 1997, Advanta Corp. and Fleet Financial Group, Inc. entered into a Contribution Agreement that memorialized the terms of Fleet's acquisition of Advanta's consumer credit card business. To create a tax-free transaction, the parties formed a new entity, Fleet LLC (now Fleet LP) (the "Business"), to which Advanta would transfer certain assets and liabilities of its consumer credit card business. The consideration for Fleet's acquisition of the Business was to be Fleet's assumption of Advanta liabilities that exceeded, by a fixed amount, the value of the assets that Fleet would be acquiring. That excess of liabilities over assets (the "Agreed Deficit") was essentially the purchase price that Fleet would be paying for the Business.

*2 As originally drafted, the Contribution Agreement contemplated that the transaction would close on the last business day of the calendar quarter in which specified conditions were satisfied. But, a covenant in one of Advanta's corporate debt instruments required that if Advanta sold substantially all of its business, Advanta must obtain approval from its bondholders. That covenant caused Fleet and Advanta to become concerned that the bondholders might not approve the transaction, and indeed might seek to enjoin it. Accordingly, the parties decided to close the transaction as soon as possible.

FN4. Contribution Agreement § 1.02

FN5. Calamari Dep. (Nov. 8, 2000) at 67:20-22

FN6. Id. at 68:3-25

FN7. Nahigian Dep. (Nov. 29, 2000) at 154:20-156:12

The parties closed the transaction on February 20, 1998-one week before the last business day of that month. Because the value of many of the accounts Advanta would be contributing to the Business could not be determined until the end of the month (February 28), at the closing the parties executed a "First Amendment" to the Contribution Agreement. The function of that Amendment was to outline a "logical closing procedure to give effect to that mid month [closing]."

FN8. Mai Dep. (Sept. 28, 2000) at 77:2-13

FN9. Calamari Dep. (Nov. 8, 2000) at 69:15-70:22

FN10. Id. at 71:21-24.

The underlying, central concept in the amended Contribution Agreement was that the value of Advanta's contributed liabilities would exceed the value of Advanta's contributed assets by an amount equal to the "Agreed Deficit." The Agreed Deficit would be determined independently as of February 20, 1998, and its amount was fixed at (i) $510 million, plus (ii) a "Special Adjustment" of $43 million, plus or minus (iii) an "Agreed Adjustment" that would depend on the volume or amount of "Managed Receivables" as of February 20, 1998. In this manner the purchase price Fleet would pay for the Business was set as of February 20. Advanta estimates (and, for the purposes of this motion, Fleet does not dispute) that the amount of the Agreed Deficit was approximately $534.2 million.

FN11. Contribution Agreement § 1.06(a)

Although the purchase price was fixed as of, and the closing would occur on, February 20, 1998, the assets and liabilities of the Business were not actually transferred to Fleet until the end of that month, i.e., February 28, 1998. The reason is that the accounting difficulties of a mid-month closing led the parties to agree that Advanta would not actually transfer the

Not Reported in A 2d
Not Reported in A 2d, 2001 WL 1333405 (Del Ch )
(Cite as: Not Reported in A.2d)

assets and general liability accounts of the Business to Fleet until February 28  To document which assets and liabilities were actually transferred on February 28, Advanta agreed to deliver to Fleet a pro forma balance sheet of the Business (the "Closing Balance Sheet") "as of the close of business on February 28, 1998 "  Thus, although the transaction "closed" on February 20, the Closing Balance Sheet would present a financial picture of the Business as if the closing had occurred at month-end

FN12. *Id* § 1 06(f)

The critical feature of the Closing Balance Sheet is that if it showed that the liabilities actually transferred to Fleet exceeded the assets that were transferred to Fleet by more than the Agreed Deficit, Advanta would compensate Fleet either by reassuming the "excess liabilities" or by wiring funds to Fleet in the amount of the excess liabilities

FN13. *Id* § 1 06(l)-(n)

**\*3** That feature of the Closing Balance Sheet is critical to the parties' dispute because the main area of contention between them is whether Advanta's draft of the Closing Balance Sheet was prepared in accordance with Schedule 1 06(g) to the Contribution Agreement

> FN14. The parties agree that the Closing Balance Sheet was to be prepared in conformity with the provisions of Schedule 1 06(g), which addressed certain items that were to be included on the Closing Balance Sheet

During the three-month interval between the October, 1997 Contribution Agreement and the February 20, 1998 closing, the parties identified certain to-be-transferred accounts that had not been originally identified when the Contribution Agreement was first executed  Exhibit A to Schedule 1 06(g) ( "Exhibit A") was the record of the parties' effort to identify those accounts that were used in Advanta's consumer credit card business and were to be included on the Closing Balance Sheet  As reflected in Section 1 06(f) of the Contribution Agreement. the parties intended that that account identification would continue even after the closing

FN15. Section 1.06(f) states that:
> The Estimated Closing Balance Sheet shall be reviewed by [Advanta] on February 23, 1998 and on March 16, 1998 to determine if the Company Transferred Liabilities should be adjusted to more closely approximate the Company Contributed Assets and the Agreed Deficit; to the extent that an adjustment is appropriate, taking into account the then available information, the adjustments shall be made by adding and subtracting Company Transferred Liabilities

The overall principle governing which accounts would be included on the Closing Balance Sheet was that those account(s) would reflect the Business "as of  February 28, 1998 "  That is, the Closing Balance Sheet was to be a snapshot of the Business as of that date

FN16. *Id*

During the interim period between the February 20 closing and the February 28 transfer of assets and liabilities. Fleet funded the Business's assets and liabilities, as the Contribution Agreement required  On February 28, the accounts of the Business, including those that were used to track Fleet's interim period funding, were transferred to Fleet. Advanta did not, however, include those interim period "tracking" accounts on its draft of the Closing Balance Sheet.

Because of its importance to the issues presented on these motions, the process by which Fleet funded the Business during the interim period is next discussed in some detail.

B  Fleet's Interim Period Funding Of The Business

During the February 20-28 interim period, Fleet had legal title to the assets and liabilities of the Business. Fleet was also obligated to fund those assets and liabilities, primarily by advancing cash to pay the vendors for the services or goods sold by credit card  All told, during the interim period, Fleet provided about $444 2 million in funding, while Advanta continued to operate the Business

1  *Fleet's Funding of Credit Card Receivables*

© 2006 Thomson/West  No Claim to Orig  U S  Govt  Works

Not Reported in A 2d
Not Reported in A 2d, 2001 WL 1333405 (Del Ch )
(Cite as: Not Reported in A.2d)

During the interim period, Fleet provided $412 6 million to fund the growth of the Business's "credit card receivables" arising from new purchases, balance transfers, and cash advances by customers Fleet did this by wiring the funds to First Data Resources, Inc , a third-party processor of credit card transactions. The result was an increase in the amount of receivables (assets) that were transferred to Fleet on February 28, 1998

> FN17. The parties initially anticipated that Advanta would continue to fund the growth in credit card receivables and pay off maturing liabilities during the interim period Shortly before closing, however, Advanta informed Fleet that this funding could be construed as a commercial loan, in violation of Advanta's charter Gavin Dep (August 30, 2000) at 38:24-39:15 Advanta agreed to pay interest on the average of all amounts provided by Fleet to fund the assets and liabilities that Advanta contributed to the Business Contribution Agreement § 1 07(c)

During the interim period, Advanta customers were also paying off their credit card balances, which had the effect of decreasing the Business's receivables Advanta used the same bank account to deposit customer payments from *all* aspects of its business, as it had done before February 20 As a result, Advanta's customer payments from Advanta's overall operations, including those unrelated to the Business, became commingled with the payments by credit cardholders that were related to the Business The latter would be due to Fleet; the former would not Advanta attempted to determine which portion of those commingled funds belonged to Fleet and ultimately, wired to Fleet $225 8 million representing collections of credit card payments during the interim period

> FN18. Fleet claims that Advanta still owes it $36 9 million in credit card payments Advanta does not address this point in its brief

*4 To track Fleet's interim period receivable funding, as well as the customer payments being forwarded to Fleet from Advanta, the parties used Wire Suspense Account No 152265 (the "Wire Suspense Account") When Fleet wired money to fund customer purchases or cash advances, the Wire Suspense Account would

be credited; and when Advanta repaid Fleet for any credit card payments by customers, that Account would be debited During the interim period, Fleet funded approximately $412 million in receivables, which meant that $412 million was credited to the Wire Suspense Accounts During that same period, Advanta forwarded $209 million in customer payments to Fleet, which meant that $209 million was debited to that account as a result

> FN19. Account No 152265 previously existed as a dormant account on Advanta's general ledger

> FN20. After February 28, Advanta wired to Fleet and additional $16 million in customer credit card payments.

On February 28, the Wire Suspense Account was transferred to Fleet, together with the other assets of the Business. Because the amount of Fleet's interim funding of the Business exceeded the amount of customer payments by $203 million, the Wire Suspense Account had a negative balance of $203 million at the time it was transferred Had that Account been included (as an asset) on the Closing Balance Sheet, the effect would have been to reduce the total asset amount by $203 million Because the Agreed Deficit was a fixed amount, that meant that Fleet would assume $203 million less in liabilities The Wire Suspense Account was never included on the Closing Balance Sheet, however.

### 2 *Fleet's Interim Period Funding of Maturing Liabilities*

A second kind of interim period funding practice also requires discussion During the interim period, Fleet would deposit the funds in an amount necessary to pay the Business's liabilities that would mature each day For that purpose Fleet established a demand deposit account at Advanta National Bank (the "DDA Account"), and would wire to the DDA Account the funds necessary to pay the liabilities maturing during the interim period

Again, to enable the parties to track Fleet's funding of liabilities arising during the interim period, a suspense account (the "Liability Suspense Account" and together with the Wire Suspense Account, the "Suspense Accounts") was established. During the interim period, Fleet deposited approximately $31 4 million into the DDA Account at Advanta, and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A 2d
Not Reported in A 2d, 2001 WL 1333405 (Del Ch )
(Cite as: Not Reported in A.2d)

Page 5

Advanta paid out $31 4 million from that Account to fund the Business's liabilities. Each and every payment that Advanta paid from the DDA Account was reflected by an offsetting entry to the Liability Suspense Account. As of February 28, 1998, the Liability Suspense Account had a negative balance of $31 4 million. If that Account had been included on the Closing Balance Sheet, Fleet would have had to assume $31 4 million less in liabilities from Advanta. That ($31 4) million Liability Suspense Account was not reflected on the Closing Balance Sheet, however.

The foregoing facts are material to the treatment of these Suspense Accounts on the Closing Balance Sheet, which is the major issue of contention on this motion. Additional issues are also presented on these motions, but the facts that pertain to them are set forth in those sections of this Opinion to which those facts are pertinent.

## II THE CONTENTIONS, ISSUES, AND PROCEDURAL STANDARD

### A The Contentions And Issues

#### 1 Fleet's Motion for Summary Judgment on *Counts IX and III through v of the Complaint*

*5 In Count IX of its complaint, Fleet claims that it paid to Advanta (in the form of assumed liabilities) $126 million more than Fleet had contracted to pay to acquire Advanta's credit card business. Fleet claims that Advanta breached the Contribution Agreement by not refunding that overpayment to Fleet. Of that $126 million claim, $97 2 million is at issue on this motion.

Counts III through V of Fleet's complaint allege alternative theories of recovery: conversion, unjust enrichment, and money had and received. Those Counts rest on the same facts that are the subject of Fleet's Count IX contract claim. Because the Court concludes that Advanta breached the Contribution Agreement, and that Fleet is entitled to contract damages under Count IX, it does not reach or address the claims alleged in Counts III through V.

To understand the Count IX related issues presented by Fleet's motion, a somewhat more detailed description of the Fleet and Advanta transaction is helpful. Fleet's acquisition of Advanta's credit card business was structured so that Fleet would purchase

the Business by assuming liabilities whose value exceeded the value of the assets that Fleet would be acquiring. The amount of "excess liabilities" Fleet would assume is equal to the "Agreed Deficit," which was fixed as of February 20, 1998. The core circumstance that generated the problems leading to this lawsuit is that although the Agreed Deficit was fixed as of February 20, 1998, the assets and liabilities of the Business were not transferred until February 28, 1998. The eight day interim period between the "closing" and the actual transfer of assets and liabilities required a mechanism to enable the parties to ascertain whether the net liabilities Fleet actually assumed on February 28 equaled the Agreed Deficit. The mechanism the parties selected was, as the amended Contribution Agreement provides, the "Closing Balance Sheet." To the extent that the excess of assumed liabilities over transferred assets (the "net liabilities") was greater than the Agreed Deficit, then Advanta would either re-assume the excess net liabilities or compensate Fleet in the appropriate amount.

Between February 20 and February 28, 1998 (the interim period), Fleet owned and funded the Business, but Advanta continued to operate it. The parties sharply dispute whether certain transactions relating to the Business, that took place during the interim period, should have been reflected on the Closing Balance Sheet. That disagreement is what generates the two principal issues that drive Fleet's Count IX breach of contract claim: (i) the "Interim Period Funding" issue and (ii) the "Balance Sheet Adjustment" issue, both of which are next summarized.

#### a. *The Interim Period Funding Issue*

Of the $97 2 million claimed on this motion, $78 7 million turns on the resolution of the "Interim Period Funding" issue. That issue, succinctly expressed, is whether the accounts that were used to track Fleet's funding of the Business's receivables and maturing liabilities during the interim period should have been included on the Closing Balance Sheet. Had those accounts been included, the result would be that Fleet would assume fewer liabilities, and to that extent would pay less for the Business than had the interim period accounts not been included.

*6 Fleet contends that the Contribution Agreement requires those accounts to be included on the Closing Balance Sheet; Advanta argues the contrary. In Part III of this Opinion, I conclude that the plain language

Not Reported in A 2d
Not Reported in A 2d, 2001 WL 1333405 (Del Ch )
(Cite as: Not Reported in A.2d)

of the Contribution Agreement requires that those accounts be included on the Closing Balance Sheet The legal consequence of that ruling is that Fleet paid more for the Business than it contracted to pay, and as a consequence, Fleet is entitled to summary judgment on its claim for the overpayment

Fleet contends that it is entitled to recover $78 7 million in damages on its Count IX claim. Fleet arrived at that amount by making corrections to Advanta's third draft of the Closing Balance Sheet, primarily by valuing the "Managed Receivables" as of February 28. 1998 Advanta contends that the correct valuation date is February 20. not February 28 The present record is insufficiently developed for the Court to decide that issue Accordingly, the precise amount of damages to which Fleet is entitled must await a trial

### b The $12 6 Million Balance Sheet Adjustment Issue

The remaining $12 6 million of Fleet's breach of contract claim relates to other adjustments to the Closing Balance Sheet that Fleet contends are required If these adjustments are made, the effect would be that Fleet would assume $12 6 million fewer liabilities and therefore pay $12 6 million less for the Business

> FN21. Fleet is also claiming that the net transferred liabilities exceeded the Agreed Deficit by an additional $5 9 million, apart from the Interim Period Funding and Balance Sheet Adjustment issues As with the Interim Period Funding issue, I am unable to determine that damages claim until after trial

At this stage. only $3 4 million of the $12 6 million remains in dispute; moreover, Advanta does not seriously contest that it owes Fleet that $3 4 million amount Accordingly, I conclude that Fleet is contractually entitled to have those adjustments made to the Closing Balance Sheet, and that the determination of appropriate damages must await a trial

> FN22. Advanta alleges that this amount should be offset by amounts that it is owed by Fleet

2 Fleet's Motion for Summary Judgment on Count

### VII, and for Partial Summary Judgment *on Counts III and IV of Advanta's Counterclaim*

#### a *Counts III and IV of Advanta's Counterclaim*

Counts III and IV of Advanta's counterclaim concern Fleet's failure to make remittances on a daily basis to the trustees of certain securitized investment trusts Those remittances were made to fund payments due from the Business to the investors in the securitized trusts Before February 20, 1998, when Advanta was funding those payments, it was required to remit the payments on a daily basis Because those daily payments usually exceeded the amount required to pay the investors, the trustees would normally refund a significant portion of those remittances to Advanta That anticipated refund was accounted for as an asset in the Business's "Due From Trust Account."

During the February 20-28 interim period, Fleet, because of its superior credit rating, was permitted to remit these payments on a monthly, rather than on a daily, basis Advanta claims that Fleet's failure to make these interim period remittances on a daily basis caused the Due From Trust Account balance to be $68 3 million less than it otherwise would have been Advanta further contends that because that $68 3 million would have been reflected as an asset on the Closing Balance Sheet, Fleet would have been required to assume $68.3 million of additional liabilities so that the "net liability" figure would remain equal to the Agreed Deficit Advanta contends that its inability to include that $68 3 million in additional liabilities on the Closing Balance Sheet caused it financial harm.

**\*7** Counts III and IV advance the same grievance, but on alternative grounds. In Count IV, Advanta claims that by failing to make these payments on a daily basis, Fleet breached its fiduciary duty and was unjustly enriched. In Count III, Advanta seeks an accounting from Fleet to remedy that alleged breach of duty

Advanta has not pursued its Breach of Fiduciary Duty and Accounting claims on this motion. Accordingly, the only issue presented is whether Fleet was unjustly enriched by its failure to make daily remittances In Part IV of this Opinion, I conclude that Fleet was not unjustly enriched by that practice, and that therefore, Fleet is entitled to summary judgment dismissing Counts III and IV of Advanta's counterclaim insofar as those Counts relate to the Due From Trust Account

© 2006 Thomson/West No Claim to Orig. U S Govt Works.

Not Reported in A 2d
Not Reported in A 2d, 2001 WL 1333405 (Del Ch )
(Cite as: Not Reported in A.2d)

motions.

#### b  *Count VII of Advanta's Counterclaim*

Count VII of Advanta's counterclaim alleges that Fleet breached a Human Resource Assumption Agreement and the Contribution Agreement by failing to make payments allegedly owed to several former Advanta employees who became Fleet employees when Fleet purchased the Business Fleet has settled the claims of all those employees except Mr Jeffrey Denton Because the record discloses disputed material facts regarding that claim, Fleet's motion for summary judgment on Count VII of Advanta's counterclaim must be denied

#### B  The Applicable Procedural Standard

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law In deciding a Rule 56 motion, the Court must view the evidence in the light most favorable to the nonmoving party, and accept all undisputed factual assertions made by either party as true

> FN23. Ch Ct R 56(c); *Mentor Graphics Corp v Quickturn Design Systems. Inc*. Del Ch C A No 16584, mem op. at 7, Jacobs V C (October 9, 1998); *see also Gilbert v. El Paso Co.,* Del.Supr., 575 A.2d 1131. 1142 (1990); *Brown v. Ocean Drilling & Exploration Co,* Del.Supr., 403 A.2d 1114, 1115 (1979)

> FN24 *Mentor Graphics.* mem op at 7 (citing *Brown.* 403 A.2d at 1115).

As the party moving for summary judgment, Fleet has the initial burden to establish the absence of any genuine issue of material fact The burden then shifts to Advanta to submit controverting evidence If Advanta fails to establish a material factual dispute, and if Fleet establishes that it is entitled to judgment on the undisputed material facts, summary judgment may be granted in Fleet's favor Summary judgment will be denied, however, if "there is any reasonable hypothesis by which the opposing party may recover, or if there is a dispute as to a material fact or inferences to be drawn therefrom." These are the procedural standards to be applied to the claims and counterclaims that are the subject of the pending

> FN25. *Scureman v. Judge.* Del. Ch., 626 A.2d 5, 10 (1992)

> FN26. *Feinberg v. Makhson,* Del Supr., 407 A.2d 201, 203 (1979)

> FN27. *Seagraves v Urstadt Property Co ,* Del Ch , C A No 10307, mem op. at 7, Jacobs V C (April 1, 1996) (citations omitted)

#### C  The Structure Of This Opinion

The legal analysis that follows comes in two parts. Part III of this Opinion addresses Fleet's motion for summary judgment on Counts III, IV, V, and IX of its complaint. Fleet's primary claim, advanced in Count IX, is that Advanta breached the Contribution Agreement with Fleet.

> FN28. As earlier noted, Counts III, IV and V advance alternative theories of recovery based on the same facts and conduct as Count IX.

Fleet has also moved for summary judgment dismissing portions of Counts III and IV, and all of Count VII, of Advanta's counterclaim That latter motion is addressed in Part IV of this Opinion

### III PARTIAL SUMMARY JUDGMENT ON COUNT IX OF FLEET'S COMPLAINT

*8 Count IX of Fleet's complaint asserts a claim for $126 million Fleet's partial summary judgment motion seeks judgment for $97.2 million of that larger amount Of this $97.2 million claim, $78.7 million turns on question of whether the accounts used to track Fleet's $444.2 million of interim period funding were required to be reflected on the Closing Balance Sheet (the "Interim Period Funding" issue). The remaining $12.6 million of that claim turns on the question of whether certain other balance sheet adjustments were contractually required (the "Balance Sheet Adjustment" issue) Those issues are separately addressed

#### A  The Interim Period Funding Issue

© 2006 Thomson/West No Claim to Orig U S Govt Works.

Not Reported in A 2d                                                                        Page 8
Not Reported in A.2d, 2001 WL 1333405 (Del Ch )
(Cite as: Not Reported in A.2d)

It is undisputed that the contracted-for purchase price for Advanta's Business was Fleet's assumption of net liabilities equal to the $534 million Agreed Deficit During the February 20-28 interim period, Fleet expended significant monies to operate the Business, even though the assets and liabilities of the Business were not transferred to Fleet until February 28 Fleet claims that it is contractually entitled to be credited on the Closing Balance Sheet for that interim period funding, and that as a result it is entitled to recover $78 7 million. Advanta's position is that Fleet's interim period funding is not contractually required to be credited on the Closing Balance Sheet

Having considered to the parties' contentions and the undisputed facts, I conclude that (i) Fleet's position is compelled by the plain language of the Contribution Agreement, and (ii) in all events, the contemporaneous conduct of Advanta's employees, together with admissions made in their affidavits and depositions, establish that Advanta understood that Fleet was to be credited with that funding

1 The Plain Language and Logic of the Contribution Agreement Dictate that the Closing Balance *Sheet Should Reflect Fleet's Interim Period Funding*

To reiterate, the Agreed Deficit, which essentially was the net purchase price for the Business, was determined by Advanta to be about $534 2 million. Thus, Fleet agreed to pay for the assets of the Business by assuming $534 2 of excess liabilities

> FN29. For the purposes of this motion for summary judgment, Fleet does not dispute this figure

Because the Agreed Deficit was set as of February 20, and the assets and liabilities comprising the Business were not transferred to Fleet until February 28, the parties needed a mechanism to ensure that the amount by which the liabilities actually transferred exceeded the assets actually transferred, was equal to the Agreed Deficit. As earlier noted, that mechanism was the Closing Balance Sheet. Section 1 06(f) of the First Amendment to the Contribution Agreement required Advanta to deliver a Closing Balance Sheet of the Business *as of February 28, 1998,* that would confirm that the excess of transferred liabilities over transferred assets equaled the Agreed Deficit. Section 1 06(f) also contemplated that post-closing adjustments might have to be made to the Closing Balance Sheet in order to assure that the net liabilities

assumed by Fleet did not exceed the Agreed Deficit.

*9 Thus, after the closing the parties would review the assets and liabilities actually transferred to Fleet, and would adjust the Closing Balance Sheet to reach the Agreed Deficit as the Contribution Agreement required    Because the Suspense Accounts were *actually* transferred to Fleet on February 28, 1998, Section 1 06(f) of the Contribution Agreement required that those Accounts be included on the Closing Balance Sheet Although Advanta asserts the contrary, there is no evidence that the parties intended otherwise.

> FN30 Section 1 06(1) of the Contribution Agreement provides that, "[i]f the value of the Company Transferred Liabilities over the Company Contributed Assets as reflected on the Closing Balance Sheet exceeds the Agreed Deficit, then the Company shall pay to [Fleet] ... the amount of such excess "

a *The Plain Language and Logic of the Agreement Requires the Inclusion of the Suspense Accounts on the Closing Balance Sheet*

Advanta's contrary argument runs as follows: Exhibit A to Schedule 1 06(g) constitutes the exhaustive list of all accounts that are required to be included on the Closing Balance Sheet. Because the Suspense Accounts are not listed on Exhibit A, the Contribution Agreement does not require that the Closing Balance sheet reflect Fleet's interim period funding. A "plain-language" reading of the Contribution Agreement and Schedule 1 06(g) thereto, however, compels that Advanta's argument be rejected

Schedule 1 06(g) states that:
The assets will *include* all assets in the general ledger accounts included in the September 30, 1997 Pro Forma Balance Sheet and such accounts listed in Exhibit A hereto.... A schedule with explanations of any new or deleted accounts will be supplementally provided with the statements

> FN31. Contribution Agreement at Schedule 1 06(g)(II)(1) (emphasis added)

Schedule 1 06(g) provides that the accounts listed on Exhibit A are to be "included" on the Closing

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 1333405 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 9

Balance Sheet. That Schedule does not state, however, that the Exhibit A listed accounts are the *only* accounts that may be included. Indeed, Schedule 1.06(g) requires that the Closing Balance Sheet be accompanied by "[a] schedule with explanations of any new or deleted accounts" -a requirement that would be meaningless if there could be no "new or deleted" accounts.

FN32. *Id.*

To hold that Exhibit A constitutes the exclusive list of Closing Balance Sheet accounts would also bring Schedule 1.06(g) into conflict with Section 1.06(f), which mandates that the Closing Balance Sheet reflect the Business as of February 28. Under Advanta's interpretation, Schedule 1.06(g) would permit the inclusion in the Closing Balance Sheet of *only* those accounts listed on Exhibit A-whether or not they were relevant to or impacted the Business *as of February 28.* During the interim period, transactions occurred that affected the Business as of February 28, such as the payment of maturities and funding of receivables. The plain language and logic of Section 1.06(f) dictate that those interim period transactions must be included on the Closing Balance Sheet to reflect the Business accurately as of February 28.

Advanta's assertion that Exhibit A was meant to be the definitive final list of the *only* accounts that could appear on the Closing Balance Sheet is also belied by the manner of Advanta's own preparation of the Closing Balance Sheet. On that Balance Sheet Advanta included various accounts that were *not* listed on Exhibit A. Mr. David Weinstock, Advanta's Chief Accounting Officer and Vice President of Investor Relations, submitted an affidavit stating that the accounts listed on the Closing Balance Sheet that are not listed on Exhibit A "have no impact on the final Closing Balance Sheet because I have adjusted their value [to zero]," or because those accounts netted to zero. Mr. Weinstock goes on to say, however, that the accounts on the Fourth Draft of the Closing Balance Sheet are from Exhibit A or "as *otherwise agreed by the parties.*" This statement necessarily concedes that Advanta recognized that Exhibit A was not the final, determinative list of accounts whose inclusion on the Closing Balance Sheet was required.

FN33. Fleet contends that more than fifty accounts on the Fourth Draft of the Closing

Balance Sheet were not listed in Exhibit A, including the Wire Suspense Account having a zero balance.

FN34. Weinstock Aff. ¶ 4.

FN35. *Id.* ¶ 8 (emphasis added).

FN36. Furthermore, Mr. Ernest L. Ten Eyck, Advanta's expert witness on the preparation of the Closing Balance Sheet, testified that accounts should be included on the Closing Balance Sheet if the Contribution Agreement shows that the parties intended for the accounts to be included, even if the particular account numbers were not listed in Exhibit A. Ten Eyck Dep. (June 26, 2001) at 178:3-179:17. Advanta contends that much of this testimony concerning the parties' understanding of the documents is inadmissible parol evidence. I conclude otherwise. See *infra.* Part III(A)(2) for that discussion.

*10 Advanta also argues that including accounts not listed on Exhibit A would constitute a legally impermissible amendment to Exhibit A, because any amendment to the Contribution Agreement must be in writing. That argument fails, because I have earlier concluded that Exhibit A is not the definitive statement of the universe of accounts whose inclusion on the Closing Balance Sheet was required. Therefore, the inclusion of accounts which were not listed in Exhibit A cannot operate as an "amendment" to the Contribution Agreement.

FN37. Contribution Agreement § 9.03.

FN38. Fleet points out that it is unclear when Exhibit A was finalized. It appears to have been finalized at least two days *after* the First Amendment was signed.

Even if the Court were to conclude that Schedule 1.06(g) is ambiguous as to whether the Suspense Accounts must be included on the Closing Balance Sheet, the result would be the same. The logic of the Contribution Agreement itself leads to the same bottom line conclusion that Fleet paid more for the Business than was contractually required.

During the interim period, Fleet, as it was contractually obligated to do, funded the Business's

Not Reported in A 2d
Not Reported in A 2d, 2001 WL 1333405 (Del Ch )
(Cite as: Not Reported in A.2d)

receivables  As a result, the assets of the Business's balance sheet increased by the amount of that funding  Fleet's interim period funding was reflected on the Closing Balance Sheet as an additional asset account of about $203 million   To assure that the net liabilities on the Closing Balance Sheet would equal the Agreed Deficit, Advanta added $203 million of additional liabilities to the Closing Balance Sheet  The problem is that Advanta did not include the Suspense Account that had an offsetting negative balance of $203 million that was used to track that funding  Had that Suspense Account been added to the Closing Balance Sheet, the result would have been a zero (0) increase in assets  Therefore, no (0) increase in liabilities would have been warranted  Because of that omission, Fleet was required to pay $203 million (in assumed liabilities) more for the Business than Fleet had contracted to pay  Similarly, because the Contribution Agreement obligated Fleet to fund maturing liabilities during the interim period, Fleet paid approximately $31 4 million into a Demand Deposit Account established at Advanta National Bank  The funds in that DDA were used to pay liabilities of the Business as they matured during the interim period  Fleet's obligatory payment of those liabilities during the interim period does not entitle Advanta to include $31 4 million in additional liabilities on the Closing Balance Sheet, because that would cause Advanta to receive consideration for the Business above and beyond what the parties had contracted for  The amended Contribution Agreement provides that the purchase price would be the Agreed Deficit, not the Agreed Deficit *plus* the liabilities Fleet funded during the interim period

FN39. Fleet funded the receivables in the approximate amount of $412 6 million

FN40. Fleet Br  At 10, 15  Advanta does not dispute that as the receivables were funded, the assets to be transferred to Fleet increased by the amount of that funding

FN41  Of the $412 6 million, approximately $209 million was wired to Fleet from Advanta, and that amount was debited to the Wire Suspense Account

2  The Contemporaneous Evidence Establishes that Advanta Understood that Fleet Would *be Credited for the Interim Period Funding*

Apart from the language and logic of the Contribution Agreement, contemporaneous documents and the deposition testimony of key Advanta employees establish that Advanta understood that Fleet's interim period funding should be reflected on the Closing Balance Sheet, and that Fleet should be given credit for that funding  Before this contemporaneous evidence is discussed, the Court must first address Advanta's contention that that evidence is inadmissible under Pennsylvania's parol evidence rule

FN42. Section 11 06 of the Contribution Agreement provides that it is governed by Pennsylvania law

*11 Under Pennsylvania law, "the fundamental rule in construing a contract is to ascertain and give effect to the intentions of the parties  [which]  must be ascertained by the document itself, if its terms are clear and unambiguous "  The courts may not rewrite the parties' contract "or give it a construction *in conflict* with the accepted and plain meaning of the language used."    Advanta argues that the contemporaneous evidence is inadmissible because the "parties' dispute begins and ends within the four corners of their signed, integrated contracts-the Contribution Agreement and the First Amendment," with which the contemporaneous evidence conflicts  Advanta misapprehends Fleet's position  Fleet is not seeking a construction that conflicts with the parties' contract  Rather, Fleet relies on the contemporaneous evidence to establish the parties' understanding of a term whose meaning is apparent from the Contribution Agreement and the First Amendment thereto-that Fleet is entitled to Closing Balance Sheet credit for its interim period funding

FN43. *Sun Co. v. Pennsylvania Turnpike Comm'n.,* Pa. Commw., 708 A.2d 875, 878 (1998) (citations omitted)

FN44. *Steuart v. McChesney,* Pa.Supr., 444 A.2d 659, 662 (1982) (quotations and citations omitted) (emphasis added)

FN45. Advanta Opp. Br. at 44 (citing *Steuart,* 444 A.2d at 662).

The Pennsylvania rule does not bar that evidence for a second reason: rule excludes only evidence that would require the courts to rewrite the parties' contract  In this case the Court has already concluded that the plain meaning and the logic of the amended Contribution Agreement require that Fleet

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 1333405 (Del.Ch.)
(Cite as: Not Reported in A.2d)

be credited with its interim period funding on the Closing Balance Sheet. At most, Advanta might argue that the contractual terms are ambiguous. but even if that were so, parol evidence would be admissible to clear up the ambiguity. For these reasons, Advanta's parol evidence argument must be rejected.

FN46. *Steuart,* 444 A.2d at 662; *Spatz v. Nascone,* Pa.Super. 424 A.2d 929 (1981)

FN47. *See Sun Co.,* 708 A.2d at 878 ("A determination of whether a contract is ambiguous is a question of law.") (citations omitted)

FN48. *Id.* at 878 (Where ambiguity exists in the contract, parol evidence is admissible to explain, clarify or resolve the ambiguity, irrespective of whether the ambiguity is created by the language of the agreement or by extrinsic collateral circumstances.") (citations omitted)

Advanta's internal documents and the testimony of its employees show that Advanta understood that Fleet would receive credit for its interim period funding and that the Suspense Accounts would be reflected on the Closing Balance Sheet. That evidence is consistent with this Court's reading of the Contribution Agreement, and is not materially controverted.

FN49. Advanta attempts to dispute the contemporaneous evidence, principally by undercutting the credibility of Ms. Natalie Prosper, the accountant at Arthur Andersen who concluded that Advanta had a $31 million accrual on its books (from Fleet's interim period funding of liabilities). Ms. Prosper determined that that accrual should be paid to Fleet. Advanta characterizes Ms. Prosper as a junior level staff accountant and it asserts that the accrual documented by her is erroneous. But Advanta presents no evidence that anyone as Advanta disagreed with her characterization of the accrual. In fact, it was Advanta that appears to have originally made the accrual. Ms. Prosper's role was to draft a memorandum concerning the accrual based on information given to her by Advanta.

John Calamari, Advanta's Vice President of Finance, Controller, and Chief Accounting Officer, stated that the Wire Suspense Account was used to guarantee that "if Fleet funds growth in receivables, they need to receive credit so they don't pay twice." Mr. Calamari acknowledged that the Fleet Liability Suspense Account was used to ensure that, "If Fleet funds deposit maturities, they need to receive credit so they don't pay twice. Once @ 2/20/98 and again at 2/29/298 when the liabilities are transferred in the LLC Balance Sheet."

FN50. Fleet Exh. 21 at ADVR1003318

FN51. *Id*

Mr. Calamari also prepared a memorandum describing Advanta's draft closing procedures. In that memorandum, which was distributed to Fleet personnel shortly before the closing, Mr. Calamari recognized that the Closing Balance Sheet would offset, dollar for dollar, any increase in credit card receivables during the interim period, and that that receivables funding would be reflected on the Closing Balance Sheet.

FN52. Fleet Exh. 38 at 54843; *see also* Calamari Dep. (Nov 8, 2000) at 110:2-9 (confirming the offsetting entry in that memorandum). Advanta asserts that Mr. Calamari's views are inconsistent with the Contribution Agreement, but provides no evidence to back up the assertion. Advanta Opp. Br. at 33. In addition, Advanta asserts that Mr. Calamari changed his views on whether Fleet should receive credit for its interim funding. But again, Advanta cites no record evidence to support its *ipse dixit* that Mr. Calamari has since changed his views.

*12 The record shows that Advanta was aware that it had realized approximately $78 million of excess gain on the transaction. As of March 31, 1998, Advanta had backed $223 million out of its transaction gain account. In October of 1998, Mr. Calamari performed an analysis that revealed that Advanta had accrued about $78.6 million on its books for its final settlement with Fleet. After backing out partial settlements previously made to Fleet, $77.1 million remained accrued on Advanta's books at the year-end 1998. That amount is almost exactly what Fleet claims it is owed by Advanta.

Not Reported in A 2d                                                                           Page 12
Not Reported in A 2d. 2001 WL 1333405 (Del Ch )
(Cite as: Not Reported in A.2d)

FN53. Fleet Exh 13 (Prosper Exh 2A) at A-02377A; Butz Dep. (Aug. 21, 2000) at 270:15-24

FN54. Fleet Exh 13 at A-023778A; Fleet Exh 14 at ADVR1033722: *see also* Fleet Br at 13

In addition, Ms Donna Butz, who prepared Advanta's transaction gain account, concluded that Advanta had booked over $77 million in that account. Arthur Andersen, Advanta's auditor, also concluded that as of the end of 1998 there was a balance of over $77 million in Advanta's transaction gain account That $77 million balance was in excess of the Agreed Deficit

FN55. Prosper Dep (May 15. 2000) at 45:13-16

FN56. *Id* at 66:16-22; Fleet Exh 13 at A-02378A

Lastly, John Lafferty, Arthur Andersen's engagement partner on the Advanta audit team, testified in his deposition that:
the assets related to [the] consumer credit card business were removed from [Advanta's] ledger and the liabilities were removed ... and the net impact of that removal was an excess of liabilities transferred over assets    A portion of that credit was deemed to be gain and was recorded in 1998

FN57. Lafferty Dep (Sept 7. 2000) at 151:12-20

Advanta argues that those gains were merely a "contingency reserve" created to reflect the parties' dispute over the proper amount of net excess liabilities Citing Court of Chancery Rule 56(c), Advanta then argues that "information regarding a party's litigation reserves are not appropriate for resolution of summary judgment because such information is irrelevant to the evaluation of a party's claims and would not even be admissible at trial " This argument fails because Advanta has not shown that those "backed out" funds were litigation reserves. Advanta adjusted its "gain" on the transaction long before it learned that Fleet was claiming that those amounts were owed to it

Within one month of the February 28 transfer of assets, Advanta determined that it might have excess gain, and backed out about $223 million out of its transaction gain account to make the gain equal to the Agreed Deficit After adjusting those amounts for partial settlements with Fleet, $77.1 million remained on Advanta's books. There is no evidence of record that that was done with litigation in mind.

FN58. Advanta Opp. Br at 39

FN59. Fleet Reply Br at 24

FN60. Fleet Exh 13 (Prosper Exh 2A) at A-02377A; Butz Dep (Aug. 21, 2000) at 270:15-24.

In sum, the plain language and the logic of the Contribution Agreement, and the testimony of, and contemporaneous evidence generated by, Advanta employees, establish that Fleet is contractually entitled to receive credit for its interim period funding on the Closing Balance Sheet Because that credit was not received, Fleet paid more for the Business than it had agreed to pay under the amended Contribution Agreement Accordingly, Fleet's motion for partial summary judgment for breach of contract on Count IX of its complaint will be granted

### 3 *The Damages Issue*

*13 The final Count IX issue concerns the damages to which Fleet is entitled by the entry of partial summary judgment in its favor. Fleet contends that it is entitled to $78.7 million in damages, based on a report prepared by Robert Swegle of Ernst and Young, which calculated that in addition to the Suspense Accounts. an additional $139 6 million adjustment should have been made to the Closing Balance Sheet That $139.6 million adjustment is based on "corrections" Fleet made to Advanta's third draft of the Closing Balance Sheet Fleet contends that account items falling within the definition "Managed Receivables" should have been valued, for Closing Balance Sheet purposes, as of February 28. Advanta disagrees, contending that they should have been valued as of February 20 For the reasons next discussed, the record does not permit the determination of the amount of damages at this stage

FN61. Mr Swegle's firm (Ernst & Young)

Not Reported in A 2d                                                                    Page 13
Not Reported in A 2d, 2001 WL 1333405 (Del Ch )
(Cite as: Not Reported in A.2d)

was hired by Fleet to render an expert opinion regarding the accounting of the Fleet's acquisition of the Business

FN62. Simply stated, the cash flows are as follows. Fleet advanced $444 2 million to fund the Business during the interim period Of that amount, Advanta repaid Fleet $225 8 million in the form of wire transfers By correcting the Closing Balance Sheet for mixed dates Fleet determined that there was $139 6 million in "Net Asset Growth," a benefit which Fleet received when the Business was transferred on February 28, 1998 This leaves $78 8 million: the amount Fleet claims that is due from Advanta.

FN63. The Contribution Agreement defines Managed Receivables as:
all consumer credit card receivables owned, managed or serviced by the Company or the Company Contributors under Master Trust I or Master Trust II or under other agreements relating to the securitization of such receivables   or included as part of the Company Contributed Assets
Contribution Agreement § 2 01(bbb)

The critical damages issue is as of what date the Managed Receivables must be valued for Closing Balance Sheet purposes In its earlier Opinion, this Court held that "the Closing Balance Sheet (including all assets and liabilities disclosed thereon) must be valued as of the close of business on February 28, 1998, with the exception of the items referred to in [Section] 1 06(a) [the Managed Receivables]." The January 5, 2000 Opinion did not decide as of what date-February 20 or February 28-the Managed Receivables were to be valued Fleet contends they must be valued as of February 28, 1998 Nor does the Contribution Agreement afford clear guidance as to when the Managed Receivables should be valued

FN64. *Fleet Financial Group v Advanta Corp.* Del Ch , C A No 16912, Jacobs, V C , mem op at 12 (Jan 5, 2000)

FN65. I note, however, that Advanta's draft of the Closing Balance Sheet is inconsistent with its argument that the Contribution Agreement requires the Managed Receivables to be valued as of February 20 On Advanta's draft Managed Receivables appear to be valued as of both February 20

and February 28

Because the record before me does not permit a determination of the valuation date for the Managed Receivables for Closing Balance Sheet purposes, the damages to which Fleet is entitled on its Count IX claim cannot be determined without a trial

B The $12 6 Million of Balance Sheet Adjustments

The remaining $12 6 million portion of Fleet's $97 2 million Count IX claim is next addressed Most of that $12 6 million is now no longer in issue The Third and Fourth Drafts of Advanta's Closing Balance Sheet acknowledge that Fleet is entitled to $7 37 million of the $12 6 million Moreover, Fleet has withdrawn its summary judgment motion as to: (i) the Accrued CFS Account ($662,341), (ii) the accounts relating to Fraud Investigation Items ($282,973), (iii) the Cash Surrender Value Split Account ($59,900) and (iv) the Prepaid Repairs and Maintenance Account ($36,626) Finally, Advanta concedes that Account 152604 should be adjusted in Fleet's favor by $27,376 As a result of the foregoing, approximately $4 19 million remains at issue on this motion For the reasons next stated, I find that Fleet is entitled to recover that amount, and this summary judgment will be granted in Fleet's favor on this claim

1 *Adjustments Relating to Accounts No 152321 and 152336*

Approximately $3 4 million of the $4 19 million disputed adjustments involve the Balance Transfer Inquiry Suspense Account (Account No. 152321) and the Current Payment Inquiry Suspense Account (Account No. 152336) Those Suspense Accounts held balances that were "subject to settlement" at the time of the closing For that reason, those Accounts could not be transferred outright at the closing

*14 Schedule 1 06(g)(II)(1)(d)(3), which governs these accounts, pertinently provides that:
Suspense Accounts (general ledger account number 1523xx) shall include those balances which are aged less than 180 days, subject to subsequent settlement between Fleet and the Company for all items which are charged-off or otherwise unresolved as of the 180th day following the Closing Date, as long as the aggregate amount of such settlement exceeds $250,000

© 2006 Thomson/West No Claim to Orig U.S Govt Works

Not Reported in A 2d
Not Reported in A 2d, 2001 WL 1333405 (Del Ch )
(Cite as: Not Reported in A.2d)

Page 14

Both sides agree that these Accounts have aged more than 180 days and that the amounts involved exceed $250.000 Also. Advanta does not dispute that the amounts held in these accounts are owed to Fleet Rather, Advanta appears to argue that those amounts must be offset by $37 million that (Advanta claims) it overpaid to Fleet  Advanta has made no serious effort to support that offset claim and therefore, Fleet is entitled to summary judgment on the remaining ($4 19 million) portion of its claim  The propriety of any offsets claimed by Advanta must be determined at trial

FN66. Advanta also implies that there may need to be additional settlement amounts, but does not provide any evidence as to these amounts, nor does Advanta even specify what other settlements might be at issue  Advanta Opp  Br  at 51

FN67. Advanta contends that after the close of discovery in this case, it determined that Fleet received from Advanta an additional $37 million in cash collection without giving Advanta credit on the Closing Balance Sheet  Id  at 22-24  This motion is the first time that Advanta has claimed this specific setoff  Advanta did not plead this amount as a setoff, nor did it assert any claim for that setoff in its counterclaim or in any correspondence with Fleet  This claim comes too late to be considered on this motion. and will have to be addressed (if at all) at the trial

### 2  *Prepaid Securitization Transaction Expense Account*

Advanta does not contest Fleet's proposed $848,571 adjustment relating to the Prepaid Securitization Expense Account  Accordingly, Fleet is also entitled to summary judgment on that portion of its claim as well

### IV  FLEET'S MOTION FOR SUMMARY JUDGMENT DISMISSING CERTAIN COUNTS OF ADVANTA'S COUNTERCLAIM

Having decided Fleet's motion for summary judgment on the specific affirmative Counts of its complaint, I next consider Fleet's motion for summary judgment on certain Counts of Advanta's counterclaim.

### A  Counterclaim Counts IV (Breach Of Fiduciary Duty) And III (Accounting Of Fleet LP)

Counts III and IV of Advanta's counterclaim allege that Fleet failed to make daily remittances (to the securitized trusts) of interest payments received on securitized credit card accounts  As a result, Advanta claims, the "Due From Trust Account," (which represented the amounts Advanta expected to be refunded to it from the daily remittances), was $68 3 million less than it should have been  For the reasons discussed below, Fleet's motion for summary judgment dismissing those portions of Counts III and IV that relate to Advanta's claim for $68 3 million is meritorious and will be granted

### 1  *Advanta's Count IV Unjust Enrichment Claim*

Count IV of Advanta's counterclaim pleads unjust enrichment  For Advanta to prevail on a claim of unjust enrichment  it must prove an "unjust retention of a benefit to the loss of another ... against the fundamental principles of justice or equity and good conscience."  Advanta's claim for unjust enrichment must fail because Advanta has not shown how Fleet's failure to make daily remittances to the trustees was in any legal or equitable sense "unjust," or that Fleet was "enriched" as a result.

FN68. *Fleet Corp. v. Topps Chewing Gum, Inc.,* Del.Supr., 539 A.2d 1060, 1062 (1988) (citations omitted).

A brief factual description of the circumstances underlying this claim will suffice to make the point. Advanta "securitized" its consumer credit card receivables by pooling those receivables into securitized trusts  Interests in the anticipated principal and income of those trusts were then sold to institutional investors  Advanta was responsible for remitting the amounts received on the securitized accounts to the trustees, to provide the trustees with funds with which to pay the investors.

**\*15** Because Advanta had a low credit rating, it was required to remit payments to the trustees on a daily basis  Fleet had a far better credit rating, and therefore, it was not required to remit these payments on a daily basis  Rather, Fleet was allowed to make the payments monthly

© 2006 Thomson/West  No Claim to Orig  U S  Govt  Works.

Not Reported in A.2d                                                                                    Page 15
Not Reported in A.2d, 2001 WL 1333405 (Del.Ch.)
(Cite as: Not Reported in A.2d)

As a general practice, Advanta deposited customer payments into a PNC account (which appears as an asset on the Closing Balance Sheet). Those deposits were then swept into Advanta's Fed Account, and a portion of that Account was paid daily to the trustees. These daily remittances generally exceeded the amount that was actually needed to pay the investors. As a result, Advanta would normally be refunded the excess portion of those remittances. The portion that Advanta anticipated would be repaid was booked in Advanta's "Due From Trust Account."

Advanta has abandoned its claim that it was illegal or inequitable for Fleet to remit these payments on a monthly rather than a daily basis. Instead, Advanta is reduced to claiming that the *effect* of that change in payment practice harmed it to the extent of $68.3 million-the amount Advanta says should have been reflected in the Due From Trust Account. That is, Advanta now claims that (i) the Due From Trust Account should have had a $68.3 million balance, and (ii) because that balance represented an asset, Fleet should have assumed $68.3 million of additional liabilities. Stated differently, Advanta contends the Due From Trust Account should have been reflected on the Closing Balance Sheet so that Advanta could then add another $68.3 million in liabilities that Fleet would be required to assume. What Advanta overlooks, however, is that because those monies were *not* being paid to the trustees on a daily basis, the Business's cash account would have been $68.3 million higher on the Closing Balance Sheet. Thus, the change in remittance practice had no Closing Balance Sheet impact; therefore, in no event could Advanta have been damaged by Fleet's remittance practice.

> FN69. Advanta contends that the payments for the Due From Trust Account should not have come from a cash account of the Business, but from the $225 million in two separate customer payments that it wired to Fleet, one on February 27, 1998, and on March 2, 1998. Fleet responds (correctly) that the Wire Suspense Account was the appropriate mechanism by which these payments to Fleet could be tracked. Because I have previously held that the Wire Suspense Account should be included on the Closing Balance Sheet, that conclusion credits Advanta for the amount it wired to Fleet on February 27, and offsets the amount Advanta claims it is owed from the Due

From Trust Account.

### 2. Count IV (as it Relates to Fleet's Alleged Breach *of Fiduciary Duty*) and Count III of Advanta's Counterclaim

Count IV is a restatement, on alternative grounds, of the claim previously discussed (and rejected) immediately above. Advanta claims that because Fleet failed to operate the Business in its ordinary course (that is, by not making *daily* remittances to the trustees), Fleet breached a fiduciary duty owed to the Business, thereby causing the assets on the Closing Balance Sheet to be materially understated. Count III seeks an accounting by reason of that breach.

Advanta has now abandoned its claim that the change in remittance practice to the securitization trusts constituted a breach of fiduciary duty. In its brief Advanta concedes that it "has no beef with the change in practice [of remitting payments to the securitization trust] itself; Advanta's claim is based on the *effect* of the change-enrichment of Fleet at Advanta's expense-not the identity of the decision-maker." That concession establishes that Fleet was not "unjustly" enriched (or, for that matter enriched at all), and entitles Fleet to summary judgment dismissing Advanta's counterclaim against Fleet in Counts III and IV.

> FN70. Advanta Opp. Br. at 20.

### B. The Employment Contract Issue

**\*16** As earlier noted, Fleet has settled the claims of all but one of the former Advanta employees who are the subject of Count VII of Advanta's counterclaim. The only claim not settled is that of Mr. Jeffrey Denton. Accordingly, Count VII will be dismissed as to those employees other than Mr. Denton. With respect to Mr. Denton's claims, I will deny Fleet's motion for summary judgment on Count VII of Advanta's counterclaim insofar as it relates to him.

The basis for the claim is that Advanta offered its senior executives, including Mr. Denton, additional compensation if they remained at Advanta during the reorganization process. That offer is embodied in the "Company Letter Agreement" between Fleet and Advanta, which relevantly stated that:
In the event of a change of control of the company ... you will receive a bonus of 200% of your base salary. This will be paid out in two parts ... after the transaction takes place, and after you offer to remain

Not Reported in A 2d
Not Reported in A 2d, 2001 WL 1333405 (Del Ch )
(Cite as: Not Reported in A.2d)

employed in your present position by Advanta, or any successor company, during that year.

> FN71. Denton Aff at Exhibit A (the "Company Letter Agreement")

In the Contribution Agreement, the parties agreed to split the costs associated with that contractual undertaking

> FN72. Contribution Agreement § 6 08(b)(7), (c)(2)(ii)

Advanta claims that Mr Denton offered to remain at Fleet in a position commensurate with his position at Advanta, but Fleet rejected Denton's offer As a result. Advanta contends. Mr Denton's responsibilities at Fleet were greatly diminished and amounted to a constructive demotion Unwilling to accept a demotion. Mr Denton resigned

Fleet responds that Mr Denton left the company of his own volition, and that because the Letter Agreement required the employee to stay on for one year, Fleet is not obligated to pay the balance of Mr Denton's stay bonus

Because this claim rests on disputed facts and disputed interpretations of the Contribution Agreement and the Letter Agreement, Fleet's motion for summary judgment on Count VII of Advanta's counterclaim, insofar as it relates to Mr Denton, will be denied

## V CONCLUSION

For the reasons previously set forth, Fleet's motion for partial summary judgment is granted as to Count IX of the complaint, with the amount of damages to be determined after trial This Court makes no ruling on Fleet's motion for summary judgment as to Counts III, IV, and V of its complaint Fleet's motion for summary judgment dismissing Counts VII and III and IV (in part) of Advanta's counterclaim is granted as to Counts III and IV Fleet's motion is also granted as to Count VII, insofar as Count VII relates to the claims of former Advanta employees other than Mr. Denton With respect to the claim of Mr Denton, Fleet's motion as to Count VII is denied IT IS SO ORDERED

Del Ch ,2001
Fleet Nat. Group, Inc v. Advanta Corp.
Not Reported in A 2d, 2001 WL 1333405 (Del Ch )

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U S. Govt Works.

LEXSEE 1994 US DIST LEXIS 20531

**IN RE: CONTINENTAL AIRLINES, et al., Debtors. AD HOC COMMITTEE OF CTA BONDHOLDERS, Appellant, v. CONTINENTAL AIRLINES, INC., et al., Appellees.**

**C.A. No. 93-252-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*1994 U.S. Dist. LEXIS 20531*

**June 8, 1994, Decided**

**SUBSEQUENT HISTORY:** Appeal dismissed by, in part, Appeal denied by, in part *Ad Hoc Comm of CTA Bondholders v. Continental Airlines, Inc. (In re Continental Airlines), 1995 U.S. Dist. LEXIS 22119* (D. Del., Mar. 16, 1995)

**PRIOR HISTORY:** [*1] Bankruptcy Nos. 90-932 through 90-984.

**COUNSEL:** R. Stokes Nolte, Esquire, of Bailey & Wetzel, P.A., Wilmington, Delaware; Lewis S. Rosenbloom, Esquire, and Dean C. Gramlich, Esquire, of McDermott, Will & Emery, Chicago, Illinois; attorneys for appellant.

Laura Davis Jones, Esquire, and Robert S. Brady, Esquire, of Young, Conaway, Stargatt & Taylor, Wilmington, Delaware; and Richard P. Schifter, Esquire, and Brian P. Leitch, Esquire, of Arnold & Porter, Washington, D.C.; attorneys for appellees.

Neil B. Glassman, Esquire, and Dale R. Dube, Esquire, of Bayard, Handelman & Murdoch, Wilmington, Delaware; Robert J. Rosenberg, Esquire, and Bennett J. Murphy, Esquire, of Latham & Watkins, New York, New York; attorneys for the Post-Effective Date Committee of Unsecured Creditors of Continental Airlines, Inc. et al. (successor to the Official Committee of Unsecured Creditors of Continental Airlines, Inc., et al.)

Henry E. Gallagher, Jr., Esquire, and Arthur S. Connolly, III, Esquire, of Connolly, Bove, Lodge & Hutz, Wilmington, Delaware; Thomas D. Goldberg, Esquire, of Day, Berry & Howard, Stamford, Connecticut; attorneys for IBM Credit Corporation.

Norman L. Pernick, Esquire, [*2] of Prickett, Jones, Elliot, Kristol & Schnee, Wilmington Delaware; attorneys for the Pension Benefit Guaranty Corporation.

Adam C. Harris, Esquire, of O'Melveny & Myers, New York, New York; attorneys for the Estate of Eastern Air Lines, Inc.

**JUDGES:** Sue L. Robinson, District Judge

**OPINIONBY:** Sue L. Robinson

**OPINION:**

### MEMORANDUM OPINION

Dated: June 8, 1994

Wilmington, Delaware

Sue L. Robinson, District Judge

This matter is before the Court for disposition of the motion for approval of settlement filed by appellees, Continental Airlines, Inc. and 52 affiliated companies which, in late 1990, filed Chapter 11 petitions in the United States Bankruptcy Court for the District of Delaware. n1 This motion comes approximately one year after confirmation of Debtors' Chapter 11 plan of reorganization, and several months after substantial consummation of same. The motion is opposed, inter alia, by various members of a class of creditors who, under the terms of the settlement agreement, would be required to relinquish their right to certain funds being distributed under Debtors' reorganization plan. n2 These funds are to be paid to appellant, the Ad Hoc Committee of CTA Bondholders [*3] ("Ad Hoc Committee"), in exchange for appellant's agreement to abandon this and other related litigation. For reasons that follow, the motion will be denied.

n1 Appellees are collectively referred to herein as "Debtors."

n2 These opposing creditor parties are: IBM Credit Corporation ("IBM Credit"); the Pension Benefit Guaranty Corporation ("PBGC"); and the Chapter 11 Estate of Eastern Air Lines, Inc. In addition, the Post-Effective Date Committee of Unsecured Creditors of Continental Airlines, Inc., et al. (successor to the Official Committee of Unsecured Creditors of Continental Airlines, Inc., et al.) (the "Post-Effective Date Committee"), which represents Debtors' unsecured creditors, also has appeared in opposition to this motion. These four parties are collectively referred to herein as the "Settlement Opponents."

## I. FACTUAL AND PROCEDURAL BACKGROUND

Debtors filed their Chapter 11 petitions for reorganization on December 3, 1990. The Bankruptcy Court, following an eight day trial, [*4] entered the Confirmation Order approving the Debtors' Joint Plan of Reorganization (the "Plan"). n3 Under the Plan, Air Canada, Air Partners and other entities (the "Investors") agreed to infuse a $ 450 million investment into the reorganized Debtors ("NewCal") in exchange for approximately two-thirds of NewCal's common stock and other valuable consideration. The remaining one-third fraction of New-Cal common stock and some cash assets are to be made available to satisfy the allowed claims of various unsecured creditors of the Debtors.

n3 The term "Confirmation Order" refers to the Bankruptcy Court's April 16, 1993 "Findings of Fact, Conclusions of Law and Order Confirming the Debtors' Revised Second Amended Joint Plan of Reorganization, as Modified, Under Chapter 11 of the United States Bankruptcy Code, and Granting Related Relief."

The Plan creates, pursuant to what has been referred to as the "Pooling Settlement," four "pools" constituted by groups of closely-related Debtors and their respective assets and [*5] liabilities. Each pool contributes all of its assets to NewCal, the reorganized Debtor. Additionally, each of the four pools receives a portion of the stock and cash allocated for payment of unsecured creditors. The apportionment of that stock and cash to the four pools is determined, under the terms of the Plan, according to the relative value of the assets contributed by each pool.

Therefore, classes made up of Continental debtors which had lesser relative debtloads and greater relative assets received greater relative apportionments of stock and cash under the Plan. It appears, for example, that Class 16 creditors realized a recovery of nearly $ 50 on-the-dollar of their claims while Class 14 creditors realized only about $ .05.

The record indicates the Pooling Settlement was necessitated by several factors, chief among them being the need to consolidate the Debtors into a single corporate entity and to satisfy or discharge the claims of unsecured creditors of the Debtors' estates with only one type of common stock, as required by the Investors. The Pooling Settlement resolved disputes regarding, inter alia, the following: (1) the proper valuation of the assets and liabilities [*6] of each Debtor company; and (2) various prepetition and postpetition intercompany claims. In the proceedings below and in this appeal, the Ad Hoc Committee challenged the Pooling Settlement as legally impermissible, arguing the law does not permit complete consolidation of assets into one entity without consolidating all creditors/liabilities in the same fashion. That is, the Ad Hoc Committee challenged the Plan's creation of the four creditor pools and the "disparate" allocation of value to those pools.

The Plan also provides for the release of certain claims against various non-debtor individuals and entities, including officers and directors of the Debtors, the official committees and their members, and the Debtors' professional advisors. In addition, these same entities and individuals receive the benefit of an indemnity provision under the Plan, with Debtors serving as the indemnitor. In the Bankruptcy Court proceedings and in this appeal, the Ad Hoc Committee challenged the Plan's release provision, contending the mandatory, non-consensual release of claims against non-debtor parties is legally impermissible.

On January 8, 1993, the Bankruptcy Court issued an order approving [*7] the Debtors' Disclosure Statement describing, inter alia, the Pooling Settlement. Thereafter, majorities of each class of unsecured creditors, as well as ninety-six of one-hundred classes of secured creditors, voted to accept the Plan. The Ad Hoc Committee, a group of Continental Airlines Holdings, Inc. bondholders collectively owning approximately $ 9 million in bonds, filed various objections to the Plan. n4 On April 16, 1993, the Bankruptcy Court overruled those and other objections and entered the Confirmation Order approving the Plan.

n4 It is undisputed that most of the bonds held by the Ad Hoc Committee's members were

purchased at deep discounts after Debtors filed their Chapter 11 petitions.

On April 20, 1993, the Ad Hoc Committee brought this appeal to challenge, inter alia, the Bankruptcy Court's Confirmation Order. Appellant filed an emergency stay motion with the Bankruptcy Court seeking a stay of distributions under the Plan. The motion was denied. Appellant then filed a stay motion with [*8] this Court. On April 23, 1993, Chief Judge Longobardi denied the motion. Appellant filed a second stay motion in this Court, which Chief Judge Longobardi denied on April 27, 1993. On May 7, 1993, appellant appealed this Court's denial of its stay motion to the United States Court of Appeals for the Third Circuit (Appeal No. 93-7332). n5 The parties successfully obtained a limited remand of the Third Circuit stay appeal to this Court for disposition of the instant motion for approval of settlement.

n5 Appellant also filed an Application for a Writ of Mandamus seeking to compel Chief Judge Longobardi to stay all distributions pending the outcome of this appeal. The Third Circuit denied appellants' mandamus application on July 7, 1993.

Consistent with denial of appellant's stay motions and in reliance on the court orders permitting implementation of the Plan to go forward, Debtors consummated a series of transactions contemplated by the Plan. On June 28, 1993, Debtors moved the Bankruptcy Court for an order approving [*9] initial distributions to Debtors' general unsecured creditors. The Bankruptcy Court granted the motion on July 29, 1993. The Initial Distribution Order permitted a substantial distribution to each of the four classes or pools of unsecured creditors and established a Disputed Claims Reserve for each of the classes.

As of September 15, 1993, nearly 100% of the total stock and cash NewCal was authorized to distribute pursuant to the Initial Distribution Order already had been distributed to unsecured creditors. n6 NewCal stock has been approved for trading on the New York Stock Exchange and, it appears from the record, shares are being traded actively on today's market. n7

n6 This Court issued an order on September 9, 1993 directing the participants to this appeal to file fact submissions regarding whether the Plan had been substantially consummated and whether the commencement of distribution had occurred.

See *In re Cantwell, 639 F.2d 1050, 1053 (3d Cir. 1981)* (appellate court may receive factual information regarding mootness and record on appeal is properly supplemented with facts arising after appeal is filed since "facts bearing on the issue of mootness can be raised at any time during the judicial proceedings").

[*10]

n7 Because Debtors have emerged from bankruptcy and reorganized into a single new entity, NewCal, the legal status of Debtors and their distinctiveness from NewCal is unclear at best.

On October 29, 1993, after completion of briefing, the Court scheduled oral argument on this appeal for November 11, 1993. Although the Ad Hoc Committee raised several arguments on appeal, the Court instructed the parties only to "be prepared to address the issue of whether the Bankruptcy Court's confirmation of a reorganization plan containing mandatory, non-consensual releases of non-debtors was erroneous." (D.I. 18)

On or shortly before November 10, 1993, the parties to this appeal informed the Court they had reached a tentative settlement agreement, and jointly moved for continuance of oral argument in order to finalize and obtain Bankruptcy Court approval of the agreement. (D.I. 19) The Court granted the parties' request for continuance. During the following two months, the parties provided status reports indicating they were continuing to seek Bankruptcy Court approval of the settlement agreement. (D.I. [*11] 20; D.I. 21) The latter of these reports informed the Court that several parties filed objections to the motion, and that a previously-scheduled hearing on the matter had been continued, but not rescheduled. Included among the objections to the settlement motion was the assertion that the Bankruptcy Court lacked jurisdiction to authorize Debtors to enter into the settlement due to the pendency of the appeals in this Court and the Third Circuit.

On February 18, 1994, the parties filed the instant motion for approval of settlement. (D.I. 22) In their motion, the parties explained they "believe that the Bankruptcy Court does have jurisdiction [over this matter]; however, in view of the concurrent jurisdiction in bankruptcy of this Court (of which the Bankruptcy Court is an adjunct), and in order to avoid unnecessary litigation of the jurisdictional issues, Continental is currently circulating a Stipulation dismissing its motion for approval of the settlement from the Bankruptcy Court, and the parties now seek approval of such settlement from this Court." (D.I. 22 at 4-5)

Appended to the settlement motion filed in this Court were various motion papers and objections filed previously [*12] in the Bankruptcy Court. In their motion (D I  22 at 5), the parties concluded by requesting "that this Court grant this motion to approve the proposed settlement, and enter as 'so ordered' the accompanying order and stipulation of settlement, in settlement of this litigation " n8 Subsequently, two of the objecting parties filed sur-reply briefs in further opposition to the settlement motion. On May 17, 1994, the Court heard oral argument on the motion to approve settlement. n9 Appearing at argument, in addition to both parties to this appeal (the proponents of the settlement), were settlement opponents the Post-Effective Date Committee, IBM Credit Corp , and the PBGC.

n8 On March 3, 1994, the Court "so ordered" the motion to approve settlement  At that time, because of the unusual procedural circumstances of this case and by virtue of the unusual presentation of the dispute over the settlement, the nature of this proceeding was unclear. The Court's approval was subsequently withdrawn (D.I  25 at 2), and no legal significance can be attributed to this aspect of the proceedings.

n9 In the order scheduling oral argument (D.I  36), the Court addressed the issue of whether the moving parties provided adequate notice of their motion for approval of settlement. (See D I  25; D I  30; D I  31; D I  32; D I  33; D I  34; D I  35) The Court concluded that adequate notice was given and, in addition, that "the interests of parties (potentially) affected adversely by approval and implementation of the settlement agreement are adequately represented by the parties which received notice and appeared to oppose the same." (D.I  36 at 1) In any event, the Court's denial of the motion for approval of settlement would appear to moot the notice issue.

[*13]

## II. DISCUSSION

The Settlement Opponents are included among the parties who would be required--under the terms of the settlement agreement itself--to fund the payment of value to members of the Ad Hoc Committee in exchange for the Ad Hoc Committee's agreement to dismiss this appeal and the related Third Circuit stay appeal n10 Debtors/NewCal have not offered to settle this matter with use of their own funds, but instead sought to finance this settlement with value (in reserves) allocated under the

Plan to holders of Class 16 allowed claims. Settlement Opponents are creditors placed in Class 16 under the Plan, a class constituted by creditors of System One Holdings, Inc. n11

n10 As noted above, the parties to this appeal obtained a limited remand of the Third Circuit stay appeal to this Court for disposition of this settlement matter.

n11 The Post-Effective Date Committee, representing all unsecured creditors of the Debtors, also opposes the settlement.

The settlement agreement contemplates [*14]  payment of 40,000 shares of NewCal stock to the Ad Hoc Committee. n12 Under the terms of the agreement, the stock distributed to appellant's members would come "from the reserve fund for the payment of disputed claims and allowed claims of Class 16 creditors, and the amounts of such common stock which shall be Class A and Class B common stock, respectively, shall be the product of the percentage each such class bears to the whole of the Class 16 reserve and 40,000 " (D.I  22, settlement agreement at 7) Around the time the settlement motion was filed in the Bankruptcy Court, these 40,000 shares were estimated to have a market value of between $ 800,000 and $ 1,000,000. It was calculated the three creditors opposing the settlement would suffer an approximate reduction in recovery of over $ 500,000, with IBM Credit losing about $ 335,000, PBGC losing about $ 135,000, and the Estate of Eastern Airlines losing at least $ 75,000. At argument, it was estimated the market value of the 40,000 NewCal shares had declined to about $ 600,000, with the value of the reduction in opponents' recoveries diminishing by a proportionate amount.

n12 The agreement provides that "the Debtors shall cause to be distributed, pursuant to instructions provided by the Ad Hoc Committee, a total of forty thousand (40,000) shares of common stock of NewCal ...to the individual members of the Ad Hoc Committee " (D I  41, settlement agreement at 7)

[*15]

In addition to asserting the settlement agreement is neither fair, reasonable, nor warranted, the Settlement Opponents raise several legal arguments in support of their position. The first such argument is that the settlement impermissibly modifies the Plan after confirmation and substantial consummation thereof, and implementa-

tion of the agreement would breach Debtors' binding obligations under the Plan.

The Bankruptcy Code contains specific provisions governing debtor modifications of a confirmed plan of reorganization. In particular, the Code provides the following substantive and procedural limitations on plan modifications:

> The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title. Such plan as modified under this subsection becomes the plan only if circumstances warrant such modification and the court, after notice and a hearing, confirms such plan as modified, under section 1129 of this title.

*11 U.S.C. § 1127*(a).

Settlement **[*16]** Opponents contend, inter alia, that because the confirmed Plan has been substantially consummated, the modification of the Plan resulting from implementation of the proposed settlement agreement is implicitly precluded by section 1127(a). Moreover, as the Settlement Opponents contend, Debtors have not provided for "notice and a hearing" in connection with the proposed plan modification and have not even acknowledged that a plan modification is sought. Settlement Opponents further argue that Debtors are bound by the terms of the confirmed and substantially-consummated Plan and that, accordingly, Debtors are without lawful authority to take actions contrary to the Plan's express terms. See *11 U.S.C. § 1141*(a) ("the provisions of a confirmed plan bind the debtor").

In responding to these arguments, Debtors do not dispute Settlement Opponents' assertion that substantial consummation of the Plan has occurred. The Court so finds. n13 Debtors contend, however, that compliance with section 1127(a) is not required here because "the proposed settlement does not result in any modification, material or otherwise, to the Plan." (D.I. 22, Exhibit F at 7) It is clear from the record that **[*17]** Debtors have not complied with the procedural requirements of section 1127(a); thus, if implementation of the proposed settlement causes the Plan to be materially altered, there is no basis in law for permitting the relief sought by this motion. n14 The critical question, therefore, is whether implementation of the proposed settlement modifies the Plan.

n13 The record at bar provides an ample basis in fact and law for the conclusion that the Plan has been substantially consummated.

n14 Debtors tacitly concede the motion for approval of settlement should be denied if this Court concludes that implementation of the settlement results in a material modification to the Plan.

Notwithstanding Debtors' assertions to the contrary, it is clear the Plan would be modified by implementation of the proposed settlement. As related above, the settlement proposes to transfer 40,000 shares of NewCal stock, valued between $ 600,000 and $ 1 million (depending on the date of calculation), to the Ad Hoc Committee's members. **[*18]** Under the settlement agreement, the source of these shares would be "the reserve fund for the payment of disputed claims and allowed claims of Class 16 creditors... " The Plan itself, however, expressly provides that each holder of a Class 16 allowed general unsecured claim "will receive...its Pro Rata Share of 614,517 shares of NewCal Class A Common Stock and 1,484,543 shares of NewCal Class B Common Stock." (Plan § 5.16) Because implementation of the proposed settlement would reduce the number of shares available to holders of Class 16 allowed claims by 40,000 shares, the Settlement Opponents argue the settlement agreement impermissibly seeks to modify this provision of the Plan. n15 The Court agrees.

n15 Debtors contend that by making this argument, the Settlement Opponents are "putting the cart before the horse" because such an argument assumes the Ad Hoc Committee would not prevail on its challenge to the allocation of value under the Plan's Pooling Settlement if this appeal were to go forward. The Court is unpersuaded by Debtors' position.

The issue on appeal is whether the Bankruptcy Court erred in confirming the Plan and overruling the Ad Hoc Committee's objections to the Plan's partial substantive consolidation and pooling scheme; and, if so, what form of effective relief, if any, can be granted at this juncture. Despite Debtors' assertion to the contrary, the issue presently before the Court is very different. Debtors urge this Court to order a post-confirmation, post-substantial consummation modification of the Plan's distribution scheme-- not to remedy any error made below--but to per-

mit Debtors voluntarily to settle appellate litigation through funds dedicated to one class of creditors, as opposed to funds obtained from a universal reallocation of value.

[*19]

The bondholder-members of the Ad Hoc Committee are not holders of allowed Class 16 claims. Accordingly, the express terms of the Plan would be violated by distribution to the Ad Hoc Committee of NewCal shares earmarked solely for pro rata distribution to holders of allowed Class 16 claims. The Court, therefore, concludes that implementation of the proposed settlement would violate the Plan. In the absence of Plan modification, there is no legal basis for such action and, consequently, no authority for judicial approval of the proposed settlement agreement.

Debtors offer several unpersuasive arguments in an effort to salvage the settlement agreement. First, Debtors assert that "no provision of the Proposed Settlement Agreement would change even one word of the Plan." (D.I. 22, Exhibit F at 7) In making this assertion, Debtors miss the point. In the absence of proper modification to the Plan, there is no legal basis for distribution to the Ad Hoc Committee of NewCal shares earmarked solely for pro rata distribution to holders of allowed Class 16 claims. Thus, Debtors' failure to obtain proper Plan modification permitting the redistribution contemplated by the proposed agreement is [*20] precisely the problem here.

Debtors's next argument is that the "proposed settlement is functionally equivalent to the compromise of a disputed Class 16 claim because it provides to individual creditors who believe that they are entitled to share in the value allocated to Class 16, a small portion of such value." (Id. at 8) Debtors further contend that the "Plan fully contemplates that disputed claims will be resolved after substantial consummation of the Plan, and indeed a reserve for disputed Class 16 claims has been established in the amount equivalent to almost $ 50 million of Class 16 claims." (Id.)

The Court is unpersuaded by this theory. It is true the Plan contemplates resolution of disputed claims after substantial consummation. The Ad Hoc Committee members' claims, which were placed in Class 14, were allowed by the Bankruptcy Court and these bondholder-claimants have received distributions under the Plan; therefore, their claims are not the subject of this settlement. Rather, this settlement seeks to resolve appeals challenging the Plan itself. Clearly, the substantial reserves established under the Plan were created for resolution of disputed claims, not settlement of [*21] postconfirmation appeals. n16

n16 Debtors (and the Ad Hoc Committee) repeatedly contend that refusal to approve this settlement will make it too difficult for Chapter 11 debtors to settle post-confirmation appellate challenges to a plan of reorganization. The Court disagrees. First, parties such as these Debtors can establish reserves for resolution of such challenges. Second, Debtors are free at any time to settle this matter with their own money--as opposed to the funds of others.

Debtors further contend that the proposed settlement would at most result in an "immaterial plan modification," and that such changes "are permitted at any time, without resolicitation of creditors." (D.I. 22, Exhibit F at 9) In making this argument, Debtors place considerable reliance on *In re American Solar King Corp., 90 Bankr. 808 (Bankr. W.D. Tex. 1988)*. In Solar King, as Debtors themselves report accurately, the court permitted "a preconfirmation modification of a plan where the effect of the modification was to dilute [*22] recoveries in one class of claims by approximately one percent." (D.I. 22, Exhibit F at 10)

For several reasons, Debtors' reliance on the Solar King case is misplaced. First, the case at bar involves a postconfirmation, post-substantial consummation plan modification, whereas Solar King involved modification of a plan that had not yet even been confirmed. Second, while the court in Solar King apparently was comfortable presuming that "no previously assenting creditor would be motivated to reconsider their vote because of" the small dilution in recovery proposed by the modification at issue there, the same cannot be presumed here--judging from the vehement creditor opposition generated by the proposed settlement. Finally, irrespective of what the court in Solar King may have held, the diversion of approximately $ 600,000 in NewCal stock from the Class 16 creditors (rightfully entitled to share in that value under the Plan) to the Ad Hoc Committee members is not a "ministerial, administrative or immaterial Plan amendment." (D.I. 22, Exhibit F at 9) Debtors' assertion that the proposed settlement would result in nothing more than an immaterial plan modification must fail. [*23] For the reasons stated, the Court concludes the proposed settlement agreement is legally impermissible.

Even were the Court to conclude otherwise as to the legal permissibility of the proposed settlement, it nonetheless is clear the agreement's terms are neither fair nor reasonable, at least from the perspective of the creditors being asked to finance the deal. n17 To justify their contention that the settlement is fair and reasonable to Class 16 creditors, Debtors offer the following reasons: (1)

Class 16 creditors are the creditors who would suffer if the Ad Hoc Committee prevailed on its challenge to the Plan's Pooling Settlement; (2) the diminution in Class 16 creditors' recoveries resulting from settlement implementation is less than fluctuations in value resulting from other factors of which the creditors were aware when voting to accept the Plan; (3) the settlement proposes only a "minuscule reallocation" of value (D.I. 39 at 12); and (4) Class 16 creditors, and all other unsecured creditors sharing one-third ownership of NewCal, are the true beneficiaries of the settlement agreement because it preserves the Plan's release provisions. The Courts finds this reasoning unpersuasive. [*24]

n17 Debtors concede the fairness issue necessarily focuses on whether the settlement would be fair and reasonable from the perspective of Class 16 creditors. Because Debtors/NewCal are not requiring themselves to finance any of the settlement funds being paid to the Ad Hoc Committee, and because Debtors/NewCal obviously receive substantial benefits from the dismissal of this litigation, preservation of the Plan (particularly its release provisions), and other elements of the settlement agreement, the proposed settlement can be described as fair and reasonable to them. Likewise, creditors outside Class 16 generally stand to benefit from the proposed settlement since they incur no costs as a result of approval and implementation of the agreement, but arguably stand to gain from preservation of the Plan in its present form.

As to any purported benefit derived by Class 16 creditors from preservation of the Plan's release provision, Settlement Opponents have explained they are aware of the risks associated with [*25] the Ad Hoc Committee's possible victory on appeal on the release issue and that they are willing to take those risks. Consequently, Debtors cannot expect these Class 16 creditors to finance a settlement aimed at curtailing such risks. Furthermore, the benefits, if any, from diminishment of such risks flow to Debtors/NewCal and to all unsecured creditors sharing in ownership of the airline. n18 Under these circumstances, there is no basis whatsoever for requiring Class 16 creditors alone to pay for those benefits.

n18 If the release provisions were found to be invalid as a matter of law and stricken from the Plan, and if lawsuits against individuals protected by the release provisions were then commenced, Debtors/NewCal (and the creditors now sharing in ownership of the airline) may be forced to incur litigation costs (and possibly to pay judgments or settlements) because of their promise of indemnity under the Plan and their obligations to provide discovery responses in connection with any such actions.

Debtors [*26] further contend Class 16 creditors are not unfairly burdened by the reallocation of value proposed by this settlement because factors independent of the settlement, such as allowance of once-disputed claims or variations in the market price of NewCal stock, caused fluctuations in the value of Class 16 recoveries which would exceed the change in value resulting from implementation of the settlement's terms, and that such creditors voted to accept the Plan with knowledge that such recovery fluctuations might occur. This contention is unconvincing since, as the Settlement Opponents point out, parties voting in favor of the Plan did so on the assumption that Plan reserves would be used solely for resolution of disputed claims, specifically claims placed in the pool connected with any particular reserve fund. Moreover, while parties agreeing to the Plan may have done so with the understanding that their recoveries could be reduced by any number of factors, Debtors' post-consummation use of Plan reserves to settle appellate litigation was not among those bargained-for risks.

Regarding the size of the proposed settlement payment and its relative impact on Class 16 creditors, Debtors' characterization [*27] of the settlement as proposing only a "minuscule reallocation" of value is unavailing. Debtors propose to reallocate at least $ 600,000 in value, with the largest Class 16 creditors being asked to suffer losses between $ 50,000 and $ 200,000. These amounts obviously are not "minuscule" and, judging from the reaction of the Settlement Opponents, are not properly viewed as having an insignificant impact on the recoveries of Class 16 creditors.

Finally, while it is true the Ad Hoc Committee sought reallocation of value through this appeal, nowhere in its appellate briefs did the Ad Hoc Committee request that value be taken specifically away from Class 16 and given to its members. The Ad Hoc Committee's only statement of record regarding use of reserves to effect a reallocation came in a fact memorandum filed in response to this Court's September 9, 1993 order. In its submission, appellant stated: "The Ad Hoc Committee believes that the reserves established by the Debtors are sufficient to effect a reallocation pursuant to a complete substantive consolidation, one of the alternative forms of relief available to the Ad Hoc Committee with respect to the issue on appeal of reallocation of [*28] consideration to Unsecured Creditors." (D.I. 15 at P 8) n19 Therefore, it is not true, as Debtors now suggest, that the Ad Hoc

1994 U.S. Dist. LEXIS 20531, *

Committee sought relief in the form of reallocation of value specifically from Class 16 to members of the Ad Hoc Committee. Rather, the Ad Hoc Committee sought to alter the Plan--completely and fundamentally--by requesting "a complete substantive consolidation" through reallocation of all "reserves established by the Debtors." Thus, the form of relief sought on appeal by the Ad Hoc Committee provides no basis for requiring Class 16 to finance Debtors' settlement of this litigation. Because it is unfair and unreasonable to expect Class 16 single-handedly to pay for Debtors' settlement plans, the motion to approve settlement must be denied. n20

n19 See also D.I. 12 at 2 ("Ad Hoc Committee simply requests that the value allocated to unsecured creditors under the Plan, which has not yet been distributed, be distributed in a non-discriminatory manner ....").

n20 Debtors' other theories offered as justification for requiring Class 16 to finance this settlement, such as because "that is really where the money is," (D.I. 39 at 13), are without merit and warrant no further discussion.

[*29]

### III. CONCLUSION

For the reasons stated, the Court declines to approve the proposed settlement. An order consistent with this memorandum opinion shall issue forthwith.

## CERTIFICATE OF SERVICE

I, Eric M. Sutty, do hereby certify that on this 26th day of April, 2006, I caused a true and correct copy of the attached **Opening Brief of Appellant, Plan Committee** to be served on the attached service list via hand delivery and electronic mail to local parties and via U.S. First Class mail and electronic mail to all remaining parties.

Eric M. Sutty (No. 4007)

## North Western Corp.

# Service List

Alan W. Kornberg, Esquire
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York   NY   10019-6064

Victoria Counihan, Esquire
Dennis A. Meloro, Esquire
Greenberg Traurig, LLP
Suite 1200
The Nemours Building
1007 North Orange Street
Wilmington   DE   19801

Mark  Kenney, Esquire
Office of the United States Trustee
Suite 2313
844 King Street
Wilmington   DE   19801

Adam G. Landis, Esquire
Kerri K. Mumford, Esquire
Landis Rath & Cobb LLP
919 Market Street
Sutie 600
Wilmington   DE   19801

Dale R. Dube, Esq.
Elio Battista, Jr , Esq.
Blank Rome LLP
1201 Market Street
Suite 800
Wilmington   DE   19801
*Magten Asset Management Corp*

Bonnie Steingart, Esq.
Gary L. Kaplan, Esq.
John W. Brewer, Esq.
Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York   NY   10004

John V. Snellings, Esq.
Francis C. Morrissey, Esq.
Lee  Harrington, Esq.
Nixon Peabody LLP
100 Summer Street
Boston   MA   02110-1832

Kathleen M. Miller , Esq.
David A. Jenkins, Esq.
Smith, Katzenstein & Furlow LLP
800 Delaware Avenue
7th Flr.
P O. Box 410
Wilmington   DE   19899

Phillip Bentley, Esq.
Matthew J. Williams, Esq.
Kramer Levin Naftalis & Frankel
1177 Avenue of the Americas
New York   NY   10036

Steven J  Reisman, Esq
Joseph D. Pizzurro, Esq
Nancy E. Delaney, Esq
Curtis, Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue
New York   NY   10178-0061